977 So.2d 212 (2008)
Reverend C.S. GORDON, Jr., J. Michael Malec, Darryl Malek-Wiley, Willie Webb, Jr., and Maison St. Charles, L.L.C. d/b/a Quality Inn Maison St. Charles
v.
The COUNCIL OF the CITY OF NEW ORLEANS and Entergy New Orleans, Inc.
No. 2005-CA-1381.
Court of Appeal of Louisiana, Fourth Circuit.
February 25, 2008.
Rehearing Denied in Part, Granted in Part April 4, 2008.
*213 J. Kenton Parsons, Luke F. Piontek, Roedel Parsons Koch Blache Balhoff & McCollister, Baton Rouge, LA, Bob F. Wright, James Parkerson Roy, Domengeaux, Wright, Roy & Edwards, Lafayette, LA, Edwin R. Murray, Michael C. Darnell, Murray, Darnell & Associates, L.L.C., Walter C. Thompson, Jr., James M. White, III, Barkley & Thompson, L.C., New Orleans, LA, for Plaintiffs/Appellants.
Clinton A. Vince, Regina Speed-Boost, Orlando E. Vidal, Sullivan & Worcester, LLP, Washington, DC, Walter J. Wilkerson, Wilkerson & Henry, L.L.C., New Orleans, LA, for the Council of the City of New Orleans.
Ewejl E. Eagan, Jr., Marcy V, Massengale, Wendy Hickok Robinson, Phillip J. Arttis, Jr., Gordon, Arata, McCollam, Duplantis & Eagan, L.L.P., J. Wayne Anderson, Matthew R. Suffern, Margot G. *214 Augustin, Entergy Services Inc., New Orleans, LA, for Entergy New Orleans, Inc.
(Court composed of Judge CHARLES R. JONES, Judge DAVID S. GORBATY, and Judge EDWIN A. LOMBARD).
CHARLES R. JONES, Judge.
The Appellants, Rev. C.S. Gordon, Jr., et al, seek review of an adverse district court judgment that affirmed the earlier decision of the New Orleans City Council (hereinafter "the City Council"), a named Appellee, by which the City Council ordered Entergy New Orleans, also a named Appellee, to reimburse ratepayers for alleged Fuel Adjustment Clause (hereinafter "FAC") overcharges, but for only a fraction of the damages actually prayed for by the Appellants. We affirm in part and reverse in part.

FACTS AND PROCEDURAL HISTORY
Entergy New Orleans, Inc. (hereinafter "ENO"), is an electric utility company engaged in the manufacture, generation, transmission, distribution and sale of electric power and energy to residential, commercial, industrial, and governmental customers in the State of Louisiana. ENO is a part of the Entergy Corporation and one of five (5) "Operating Companies"[1] which collectively form an integrated System which is operated pursuant to what is referred to as "the System Agreement."
The City Council is the legislative branch of local government in New Orleans. Its purpose is to enact laws to protect the public health, safety and welfare of the citizens of New Orleans.
Reverend C.S. Gordon, Jr., on behalf of the New Zion Baptist Church, Michael Malec, Darryl Malek-Wiley, Willie Webb, Jr., and Maison St. Charles, L.L.C., d/b/a Quality Inn Maison St. Charles (hereinafter "the Appellants") appealed the February 5, 2004, Resolution of the New Orleans City Council, No. R-04-66, under the administrative adjudicatory proceeding they brought as Plaintiffs for the recovery of alleged overcharges billed to them and all other ratepayers (more than 180,000) by ENO.[2] They also alleged that the overcharges perpetrated by ENO were routinely done at the direction of and with the participation of ENO's parent company, Entergy Corporation, and its unregulated affiliate, Entergy Services, Inc., (ESI), by improperly passing ineligible costs for fuel through a fuel adjustment charge component on its bills for electric service.
The City Council Proceedings[3]
On May 12, 1999, the Appellants filed a complaint with the New Orleans City Council in which they alleged that they, as *215 ratepayers, had incurred or paid, overcharges for electricity service sold by ENG. They further alleged that these charges were incurred or levied by ENO through costs included in its FAC without advance approval from the City Council. In the alternative, the Appellants alleged that the portion of the unapproved items and amounts that were included as purported costs were actually costs which were, not "prudently" incurred, or which did not produce "just and reasonable rates, or which were otherwise improperly included."
The complaint also alleged that Entergy overcharged ratepayers over "$160 million dollars, including interest, through its FAC charges from the period of 1985 through 2001."
Nevertheless, during the City Council proceedings, the Appellants were allowed to submit the written, pre-filed testimony of their experts concerning their respective opinions on Entergy's FAC charges. In response, ENO, the Interveners,[4] and the Advisors of the City Council[5] also submitted pre-filed expert testimony.
After the initial investigation and testimony was reviewed, it was determined that the Advisors of the City Council agreed with the Appellants and recommended that more than $34 million dollars be refunded to the New Orleans ratepayers as a result of ENO's "improper fuel adjustment practices and charges."
An administrative trial was conducted before the City Council's appointed administrative hearing officer, from February 26, 2002, through March 15, 2002. Pursuant to Resolution No. 99-525, the hearing officer's authority was limited to making evidentiary rulings, compiling records of the proceeding, and submitting the record to the City Council for final consideration.
Eventually, the City Council adopted a resolution, but instead of ordering refunds in the amounts recommended by both the Appellants' experts and the Advisors of the City Council, the City Council instead ordered Entergy to issue refunds to the Appellants of a lesser sum. The City Council did not consider ordering repayment of the refunds as recommended by the Advisors of the City Council. The Appellants contend that this action by the Council was arbitrary and capricious.[6]
The Civil District Court Proceedings
In April 1998, the Appellants filed suit in the Civil District Court for the Parish of Orleans against ENO, Entergy, Inc., and a number of Entergy's affiliates,[7] including ESI, alleging imprudent practices and overcharges. They also sought damages, including treble damages for the Appellees' alleged violations of Louisiana antitrust law and other state laws. Specifically, the Appellants alleged that Entergy charged ratepayers more than $190 million dollars, including interest, through its FAC.
After filing their petition, the Appellants also filed a complaint with the New Orleans City Council seeking an administrative remedy against ENO for refunds of alleged overcharges billed through fuel adjustment charges.
*216 From February 26th through March 15th, 2002, the City Council's trial of the administrative proceedings occurred. At trial the Appellants' experts testified that the overcharges resulting from the fuel adjustment charges exceeded $90 million dollars since 1985. The record also indicates that the City Council's own experts also testified that ratepayers were overcharged at least $34,300,000.00, which they too also recommended be refunded. However, by its February 5, 2004 Resolution, the City Council declined to award the, refund of the non-fuel costs that were allegedly passed to ratepayers in the fuel adjustment charge found on ENO's utility bills for electric service. Rather, the City Council adopted Resolution, No. R-04-66 and awarded $7,203,427.00[8] in refunds to ratepayers.
Subsequently, the Civil District Court for the Parish of Orleans, which heard the case pursuant to the Administrative Procedures Act, La. R.S. § 49:950, affirmed the City Council's adoption of the resolution on May 26, 2005,[9] and concluded that:
a. the City Council correctly applied the burden of proof, requiring the plaintiffs to make a showing of a "serious doubt" with regard to allegations of imprudence. Additionally, the District Court held that ENO proved the prudence of his actions;
b. the City Council's decision not to order refunds of SFI Period Costs that were passed on to customers through the FAC was supported by the evidence in the record;
c. the City Council's calculation of a refund in the amount of $1,831,404 plus interest due to ENO's customers relating to what the plaintiffs referred to as "wrongful profits" that were not "trued up" in base rates is supported by the evidence in the record;
d. the City Council's decision not to order a refund of the AECC Energy Adders included in the FAC was supported by evidence in the record;
e. the City Council's calculation of refunds and the amount of $3,957,925 plus interest related to purchases of EPI energy by EAI, was supported by the evidence in the record;
f. the City Council's decision not to order refunds resulting from the System's use of the margin in making power purchases in the wholesale market was supported by the evidence in the record. In addition, the City Council's decision to require ENO to provide an annual analysis of third-party offers to demonstrate that the use of the margin remains an effective tool to secure power at the lowest reasonable cost is supported by the record;
g. the City Council's conclusion that resale of wholesale power to third-party purchasers was not imprudent, and therefore that no refund should be ordered, was supported by the record;
h. the City Council's decision that ENO was not imprudent and not purchasing power for its own account was supported by the evidence in the record;
i. the City Council was not arbitrary or capricious in concluding that the plaintiffs failed to present credible *217 evidence that less expensive power , was available for purchase, and could have been purchased by ENO or the System. The district court found that the evidence in the record supported the City Council's decision; and,
j. the administrative law judge properly denied and the City Council properly affirmed the denial of the plaintiffs motion for judgment on the pleadings.
Additionally, in its written reasons for judgment, the district court indicated "for its reasons for judgment, this [c]ourt adopts the memoranda and argument of Entergy New Orleans, which is supported by the Public Service Commission's finding in Delaney v. Entergy Louisiana, Inc., L..P.S.C. Docket # U-23356."
The Appellants were granted a devolutive appeal on June 13, 2005.
Subsequently, on September 25, 2005, ENO filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Louisiana. On February 14, 2006, the Bankruptcy Court lifted the stay of proceedings in the bankruptcy court in order for this appeal to move forward.
Appellants' Assignments of Error
The Appellants have raised the following four (4) assignments of error:
1. System Fuels, Inc.[10] (hereinafter "SFI") Period Costs: The Appellants assert that the City Council, in violation of its role as adjudicative administrator, erred by invoking "equity" in conflict with positive law, in order to decline the award of refunds of $26,723,918.73, plus interest in, SFI Period Costs that it found were improperly included in ENO's fuel adjustment charges. In the alternative they assert that even if the City Council had any "regulatory" discretion to deny an administrative remedy of refunds of those overcharges, it abused that discretion;
2. Arkansas Electric Cooperative Corporation (hereinafter "AECC") Adders: The Appellants allege that the City Council erred by failing to award refunds of $6,065,151, plus interest, in fixed, predictable base rate costs, called the "AECC Adders," that had been included improperly in ENO's fuel adjustment charges;
3. The Margin: The Appellants allege that the City Council erred by refusing to award $24,400,000 in overcharges, plus interest, which Entergy and ESI caused ENO to impose on ratepayers by use of a so-called "margin"  a fictitious discount to make it falsely appear that affiliate power was cheaper than power available from nonaffiliates;
4. The Appellants allege that the City Council erred in exceeding its administrative adjudicatory authority, and impinged upon the constitutional jurisdiction of the courts, by purporting to comment on issues such as intent, motive, and fraud, which are relevant only to [the Appellants'] legal claims in court against ENO's parent and unregulated affiliates, are outside the Council's jurisdiction, were not the subject of discovery or evidence in the Council Proceeding, and are superfluous to its resolution of [the Appellants'] administrative claims for recovery of overcharges representing costs improperly included in the fuel adjustment *218 component of ENO's bills to customers.
Additionally, the Appellants have raised the following issues for review before this Court:
 Did the City Council violate the dictate of Daily Advertiser v. Trans-La, 612 So.2d 7 (La.1993), and abdicate its duties as administrative adjudicator by failing to award refunds for overcharges flowed through ENO's fuel adjustment mechanism, and caused by ENO's violations of Council rules and orders, fundamental regulatory policy, and law;
 Whether the City Council improperly invoked "equity" in refusing to order refunds of non-fuel, administrative SFI Period Costs improperly placed in the fuel adjustment mechanism and billed to ratepayers;
 And, considering even if the Council had discretion not to order refunds of overcharges (which the Appellant's brief states parenthetically that the Council did not), whether the Council abused that discretion, and acted arbitrarily and capriciously, by refusing to order refunds for ENO's inclusion of fixed predictable, non-fuel costs in the fuel adjustment mechanism, in violation of the Council's own orders. Fundamentally regulatory policy, and positive law, are inconsistent with the Council's ruling on a similar issue in the same proceeding, which ENO did not appeal;
 In refusing to order refunds for overcharges caused by ENO's practice of using a so-called "margin" by fictitiously discounting the price of power offered by its affiliates offers to nonaffiliate offers, whether the City Council improperly failed to apply ENO's burden of proof as a regulated utility, where ENO presented no contemporaneous evidence to prove that the margin was reasonable or saved ratepayers money, where Entergy's own study proved that the margin cause ratepayers to pay higher costs for electricity, and where the City Council order inconsistently that there be a later study to determine if the use of the margin is reasonable.
 Whether the City Council exceeded its jurisdiction, and impinged on the jurisdiction of the court, in making gratuitous "finding" in dicta on pages 19, 38, 44, 47, 51, 55, and 58 regarding ENO's motive, intent or fraud (which the Appellants urge are "issues on which the Council has no special expertise") when such issues were not can could not have been presented to the Council for adjudication; and,
 Whether the City Council's wholly superfluous purported "findings" on intent, motive and fraud are binding on the courts, which will adjudicate Appellants' non-regulatory, state law claims against ENO's parent and unregulated affiliates, who were not parties to the Council proceeding.

LAW AND DISCUSSION
In reviewing the decisions of public bodies . . . the courts will not interfere with the functions of these bodies in the exercise of the discretion vested in them unless such bodies abuse this power by acting capriciously or arbitrarily. Alliance For Affordable Energy v. Council of City of New Orleans, 96-0700 (La.7/2/96), 677 So.2d 424, 434, citing Coliseum Square Association v. New Orleans, 544 So.2d 351, 360 (La.1989); Caz-Perk Realty, Inc. v. Police Jury of Parish of East Baton Rouge, 207 La. 796, 22 So.2d 121 (1945). In Central Louisiana Electric Co. v. *219 Louisiana Public Service Comm'n,[11] 86-1781, 508 So.2d 1361, 1365-66 (La.1987), the Supreme Court re-iterated the standard of review for ratemaking determinations as follows:
While we thus have the power and it is undoubtedly our duty to set aside the rulings of the Commission where we believe them to be clearly wrong on the facts and/or the law, we nevertheless should accord great weight to the rulings of the Commission and should not overturn them in the absence of a clear showing of error. Courts should act slowly in substituting their own views and discretion for those of a body peculiarly constituted to act intelligently in such cases and primarily charged with doing so. Southern Bell Telephone Telegraph Co. v. Louisiana Public Service Comm'n, [239 La. 175] 118 So.2d 372, 378 (La.1960).
Further, we have described our role in the following way. Initially, as the orders of the Commission are entitled to great weight, they should not be overturned absent a showing of arbitrariness, capriciousness, or abuse of authority by the Commission. Secondly, courts should be reluctant to substitute their own views for those of the expert body charged with the legislative function of rate-making. Lastly, a decision of the Commission will not be overturned absent a finding that it is clearly erroneous or that it is unsupported by the record. South Central Bell v. Louisiana Public Service Comm'n, 352 So.2d 964, 968-69 (La.1977); Gulf States Utilities Co. v. Louisiana Public Service Comm'n, 364 So.2d 1266, 1268 (La.1978), and the cases cited therein. Moreover, in Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 437 So.2d 278 (La.1983), we reiterated these principles, stating: "A reviewing court will not substitute its judgment for that of the Commission in fixing public utility rates, and the agency's rate, order will be upheld unless shown to be arbitrary, capricious, abusive of its authority, clearly erroneous, or unsupported by the evidence." Id. at 279.
Pursuant to La.R.S. 45:1176, the Public Service Commission has the power to set "just and reasonable" rates to be charged by public "utility companies in this state. In reviewing the rate-making process, the inquiry therefore is whether the commission acted unreasonably or arbitrarily in setting rates for the utility. South Central Bell v. Louisiana Public Service Comm'n, 352 So.2d 964, 968 (La. 1971 [1977]). Accordingly, the decisive issue in this case is whether or not the commission was arbitrary in denying CLECO's request for a rate increase.
Additionally, in Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, Id., the Supreme Court also reviewed the rate-making methodology of utility companies as follows:
In utility rate^making, the primary objective is to allow the company sufficient revenues to meet its operating expenses, provide its shareholders *220 with a reasonable rate of return, and attract new capital. South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 352 So.2d at 967; Jones, Judicial Determination of Public Utility Rates: A Critique, 54 B.U.L.Rev. 873, 875 (1975). At this level, the utility's revenues are said to produce a "fair rate of return." The legal standard for determining what is a fair rate of return was articulated in two seminal cases: Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) and Bluefield Waterworks & Improvement Co. v. Public Service Comm'n, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). In Bluefield, the Court observed:
What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally. 262 U.S. at 692-93, 43 S.Ct. at 679.
In Hope, the Court reiterated these principles, stating: [r]ates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, . . . 320 U.S. at 605, 64 S.Ct. at 289.
Generalizing, these cases hold the rate-making process rests on a balancing of interests between the investors and the consumers.
The method used to balance the interests of the investors and the consumers is well established. The initial determination that must be made is the utility's future revenue requirement. City of Evansville v. Southern Ind. Gas & Electric Co., 167 Ind.App. 472, 339 N.E.2d 562, 568 (2d Dist.1975). As a guide to such a determination, data is generally gathered from some twelve month period taken as a "test year." Bonbright, Principles of Public Utility Rates, p. 150, n. 7 (1961) (hereinafter "Bonbright"). Customarily, the test year selected is the most recent annual period from which actual operating data is available. The data gathered is then used to calculate the following four variables:
1. The amount of revenues generated under the present rate structure.
2. The operating expenses, including maintenance, depreciation, and taxes, incurred to produce revenues.
3. The rate base, i.e., the value of the property, plant, and equipment, (less accumulated depreciation) which provide the service, and on which a return should be earned.

*221 4. The rate of return, a percentage figure which, when applied to the rata base, will generate revenues sufficient to cover costs and give investors a fair return on their investment.
Comment, Gulf State Utilities, The Public Service Commission, and the Supreme Court: On Raising the Electric Rates, 40 La.L.Rev. 1048, 1049-60 (1980).
These variables are then used to determine the "return" that is available to be distributed to the utility's investors and the "actual rate of return" presently being earned by the utility. The "return" or earnings is equal to the utility's revenues less its operating expenses, exclusive of interest. The ratio of the utility's return to its rate base is equal, to its actual rate of return. Lastly, the Commission must decide whether the utility's actual rate of return is deficient, adequate, or excessive. South Central Bell, 352 So.2d 864 [964], 967 (La.1977). Commission orders that approve rate increases or require rate decreases are generally based on the determination that, given the utility's current earnings, the existing rates will likely yield a deficient or an excessive rate of return in the near future. Bonbright, p. 150, n. 7.
Delaney, et al. v. Entergy
In this Court, both parties argue that the case at bar has issues very similar to another case that was heard before the Louisiana Public Service Commission,[12] *222 Delaney et al. v. Entergy.[13] Further considering that the district court has adopted the LPSC's findings in Delaney and has so stated in its reasons for judgment, we shall closely examine Delaney in our review of this present appeal.
In Delaney, a petition was filed by Plaintiffs including Ms. Delaney and others who sued as representatives of New Orleans ratepayers. The petition requested that the LPSC review the FAC charges of Entergy of Louisiana and to identify and quantify any overcharges that may have occurred beginning in January, 1975.[14]
As a result of the allegations made by the Plaintiffs/ratepayers, the LPSC conducted an independent review of the costs flowed through Entergy's FAC beginning with the period of January 1, 1975, up until the date the complaint was filed with the Public Service Commission.
Through extensive discovery, the LPSC Staff gathered information which it believed warranted further investigation. Entergy, in turn, produced extensive information relating to the Operations under the Entergy System Agreement, affiliate transactions, and the costs included in its Fuel Adjustment Charges. The LPSC Staff also conducted informal meetings with the employees and representatives of Entergy, as well as inspected the dispatch center for the Entergy System, in Woodlands, Texas, and reviewed all FAC filings.
At the close of the lengthy investigation, the LPSC Staff found no facts to support the disallowance or refund obligation by Entergy. The LPSC Staff also found no evidence of or an intention on Entergy's part:"
1. to deceive or harm Entergy ratepayers;
2. to manipulate or abuse Fuel Adjustment Charges;
3. to inflate costs included in the Fuel Adjustment Charges; or
4. to abuse or manipulate system operations.
In May 2000, an Agreement of Settlement in Principle was reached by the LPSC and Entergy. Delaney was eventually decided at an Executive Session on December 13, 2000, via a consent decree. Additionally, Settlement Order U-23356, also incorporated and attached the LPSC's Proposed Findings of Fact and Conclusions of Law into the Order. The Order, which initially sets forth the Commission's original jurisdiction in hearing the type of claims set forth in the Delaney plaintiffs' petition, provides:
1. "Entergy shall refund to its then current LPSC-jurisdictional ratepayers the sum of $72 million dollars (the "Settlement Amount") via a credit to the fuel adjustment clause." The refund was applicable to then current customers who were subject to the fuel adjustment charges at the time of *223 the refund, on a kWh allocation basis. Additionally, the credit would be spread over the months of July, August, and September 2001, subject to accrual of interest on the uncredited amount for those months from the date of the order until the refund is completed at the rate set by the Commission's November 1997 General Order relating to fuel.
2. Entergy "shall include an-adjustment in its 2000 Formula Rate Plan proceeding to reflect a credit to revenues in the FRP[15] calculation for off-system sales of $18,854 for 1997 and $3*567,485 for 1998, which adjustment will result in a credit to customers of $2,276 million..," "plus interest from August 1, 1999."
3. Entergy "shall impute prospectively," beginning with the May 2000 billing month, "the lower price for gas purchased pursuant to the Evangeline gas contract set forth in the proposed findings of Fact and Conclusions of Law" and "[tfiere will be no change in [Entergy']s recovery of the reservation fee and the lease fee charged to [Entergy] the Evangeline contract"
4. "Entergy" will no longer sell the output of its unit to the regulated Entergy Operating Companies through the Power Coordination, Interchange, and Transmission Service Agreement ("PCITA").[16]
5. Entergy shall implement all of the other commitments described in the Proposed Findings of Fact and Conclusions of Law including the implementation of the risk management and documentation plans and submission of the transmission study and the analysis of certain purchase power decision rules.
6. Payment of the Settlement Amount and implementation of the other commitments of Entergy described in the Proposed Findings of Fact and Conclusions of Law shall represent full and final settlement of all amounts due, both as to principle and interest, as a result of the LPSC's reasonableness review of Entergy's FAC filings, and shall be in consideration of the release of any and all claims as issues arising out of or relating to the FAC filings of Entergy from January 1, 1975, through December 31, 1999, except as to the (a) the Evangeline contract and (b) purchased power and associated costs for May 1, through September 30, 1999.
7. Entergy would "be permitted to recover through base rates the prudently incurred costs of litigation associated with this [Delaney] proceeding, including both the costs incurred" by Entergy and the attorney fees and costs incurred by the Staff and properly chargeable to Entergy. However, Entergy will not be permitted to recover any attorneys fees and costs of the Delaney plaintiffs that Entergy may pay to the Delaney plaintiffs or their attorneys.
8. "If, any year, Entergy is required to enter contracts for the purchase of off-system power to meet line anticipated plant loads and a proceeding is initiated to approve the contracts entered, any intervenor shall be entitled, subject to a confidentiality agreement, to discuss the documentation provided to Commission Staff. . . . "

*224 9. The settlement with Entergy Louisiana; Inc., [Docket/Order No. U-23356] concludes the Commission's investigation and the docket shall be dismissed as to all issues that were or could have been raised in this docket. However, the results after exchange of documents and the like, shall be reviewed in a subdocket of this [Delaney] docket.
10. "This order is to become effective immediately."
Additionally, the Order also stipulates that the Findings of Fact and Conclusions of Law, which consists of 382 clauses, be made a part of and adopted into the record. Some of the facts and law set forth by the LPSC include the nature of the complaint raised by the Appellants, as well as other factual determinations (including, but not limited to the following):[17]
 At the time the Delaney matter was heard before the LPSC, Entergy owned a 95% undivided interest in the Grand Gulf Nuclear Power Plant. Additionally, Entergy owned, or was a part owner of ninety (90) generating units at 35 sites throughout Arkansas, Louisiana, Mississippi, and Texas.
 Output  In 1999, it was estimated that Entergy's output was 22,569 MW. This amount included 701 MW of capacity held in extended reserve shutdown.
 What is produced  (1) oil; (2) natural gas; (3) coal; (4) hydroelectric power, and (5) nuclear power.[18]
 In addition to its own generating units, Entergy's Operating Companies along with System Energy Resources, Inc., (SERI),[19] owns, or is part owner of ninety generating units at thirty five sites in the service states.
 Pursuant the FERC-approved Unit Power Sales Agreement (UPSA), the Operating Companies were allocated the following shares of capacity, energy, and costs of Grand Gulf Nuclear Station: EAI  36%; ELI  14%; EMI  33%; and ENO  17%. EGS is not allocated a portion of the Grand Gulf Station's capacity, energy, or costs. (The Federal Energy Regulatory Commission, the "FERC," is an independent agency that regulates the interstate transmission of electricity, natural gas, and oil.)
 Any ability of a competing utility to sell electric energy to an LPSC jurisdictional retail ratepayer of ELI at a particular location arises by reason of rules and restrictions imposed by the regime of regulation existing and enforced by the LPSC during the period in question, including, but not limited to, the 300-foot rule.
As to Entergy's FAC filings, the LPSC Staff also noted:
 FACs for electric utilities have been in use for more than twenty-five (25) years.
 The purpose of FACs are to track changes in the cost of fuel and purchased energy, and thereby to provide for the recovery of fuel costs, which tend, to fluctuate more than cost normally included in base rates.[20]

*225  An FAC is a formula rate., Thus the rate is the formula and not a specific dollar rate. The FAC formula establishes the fuel cost components that can be included comment provides the formula by which the costs are translated into a rate per kilowatt hour. Id.

 An FAC, combined with deferred fuel cost accounting is intended to permit the company to recover the actual allowable cost of fuel, no more and no less, it ensures that customers will pay for actual cost of fuel, no more no less.
 Noting that it has from time to time articulated and applied state policies on the company by company in case by case basis, the Commission indicated that it has also issued general orders related to FAC charges.
 The prices ELI charges and/or may charge its ratepayers for electric service are determined and fixed by the LPSC, and are reflected in the ELI tariffs on file with and approved by the Commission. Those tariffs include an adjustment to ELI's charges in the amount of ELI's monthly FAC charge.
 The LPSC approved other FACs in tariff filings by ELI. The Commission's Order No. 7763, dated February 27, 1959, the Commission approved ELI's request to include an FAC in its tariffs setting forth rates applicable to all domestic, commercial, and small general service customers. During the Delaney proceedings, all of ELI's rate schedules and or tariffs on file with and approved by the Commission include an FAC.
 In a May 26, 1999 Order, Order No. U-23626, the LPSC ordered ELI to realign $60 million from its FAC to base rates on a revenue neutral basis. The aforementioned order followed the LPSC's. General Order No. U-21497, dated November 6, 1997, in which the LPSC defined and in certain respects, changed the types of costs that may be included in the utility's FAC filings.
 Pursuant to requirement imposed by the LPSC, the amounts of ELI's FAC charges are disclosed to the LPSC, its Staff, and ELI's customers. Additionally, by the Commission's General Orders dated July 10, 1975, and November 20, 1975, the LPSC specifically mandated what information, jurisdictional utilities, including ELI, must close on their monthly statements to their customers. By requiring these utilities to make detailed monthly filings, the LPSC makes the components of these charges a matter of public record for any customer to review.
 Under the prudent investment rule, a utility is compensated for all prudent investments at their cost when made, a respective of whether they are deemed necessary are beneficial in hindsight. Does, the focus in the prudent inquiry is not whether a decision produced a favorable or unfavorable result, rather, whether the process leading to a decision was a logical one, and whether the utility company reasonably relied on information and planning techniques known or knowable at the time.[21] The utility must demonstrate that it went through a reasonable decision making process to arrive at a course of action and, given the facts as they were or should of been known at the time, responded in a reasonable manner.
 Capital and other expenditures reflected in utilities' pro forma requests for rate increases are generally accepted by the LPSC as appropriate and *226 necessary, and therefore recoverable expenses. But utilities investments are presumed to be prudent and allowable. However, when the LPSC itself raises serious doubts about the prudence of a particular investment or other expenditures, a searching inquiry becomes necessary, and at that point, the burden shifts to the utility to prove that the expenditure was in fact necessary and appropriate, or resulted in no additional costs. Id.

 The plaintiffs bear the burden of proof to show a "serious doubt" that ELI did not act prudently with respect to any of the costs included in its FAC filings. Id.

 Bare allegations are insufficient to support a claim a of imprudence.
 To the extent that there has been no antecedent reasonableness review of such costs, the LPSC has the authority to disallow costs passed through utility's FAC.[22]
 The LPSC's Staff conducted reviews of ELI's FACs each month concerning the contents of ELI's filings. It has also exercised its right to conduct audits of ELI's FAC filings. Additionally, the LPSC authorized audits of fuel purchases to be conducted by independent nationally recognized certified public accounting firms and has also authorize an outside consultant an outside counsel to review ELI's fuel positions and fuel adjustments.
 The LPSC held hearings to prove the monthly FAC filings of ELI and other jurisdictional electric utilities. By General Order dated April 23, 1975, the LPSC ordered public hearings beginning on a monthly basis regarding the cost figures for fuel and cost figures for purchase power to be applied by means of the cost adjustments. As a result of the order beginning May 1975, ELI presented its FAC filings at such public hearings.
 On September 24, 1991, the LPSC's Secretary advised that while the commission will no longer be conducting monthly FAC hearings, the LPSC "will review each filing a notify the utility of its acceptance or rejection of the filing" and that a consumer or any interested party may request that the LPSC conduct a hearing relating to any such filing.
The Proposed Findings of Fact and Conclusions of Law in the Delaney proceedings also outlines the LPSC's General Orders Nos. U-21497 and U-23626. In Order No. U-21497,[23] the LPSC Staff conducted a generic investigation regarding the FACs of jurisdictional electric utilities. The resulting order revised the format in which FAC filings are to be made, providing for the realignment of certain, costs from FAC recovery to base rates, and establishing certain reporting and other requirements relating to LPSC jurisdictional FACs. The General Order includes a list of the types of costs considered includable and LPSC jurisdictional FAC filings and the types of costs considered to be excludable costs. The realignment of such costs from the utility's FAC to its base rates apply prospectively only, as evidenced by the LPSC's provision that such costs are to be realigned on a revenue neutral basis. Costs can be realigned on a revenue neutral basis only if recovery through base rates is commenced at the same time such costs are removed from *227 the FAC calculation. However, the LPSC Staff noted that the action of ordering the realignment of costs did not, in and of itself, imply that any realigned costs had been improperly recovered through the FAC in prior periods. The Order does, not establish that any particular costs component was improperly included in FAG filings prior to the revenue realignment prescribed by the LPSC's General Order.
Lower of Cost-Market Test
General Order U-23626,[24] as discussed in Delaney, provided that the cost of fuel purchase from affiliates included in the fuel adjustment charge, shall be at the lower of cost or market, unless that fuel is allocated pursuant to a' FERC-approved tariff. If the cost was allocated by a FERC-approved tariff, the utility must include the direct cost of fuel established Joy the FERC. The Order also states that the costs of energy purchased from affiliates included in the FAC charge shall be the lower cost or market.
The LPSC Staff noted that the sale of gas in intrastate commerce has been deregulated, and the FERC does not approve or set tariffs for the sale or allocation of gas or any other fuel in interstate commerce. Additionally, the FERC approves tariffs and contracts for the sale of electric energy and wholesale markets, and the FERC also has sole jurisdiction over the price of energy sold in wholesale markets. Furthermore, all purchases of Entergy by ELI from affiliates are made pursuant to FERC-approved tariffs.
The LPSC Staff added, however, that the lower of costs, or market test, however, would apply to any energy purchased by ELI from any ELI affiliate outside of MSS-3,[25] by the FERC-approved UPSA, and the LPSC's General Order U-21497. The MSS-3 price/charge is not the appropriate price signal to be used to determine whether less expensive power is available for purchase off-system and lieu of System generation of power. Rather, the off-system energy should be compared to the appropriate system lambda[26] or incremental cost,[27] and the off-system power should be purchased by ESI if it can be delivered to the system at a cost below system lambda, or avoided costs, taking into account an appropriate margin used for purposes of making purchase decisions over the applicable time period.
In LPSC Order No. U-23626, the LPSC approved the realignment of costs' proposed by ELI, pursuant to the 1997 General Order. This realignment was implemented prospectively, and on a revenue neutral basis. The costs that were removed from the FAC are now recovered through a per kilowatt hour charge included in a base rate rider. The LPSC noted the fact that certain costs that are currently included in its base rates formerly were included in ELI's FAC charges has not caused any harm to ELI's ratepayers, as these are costs that ELI is and has been entitled to recover from its ratepayers. The LPSC determined that there were no facts to support a claim that any of the *228 costs realigned from ELI's fuel clause to its base rates were unreasonable or excessive.
The LPSC's Staff also maintained the position that the appropriate market test to be applied is whether the Entergy System is utilizing the off-system economy energy market in a reasonable manner in pursuit of its goal to achieve the lowest reasonable costs of energy for the integrated. System.[28] It was also the LPSC Staffs position that if less expensive off-system economy energy were otherwise available, below system lambda or aborted costs as appropriate, that the LPSC has the jurisdiction and reserves the jurisdiction to determine whether allocations pursuant to MSS-3 or the UPSA were prudent, and therefore, to disallow purchases/allocations of such energy and costs to ELI from other Entergy Operating Companies.
However, the LPSC also noted in its findings that the U.S. Supreme Court has stated "[w]ithout deciding the issue, we may assume that a particular quantity of power procure by utility from at a particular source could be deemed unreasonably excessive if lower cost power is available elsewhere, even though the higher costs power actually purchased is obtained at a FERC-approved, and therefore reasonable, price."[29] The Commission noted that the Supreme Court also stated, in a case which specifically addressed the FERC's preemption with respect to the UPSA, that "it might well be unreasonable for a utility to purchase unnecessary quantities of high-cost power, even at FERC-approved rates, if it had the legal right to refuse to buy that power."[30]
Based upon the Supreme Court's cases discussed above, the LPSC stated that it was its Staffs position that it necessarily follows from these [Supreme Court] decisions that although a state commission may not alter a FERC approved rate, it can and should consider the effect on consumers of the utility's choice to pay those rates when lower cost power was available elsewhere.[31] (emphasis added)
The LPSC observed that ELI did not agree with the above-stated principle because ELI did not have the legal right to refuse to purchase energy allocated to it pursuant to a FERC-approved rate schedule such as the UPSA or the System Agreement. ELI's stated position was that federal preemption precludes the LPSC and other state regulators from disallowing costs incurred as a result of allocations of power pursuant to the UPSA or the System Agreement.
The LPSC indicated that while the Supreme Court stated that "it might be reasonable for a utility to purchase unnecessary quantities of high-cost power, even at FERC-approved rates, if it had the legal right to refuse to do buy that power," specifically, in Mississippi Power and Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 373-374, 108 S.Ct. 2428, 101 L.Ed.2d 322 (U.S.1988), the Supreme Court concluded that Mississippi Power & Light (MP & L) did not have the legal right to refuse to buy the power at issue in *229 that case,[32] and stated: "[i]f the integrity of FERC regulation is to be preserved, it obviously cannot be unreasonable for MP & L to procure the particular quantity of high-priced Grand Gulf power that FERC has ordered it to pay for." Id.
The System Agreement[33]
The LPSC also outlined the Entergy System Agreement in its Proposed Findings of Fact and Conclusions of Law. It acknowledged that since the 1930s, the Entergy Operating Companies have operated as a single, integrated system ("the Entergy System" or "the System"). In 1973, FERC[34] approved the System Agreement among ELI and the other Operating Companies in the Entergy System. The System Agreement addressed the allocation of energy among the Operating Companies, and is identical to the most recent System Agreement entered into on April 23, 1982.[35] The System Agreement is among each of the Operating Companies and Entergy Services Inc. (ESI), which is composed of the employees who manage and operate the Entergy System.[36]
The System Agreement governs transactions among electric utility companies located in four states: Louisiana, Arkansas, Mississippi, and Texas. It also governs the allocation of purchases and sales, and associated costs and revenues, among the Operating Companies in the four states. Thus the System Agreement directly and necessarily involves interstate commerce and, more specifically, "the sale of electric energy at wholesale in interstate commerce."[37]
The System Agreement is the responsibility of the Operating Committee, which is comprised of one representative from each Operating Company, and a representative of Entergy Corporation. The daily administration of the System Agreement is carried out by the Entergy Management Organization.
Since any off-system purchase or sale of electric energy under the System Agreement and the resulting allocation of electric capacity, energy and costs, or revenues pursuant to the System Agreement is made in interstate commerce, the FERC has exclusive authority to determine the reasonableness of wholesale power rates and wholesale energy rates under the System Agreement. This "exclusive jurisdiction applies not only to rates but also to power allocations that affect wholesale rates." [38]
*230 The LPSC's Staffs position, based on the above Supreme Court rulings, was that the LPSC is not precluded from disallowing purchases pursuant to the System Agreement if off-system power could have been purchased by the Entergy System, and delivered to the System, at a price below system lambda or avoided costs, taking into account an appropriate margin.
The System Agreement provides for the participation by each of the Operating Companies in the interstate wholesale electricity market. The fundamental principle of the System Agreement is that the System is planned and operated on an integrated total system basis, and its purpose "is to provide the contractual basis for the continued planning, construction, and operation of the electric generation, transmission, and other facilities of the Operating Companies in such a manner as to achieve economies consistent with the highest practicable reliability of service, subject to financial considerations, reasonable utilization of natural resources and minimization of the effect on the environment."[39] It also provides a basis for equalizing among the Operating Companies any imbalance of costs associated with the construction, ownership, and operation of such facilities used for the mutual benefit of all the Operating Companies.
The System Agreement also provides that its goals include the operation of the system capability to obtain the lowest reasonable costs of energy to the Operating Companies as a whole, consistent with the requirements of daily operating generation reserves, voltages control, electrical stability, loading of facilities, and continuity of service to the customers of each Operating Company.
The Entergy System's generation resources are dispatched, subject to reliability and operating constraints, in a way designed to achieve the lowest reasonable total cost of energy for the combined system as a whole. The aggregation of all System loads and all System resources into a single integrated System means that combined resources of all Operating Companies can be dispatched efficiently, allowing the Operating Companies' total load to be supplied with the most economical combination of resources available to the System. As a result of these coordinated operations, the Entergy Operating Companies experience enhanced reliability.
Additionally, the operation of the Entergy System as an integrated system allows emergency conditions to be met with less probability of impairment of service to the public. The integrated operation of the Entergy System also allows for fuel savings because the System is economically dispatched, subject to reliability and operation constraints, to achieve a lower cost of energy for the combined System as a whole. Therefore, each Operating Company saves fuel costs over what it would achieve if it operated on a stand-alone basis.
Under the supervision of the Operating Companies, ESI is directed to manage the centralized operations center to dispatch the capacity and energy capability of the Operating Companies, including the capacity and energy in an efficient, economical and reliable manner. The Entergy System dispatcher has the ability to dispatch all of the units of the Operating Companies that are available for dispatch. The individual Operating Companies' capacity resources *231 and loads are the component parts of the System power supply plan. Implementation of the System plan requires that the individual Operating Companies' needs be subsumed within the interests of the integrated system. See, Middle South Energy, Inc., 32 FERC ¶ 61,958.
However, the LPSC's Staff noted that there may be instances when an individual Operating Company may be adversely affected; by a transaction that may be cost-minimizing for the Entergy System. However, these disadvantages by a particular transaction to an individual Operating Company, collectively, or to its ratepayers in particular instances, are significantly outweighed over time by the benefits to the Operating Company through its participation in the System Agreement and by the Operating Company being a member of the Entergy System.
The System's capability and resources are dispatched in "real time" in an attempt to obtain the lowest practicable operating costs for the entire System within the constraints of maintaining the proper daily operating reserves, voltage control, stability, proper noting of facilities, and continuity of service to all customers. Service Schedule MSS-3 allocates the energy and associated costs among the Operating Companies on an "after-the-fact" basis. Service Schedule MSS-3 also allocates Entergy from the lowest cost System capability available on an hourly basis in order of priorities: first, to the loads of the Operating Company that owns those sources; and second, to supply the requirements of other Operating Companies' loads.
The FERC has ruled that "the interchange transactions [among the Operating Companies under the System Agreement] are' wholly within the integrated System, are centrally dispatched, and are mandated by [ESI] rather than the individual companies."[40] However, the LPSC Staff objected to ELI's position that the economic dispatch[41] of System resources to serve System loads, including the effects of economy off-system purchases, the allocation of energy, and associated costs to the Operating Companies from the Entergy System exchange, is not discretionary. The LPSC Staff noted that the fact that MSS-3 allocations are not discretionary is not determinative of the prudence of costs incurred by the System. The LPSC Staff also noted that the LPSC reserves the jurisdiction to disallow such purchases or allocations if it determines that the Entergy System is not utilizing the off-system economy energy market in a reasonable manner in pursuit of its goal of achieving the lowest reasonable cost of energy for the integrated System.
Pursuant to the MSS-3 Service Schedule, an allocation or sale occurs only when in a given period, an Operating Company has energy supplied from its own sources in excess of its own needs.[42] An Entergy Operating Company cannot buy from the System Exchange pool and sell to the System Exchange pool in the same hour. An *232 Entergy Operating Company whose energy from its own generation is allocated to the^System Exchange is subsequently reimbursed for the cost of that Entergy based upon the estimated cost of fuel used, plus an O & M adder set by the FERC. The estimated cost of fuel for each generating unit is determined by multiplying that unit's average annual heat rate from the prior year by the current estimated cost per British thermal unit ("Btu") of that fuel used. The O & M adder used for MSS-3 is calculated using the formula specified in System Agreement § 30.08.
An Operating Company is allocated energy from the Exchange pool in an hour when that Operating Company has load in excess of the energy generated or supplied by its own sources (including its share of off-system purchases) in that hour. Pursuant to Service Schedule MSS-3, that Operating Company's cost for that energy is the weighted average cost per kilowatt hour of all energy allocated to the Exchange in that hour.
Although Exchange pool energy is nonfirm in that there is no guaranteed availability as to any particular Operating Company, the system dispatcher may call on any unit to produce electricity for the System to the extent that the unit is available for dispatch. All generation resources owned or controlled by the System constitute firm resources to the System. The System Agreement provides that the output of an Operating Company's resources are first dedicated to the load of the Operating Company that owns the resource, and to the extent not needed for that purpose, the output is dedicated to the needs of the other Operating Companies. Such an output may be sold off-system only to the extent that it is not needed by or deliverable to the System. ELI bears the exact same cost per kilowatt hour for energy allocated to it by Service Schedule MSS-3 in a given hour as does any other Operating Company that is allocated energy from the Exchange pool in that hour.
Joint account off-system energy purchases are allocated to each Operating Company in proportion to its Responsibility Ratio (as "defined in the System Agreement) in effect at the end of the preceding month. Hence, ELI receives its Responsibility Ratio share of all these purchases. No Operating Company is entitled to receive more or less than its Responsibility Ratio share of joint account purchases[43] of energy.[44] This allocation method for joint account energy purchases cannot be changed without the FERC's prior approval, which if granted, could operate only on a prospective basis.
If for a given hour an Operating Company has sources (i.e., energy from its generation and purchases) in excess of its load, and its allocated share of a joint account energy purchase is more costly than its other resources, the Operating Company's share of that joint account energy purchase goes into the Entergy System Exchange for that hour. The amount of any *233 costs calculated pursuant to Service Schedule MSS-3 associated with energy produced or purchased to serve joint account sales is deducted from the gross revenue received for such sales, and that amount of costs is distributed to the Operating Companies who sources supplied the sale. He remainder of the revenues; the net balance, is distributed among the Operating Companies in proportion to the Responsibility Ratio of each Operating Company.
Both the FERC and the SEC require that power supply operations of a nonexempt holding company be conducted as a single, integrated utility system. Therefore, it can also be said that the operation of the System as a single integrated system and the use of service schedules as part of the System Agreement constitutes any intent on the part of ELI or Entergy Corporation to harm the ratepayers or to manipulate costs in such a way to harm ratepayers.[45]
The LPSC Staff concluded that the operation of the System as a single, integrated system and the use of the service schedules as part of the System Agreement, does not constitute any intent on the part of ELI or Entergy Corp., to harm the ratepayers are to manipulate costs in such a way as to harm the ratepayers. Furthermore, there were no facts to support a claim that any aspect of the administration of the System Agreement was (i) the result of any intention to harm or deceive ELI's ratepayers, or the result of any manipulation or abuse of the System Agreement to the detriment of ELI's ratepayers; or (ii) the result of any agreement between xELI and any of its affiliates to harm the ratepayers, or (iii) fraudulent.
Dispatch of the Entergy System[46]
The Entergy System utilizes sophisticated computer programs order to optimize its system dispatch. These programs are used to address the economic dispatch problem over several time frames. The System has numerous generating units, each of which may have different incremental heat rates and fuel prices, and off-system energy purchases available at different costs, any or all of which may change over time and operating conditions. The economic dispatch problem is to find the optimum operating level for each unit, in combination with off-system purchases.
The solution to the economic dispatch problem is the determination of the optimum level of output for each unit (or purchased power resource) at each instant in time, while meeting constraints and assuring reliability, which minimizes the cost of serving the combined loads of the System. Available resources that are included in the solution of the economic dispatch problem are generating units that are on-line and purchases that can be scheduled from off-system third parties.[47]
The Entergy System, like almost every other major electric utility in the United States, uses the equal incremental cost solution in the dispatch of its generation resources. The equal incremental cost solution produces the lowest overall cost solution to the economic dispatch problem.. The manner in which the Entergy System is dispatched is consistent with industry standards. Over time, the LPSC Staff *234 opined, this method should benefit all ratepayers of all Operating Companies, including ELI and its ratepayers. The incremental production cost of generating unit is the product of the incremental cost[48] of fuel, the incremental heat rate, and the incremental transmission loss factor,[49] plus incremental non-fuel O & M.
The incremental heat rate of the generating unit is calculated as the quotient of incremental amounts of heat input to the generating unit (measured in Btu) and the incremental output of the generating unit (measured in kWh). Incremental heat rate[50] therefore is expressed as Btu/kWh. A polynomial equation, referred to the input output curve, is used in the planning and operations processes to represent the efficiency of each generating unit at each level of output.
Factors considered in the economic dispatch of an electric system include operating constraints; unit constraints; transmission constraints; purchase power constraints; and operating reserve constraints. Typical generating unit constraints include the amount of time required to start the unit, to shut down the unit, to change (also referred to as "ramp") the unit's output from one level to another, and the high and low operating limits of the unit. In addition, generating units require scheduled maintenance and equipment testing.
Constraints imposed by the Entergy transmission system affect the Entergy System's ability to import electric energy from or export electric energy to neighboring systems. The Entergy transmission system will not allow 100% of Entergy System's load to be served by imports of power; neither will system limitations such as voltage, frequency and area stability permit 100% of the Entergy System load to be served by imports of power. Under normal circumstances, a simultaneous import level of approximately 3,500 MW into the Entergy System is the most that can be accomplished reliably. Transmission limitations on other systems affect the ability of some purchased electric energy to flow on to the Entergy System.
Every electrical system in the United States is required to maintain adequate operating reserves. Even if less costly purchases may be available from off-system, the Energy System must have some units providing-operating reserves that can be called upon within a short period of time in the event of a contingency. Because the System is dispatched in real time and on a system basis, at the time the System dispatcher makes dispatch decisions, he is unaware of the effect that those decisions may have on the costs of any specific Operating Company.
It is the policy of both the Entergy System and System Agreement that the resources available to the Entergy System are dispatched to achieve the lowest reasonable total operating cost for the System, and not for any one Operating Company.
The LPSC Staff concluded that the Delaney plaintiffs did not support their claim that the Entergy System resells low-cost purchases (i.e., purchases at prices below System incremental cost) when those purchases could have been used directly to serve the power demands of System native *235 load customers.[51] These resales benefit customers because the "margins" (i.e., profits) from such sales are used to reduce ELI's retail rates. In yard making the decision whether to purchase energy off-system, the Entergy System requires that the price of such a purchase be lower than the estimated avoided cost. This differential or margin is necessary to ensure that the purchase produces a benefit to the system and its customers. There were no facts presented in Delaney which indicated that the use of the margin was intended to harm ratepayers are suppliers, or for any purpose other than attempting to produce the lowest reasonable cost of energy for the total System.
In order to determine whether a price offered by third-party supplier for future delivery of energy is attractive to the Entergy System, the offer is compared to an estimate of future avoided costs. The System requires & margin for purposes of deciding the maximum acceptable price for fixed price economy energy purchases for the next hour, the next day, next month, next session, or year. The use of the margin is intended to reduce the cost of energy. There was no evidence in Delaney to support the contention that the defendants intended, through the use of the margin, to harm ELI ratepayers. Furthermore, conceptually, the System's approach of requiring a margin for purposes of determining whether it will purchase off system supplies was prudent.
However, the LPSC noted that the record did not demonstrate that the specific numerical values of the margins used by the Entergy System for making purchase power decisions are the most appropriate margins for that purpose. It may be appropriate to adjust those margins as market conditions change. The LPSC Staff did not opine as to the specific quantification of the margins that should be used in making future hourly, daily, weekly, monthly, or annual off-system purchase decisions, and recommended that the Entergy System reevaluate those margins, and to provide the basis and justification for continuing to use current margins in the future, or to determine that they should be adjusted in order to more properly access the off-system economy energy market in order to achieve reliable service at the lowest reasonable cost for the System. Thus, the appropriate level of the margin would be subject to future review and prospective adjustment, if deemed appropriate.
The LPSC Staff concluded that there were no facts presented in Delaney which supported the plaintiffs' claim that the Entergy System historically has not made proper use of off-system purchases from nonaffiliated sellers to obtain the lowest reasonable cost of energy for the System. Furthermore, there were no facts presented which supported a claim that the Entergy System has not been operated in a manner consistent with the objectives and principles of economic dispatch. No serious doubt was raised about the prudence of the administration or operation of the System Agreement with respect to the costs that have been flowed through the FAC during the period under review.
Additionally, no facts were presented that supported the Delaney plaintiffs' claim that the System fails to monitor the price of electricity products in the wholesale electricity markets, and no facts were found which supported the plaintiffs' claim that the System fails to make use of those *236 markets in an appropriate manner. The LPSC Staff noted that the mere fact that the Entergy System bought a certain amount of energy at a certain price does not by itself demonstrate that additional energy might have been available on that or subsequent hours in the same day, and if so, how much additional energy might have been available or at what price.
Furthermore, the LPSC's Staff concluded that there were no facts which supported a claim that ELI's ratepayers were harmed by the System's decision not to maintain written records of purchase power offers that were not accepted, or potential transactions that were not entered into.[52] The LPSC Staff found that there was no reliable evidence that the System's resale to others of relatively low-cost non-affiliated energy, or the sale to others of relatively low-cost System energy caused harm to System customers. Because the System makes dispatch, purchase, and sale decisions on an incremental basis, the cost of the System will be the same whether resources are stacked incrementally and the highest incremental cost source is sold or whether resources are stacked incrementally and the lowest cost resource is sold. The LPSC Staff concluded that the Delaney plaintiffs offered no ' evidence that relatively low-cost off-system purchases that were resold could have been used by the System to serve native load. The plaintiffs presented no facts to support a claim that ELI or the Entergy System have acted imprudently in connection with any off-system sale of energy.
ELI's share of profits from the off-system sales is credited to ratepayers. Prior to the realignment of costs pursuant to LPSC General Order No. U-21497, these profits were reflected in the determination of base rates. Since the realignment, they have been credited entirely to the monthly FAC to reduce fuel costs collected from ELI ratepayers. The LPSC Staff concluded that there were no facts presented to support a claim that ELI ratepayers were harmed by any Entergy System dispatch decisions as they relate to the use of owned generating facilities, purchases of and/or sales of off-system power. The LPSC Staff also concluded that there were no facts presented to support a claim that ELI or any of its affiliates manipulated the FAC or included inflated costs as a result of any dispatch decisions that were imprudent or improper. There was also no facts presented which would support the claim that any economic dispatch decisions by ELI or any of its affiliates were done with any intent to harm or deceive ratepayers.
The decision to purchase system energy on an hourly basis is based on a comparison of the purchase price to system lambda,[53] adjusted for a margin. The cost of affiliate energy allocated among the Operating Companies by the System Agreement is based on average operating cost and not incremental costs, pursuant to the terms of Service Schedule MSS-3 of the FERC-approved System Agreement. Consequently, the LPSC Staff concluded that a comparison of the cost of off-system *237 purchases to the MSS-3 cost allocated to affiliates within the System is not valid for purposes of evaluating the Entergy System's off-system purchases.
After a 1978 audit, Price Waterhouee auditors concluded, "[biased on our review, we believe that MSS [Middle South Services, predecessor to ESI] has established adequate procedures to dispatch power economically within the MSU [predecessor to Entergy Corporation] system. Procedures are adequate to ensure that [off-system] economy power will be purchased only when there is a cost savings to the MSU system. . . ."[54] The same basic procedures that Price Waterhouse found in place in 1978 remained in place through 1999. The LPSC Staff concluded that no facts were found to support a claim that dispatch decisions as to off-system purchases versus System generated energy were not reasonably made to lead to the lowest overall cost, subject to" constraints, to the Entergy System as a whole and thus to the ratepayers of the Entergy Operating Companies. The LPSC Staff concluded that there were no facts presented which indicated that ELI had omitted any material facts about System's dispatch decisions in the course of dealing with the LPSC. Additionally it was concluded that there were no facts to support a claim that any aspect of the dispatch of the Entergy System was: (i) the result of any intention to harm or deceive ELI's ratepayers, or the result of any manipulation or abuse of the System processes to the detriment of ELI's ratepayers; or (ii) the result of any agreement between ELI and any of its affiliates to harm the ratepayers, or (iii) fraudulent.[55]
Affiliate Transactions[56]
The generating units of the Operating Companies operated as a single integrated electric system and, with the exception of purchases from Qualified Facilities in certain capacity purchases, purchases of electricity from the wholesale market are made as joint account purchases on behalf of all of the Operating Companies collectively. In deciding whether to increase production from the resources of the Entergy Operating Companies or to buy from the off-system wholesale market, the Entergy System's dispatchers operate the Entergy System in a way designed to implement the principles of economic dispatch so as to obtain the lowest reasonable overall cost for the entire Entergy System. In making their dispatch decisions, they do not know whether such decisions may favor one or more individual Operating Companies to the detriment of one of the others, and do not consider the potential effects of their decisions on individual Operating Companies. The LPSC Staff concluded that the manner in which the `Entergy System is dispatched is generally consistent with industry practice and no evidence was presented which suggested any imprudence in the dispatch system employed by the Entergy System, or that the Entergy System had been dispatched in a matter that was intentionally wrongful.
Since dispatch and purchase decisions properly made on the basis of comparisons with incremental cost, and the after-the-fact[57] accounting is based on average fuel *238 costs, the Delaney plaintiffs characterized the allocations of energy and costs to ELI under the Entergy System Agreement as a "bait-and-switch" scheme or a "shell game."[58] The LPSC Staff concluded that the Delaney plaintiffs' allegation, with respect to bait and switch, was without merit. They determined that the concept of bait and switch required that an attractive offer be made to the consumer and that the consumer be deceived by the substitution of a different product or different price. The LPSC Staff determined that no offer was made to a consumer in Delaney. Rather, the "purchasers" were Operating Companies, and there was no reason to believe (and no evidence was offered to show) that the Operating Companies did not understand that the dispatch of the System was based on incremental cost and that the after-the-fact accounting pursuant to the FERC rate schedule MSS-3 was premised on average fuel cost. Hence, the LPSC Staff concluded that no facts are presented to support a claim that ELI or any of its affiliates (or any other person) attempted to mislead, harm, or defraud any ELI ratepayer or other person with respect to affiliate purchases, either individually or as a result of an agreement between them.
Additionally, the LPSC Staff rejected the Delaney plaintiffs' argument that an Operating Company should be able to make purchases on its own. The Staff noted that the plaintiffs' argument contradicted a position taken by the LPSC in April 2000, in a complaint filed before the FERC and against the Entergy System. The complaint was brought under Section 206 of the Federal Power Act and alleged that any activity that would deprive Louisiana ratepayers of the benefits and rights of having energy excess to an Operating Company's needs put into the MSS-3 pool would render the System Agreement unjust and unreasonable. Therefore, the LPSC urged that it sued the Entergy System to guarantee Louisiana ratepayers' right to access low-cost energy from other Operating Companies that is surplus to those Operating Companies' energy requirements. The Staff reiterated that historic reliance on joint account purchases as opposed to direct purchases is consistent with the approach taken on the System for at least fifteen (15), or more, years.[59]
The LPSC Staff noted off-system, non-affiliate energy is less firm as to the Entergy System than the affiliate MSS-3 energy, even though MSS-3 energy is nonfirm with respect to any particular Operating Company other than the owner of the generating unit. The LPSC Staff also opined that the "Premium" identified by *239 the Delaney plaintiffs as the difference between the average MSS-3 price and the average non-affiliate all the System energy price cannot be used in a damage calculation as the plaintiffs proposed because it assumes, without any basis in fact, that additional supplies of non-affiliated power were both available (at the average price of purchases transacted) and importable by the System in the hour in which the alleged damage occurred.[60]
The "cost" of non-affiliate power is an average; in reality, non-affiliate supplies consist of a number of different supplies, some of which are lower in price than the average and some of which are higher in price than the average. The LPSC Staff determined that no reasonable inference concerning the prudence of the System's wholesale purchases may be drawn from the fact that the average cost of energy pursuant to Service Schedule MSS-3 is different from the average price of energy paid for non-affiliated purchases.
While the Delaney plaintiffs' damage calculations concerning affiliate Entergy purchases assumed that additional supplies of off-system energy were always available at the average price of purchases made and that the acquisition of those additional supplies would not have influenced the market prices paid by the Entergy System, the LPSC Staff concluded that both assumptions were unrealistic and that there was no evidence to provide support for either assumption. Hence, the Staff found that there were no facts to support a claim that any affiliate transactions were: (i) the result of any intention to harm or deceive ELI'S ratepayers, or the result of any manipulation or abuse to the detriment of ELI's ratepayers; or (ii) the result of any agreement between ELI and any of its affiliates to harm ratepayers; or (iii) fraudulent.[61]
SFI Period Costs[62]
The LPSC Staff noted that "SFI," System Fuels Inc., had provided fuel procurement and fuel storage services to the Operating Companies throughout the period under investigation in Delaney, and until SFI Period Costs were realigned into base rates pursuant to LPSC General Order No. U-21497, all costs paid by ELI for these services, including Period Costs, were recovered through the FAC.
SFI charges each Operating Company for the services on an actual cost basis pursuant to an SEC approved procedure. Period Costs are costs other than the purchase price paid by SFI for fuel.[63] Period Costs were reflected in the calculation of ELI's FAC charges, and were stated as a separate component of the SFI fuel and invoice included in the monthly FAC filings, throughout the period prior to their realignment into base rates and the LPSC sanctioned that method of recovery in numerous base rate proceedings and monthly FAC hearings prior to October 1991.[64]
*240 In a 1977 LP & L base rate proceeding, LPSC Docket No. U-13220, the LPSC recognized that SFI Period Costs were reflected and recovered via ELI's FAC filings. The LPSC also recognized that ELI had an investment in SFI and that ELI recovered a return on its investment in SFI. The LPSC indicated that in order to prevent a double recovery of ELI's return on its SFI investment, it ruled that ELI's investment in SFI was to be included in its base rate and that the earnings of SFI allocated to ELI were to be added to ELI's net operating income.[65]
Additionally, the LPSC ordered an audit of ELI's FAC at the end of the year in 1977. The audit, which was performed by Price Waterhouse, made it clear that SFI Period Costs were included in ELI's FAG charges. Although Price Waterhouse recommended further review of the inclusion of these costs in the FAC, Price Waterhouse found that ELI was calculating the FAC filing in accordance with the LPSC's orders. Further, the LPSC did not order any refunds of SFI Period Costs as a consequence of the 1977 audit. Therefore, the LPSC, in Delaney, determined that no serious doubt was raised about the prudence of SFI Period Costs.[66]
Wrongful Profits[67]
In its FAC filings, ELI includes the total to fuel costs associated with purchased and generated power, then subtracts the fuel cost associated with power that is reallocated pursuant to MSS-3 or that is sold off-system, so that ELI ratepayers are not required to pay the cost of this power. The amount of fuel cost that is removed from the FAC calculation is based on the average cost of power from particular generating units and purchased power contracts, not the incremental cost.
The difference between the incremental cost included in the FAC and the average cost that is removed when power is sold off-system or through MSS-3 may be positive (resulting in what has been referred to as "wrongful profits") or negative (resulting in corresponding "wrongful losses"). This method of removing from the FAC fuel costs associated with power that is sold or reallocated pursuant to MSS-3 has been used since prior to 1979, when ELI was ordered by the LPSC to implement deferred fuel accounting and, in doing so, to continue to compute the monthly fuel adjustment factor "in the same exact manner" as it was using at the time. Any additional revenues received by ELI when power is sold off-system or through MSS-3 are reflected in calculating base rates, such that any so-called "wrongful profits" are returned to customers through base rates. Any difference, whether positive or negative, between fuel cost and fuel cost recovery is and has been "trued up" through base rates.
The LPSC Staff noted that beginning with the 1997 test year, ELI changed its base rate methodology in such a way, as to remove from its cost of service all fuel expenses and revenues. Consequently, the LPSC Staff determined that for the years 1997 and 1998, the correction and base rates for this differential was inadvertently eliminated by ELI and resulted in *241 ratepayers not receiving a credit to revenues in the FRP[68] calculation for the off system sales totaling $18,854.00 for 1997 and $3,567,475.00 in 1998.
To remedy this problem, in Delaney, the LPSC Staff proposed that an adjustment be included in ELI's 2000 FRP proceeding to reflect the appropriate adjustment for customers through base rates. The adjustment would have no effect on the FRP rate adjustment with respect to the 1997 test year, but would result in a credit to customers of "$2,267 million with respect to the 1998 test year, plus interest from August 1, 1999."
However, the LPSC Staff determined that there were no facts to support a claim that ELI's actions with respect to removal of the FAC of costs associated with off-system sales and MSS-3 allocations were: (i) the result of any intention to harm or deceive its ratepayers, or the result of any manipulation or abuse of the FAC to the detriment of its ratepayers; (ii) the result of any agreement between ELI and any of its affiliates to harm ratepayers; or (iii) fraudulent.
Supporting Invoices[69]
Pursuant to the LPSC General Order dated November 6, 1997, electric utilities are required to submit invoices supporting their monthly FAC filings. Prior to the date of the General Order, utilities submitted invoices in support of their monthly FAC filings.
The LPSC Staff observed that on occasion, ELI had included a fuel purchase and FAC filing without the supporting invoice. However, in each and every case, the supporting invoice was provided in a subsequent FAC filing. In no instance had a fuel purchase been passed through the ELI FAC filings without a substantiating invoice being supplied in a subsequent month.[70]
The LPSC Staff determined that delaying recovery until an invoice was submitted would defeat the purpose of timely recovery of actual fuel and generation dependent costs incurred by electric utilities on a monthly basis. Hence, the LPSC Staff concluded that ELI ratepayers Were not harmed by any delay in the filing of supporting invoices and it further concluded that no serious doubt was raised about the prudence of ELI's handling of its supporting invoices.
Purchases and Sales from Qualifying Facilities[71]
ELI has purchased electric energy from various, qualifying facilities ("QFs"). The LPSC Staff pointed out that although the Delaney plaintiffs alleged that there were discrepancies between information contained in ELI's Intra-System Bills ("ISBs") and in the information provided in the FAC filings relating to such QF purchases, it opined that the cost of QF purchases were prudently incurred. Additionally, since ELI included the total cost associated with purchases from QFs in its *242 FAC, the LPSC Staff noted that any additional revenues received by ELI when QF power is sold off-system or through MS3 are reflected in calculating base rates. In the event that there is a difference between fuel costs and fuel recovery is "trued up" through base rates. Hence, the LPSC Staff concluded that there were no facts to support a claim that the inclusion of costs from QFs were: (i) the result of any intention to harm or deceive its ratepayers, or the result of any manipulation or abuse of the FAC to the detriment of its ratepayers; (ii) the result of any agreement between ELI and any of its affiliates to harm ratepayers; or (iii) fraudulent.
The LPSC's Conclusion[72]
The LPSC Staff concluded that in its reasonableness review of all costs flowed through the FAC during the period of January 1, 1975 through the end of 1999, there were no facts to support any claim that ELI or its affiliates caused any undue harm to ELI's ratepayers with respect to ELI's FAC filings and costs. Additionally, the LPSC Staff determined that the Delaney plaintiffs' criticisms of the Entergy System's procurement practices were inconsistent with the System Agreement and inconsistent with positions taken by the LPSC.
Considering the extensive review of the Entergy System Agreement in Delaney, we conclude that it is the System Agreement itself which shall serve as the binding law in our discussion of the case sub judice.

I.
In its first assignment of error, the Appellants argue that under Daily Advertiser v. Trans-La, a Div. of Atmos Energy Corp., 612 So.2d 7 (La.1993), the City Council violated its position as an administrative adjudicator in failing to award the Appellants refunds for overages charged by ENO through its FAC.
In Daily Advertiser, natural gas customers brought a purported class action suit against an intrastate pipeline, a local distribution company, and their unregulated affiliates, alleging, inter alia, antitrust violations in connection with alleged manipulations of automatic FACs. The district court overruled the defendants declinatory and dilatory exceptions, and the defendants appealed. The Court of Appeal, 594 So.2d 546, affirmed. The Louisiana Supreme Court granted writs of certiorari, and held that: (1) automatic FACs allegedly manipulated by defendants were integral components of rate structure and, thus, the gas purchasers claims were within exclusive jurisdiction of LPSC and were subject to the requirement of exhaustion of administrative remedies insofar as they arose out of FAC computations and sought reparation for overcharges; and (2) primary jurisdiction doctrine warranted deferral, to the LPSC of claims seeking damages other than overcharges.
The New Orleans City Council
The New Orleans City Council is the legislative branch of local government and has the power to enact ordinances to protect the public health, safety, and welfare of the citizens of New Orleans. "[T]he Council of the city of New Orleans is vested with the sole legal authority to regulate the rates charged by companies furnishing utility services in the city of New Orleans." State ex rel. Guste v. Council of City of New Orleans, 309 So.2d 290, 294 (La.1975). The City Councils power is conferred by the Code of the City of New Orleans. Specifically, with respect *243 to regulatory authority, Article III, § 3-130, titled Administration of the Home Rule Charter specifies:
Section 3-130. Establishment of Rates
(1) The Council of the City of New Orleans shall have all powers of supervision, regulation, and control consistent with the maximum permissible exercise of the City's home rule authority and the Constitution of the State of Louisiana and shall be subject to all constitutional restrictions over any street railroad, electric, gas, heat, power, waterworks, and other public utility providing service within the City of New Orleans including, but not limited to the New Orleans Public Service, Inc., and the Louisiana Power arid Light Company, their successors or assigns.
(2) In the exercise of its powers of supervision, regulation and control of any street, railroad, electric, gas, heat, power, waterworks, or other public utility, the Council shall, in cases involving the establishment, change or alteration of rates, charges, tolls, prices, fares or compensation for service or commodities supplied by such utilities, cause notice of the matter to be served upon the person, firm or corporation affected thereby, so that such person, firm or corporation shall have an opportunity, at a time and place to be specified in said notice, to be heard in respect to said matter. The Council shall make all necessary and reasonable rules and regulations to govern applications for the fixing or changing of rates and charges of public utilities and all petitions and complaints relating to any matter pertaining to the regulation of public utilities, and shall prescribe reasonable rules and regulations to govern the trial, hearing and rehearing of all matters referred to herein, under the same procedure as provided for ordinances granting franchises.
(3) The City of New Orleans may institute or participate in any proceeding affecting the City Councils powers of supervision, regulation and control granted hereunder over public utilities or affecting in any way the interests of the ratepayers of the City of New Orleans, and any recovery or benefit derived from any such proceeding shall be allocated by the City Council as it deems fit and proper, pursuant to such reasonable rules and regulations as the Council may adopt.
(4) The City Council's powers of supervision, regulation and control over any street, railroad, electric, gas, heat, power, waterworks, or other public utility shall include, inter alia, the power, to allocate any funds, awards, recovery or any other benefit obtained by any public utility supervised, regulated or controlled under the provisions of this Chapter from any person, firm or corporation in connection with or in any way related to negotiations, judicial or administrative proceedings, directly or indirectly related to or in connection with any matter which is under the powers and authority herein granted to the City Council affecting the ratepayers in the City of New Orleans, and such allocations shall be made by ordinance or resolution, provided same shall be in accordance with the provisions hereof.
(5) The powers of supervision, regulation, and control over any street, railroad, electric, gas, heat, power, waterworks, or other public utility, shall include the authority to assess *244 against such public utilities all costs, fees, and expenses incurred by the City of New Orleans in (a) the exercise of its powers of supervision, regulation, and control thereof, (b) the conduct of or participation in judicial, administrative or other proceedings which directly or indirectly affect the ratepayers of the City of New Orleans, including but not limited to the costs, fees and expenses of all services provided by consultants, engineers, attorneys, experts and such other persons, firms or corporations having expertise in the supervision, regulation or control of a public utility and (c) any costs, fees, and expenses otherwise related to such other matters over which the Council has jurisdiction.
(6) The orders of the Council fixing or establishing any rate, fare or charge for any commodity furnished, service rendered, or to be rendered, by any street, railroad, electric, gas, heat, power, waterworks, or other public utility, or allocating any funds or other benefits, shall go into effect at such time as may be fixed by the Council and shall remain in effect and be complied with, unless and until changed, set aside or suspended by the Council or by a court of competent jurisdiction. Such order of the Council shall be upon a resolution or an ordinance in open council meeting and passed by an affirmative vote of a majority of all members of the Council.
(7) The orders of the Council shall be enforced by the imposition of such reasonable penalties as the Council may provide, and any party in interest may appeal from orders of the Council to the Civil District Court for the Parish of Orleans by filing suit against the Council within thirty (30) days from the date of the order of the Council, and not thereafter.
(8) The Council shall supervise, regulate, and control any street, railroad, electric, gas, heat, power, waterworks, or other public utility, including but not limited to New Orleans Public Service, Inc. and Louisiana Power and Light Company, and their respective successors and assigns. The Council shall have the right and authority to obtain from the street railroad, electric, gas, heat, power, waterworks, or other public utility, supervised, regulated and controlled by it all information, papers, books, records, documents, and such other materials as shall be necessary and proper for the exercise of said powers, regulatory or otherwise and all costs, fees, and expenses in connection therewith shalI be borne by the public utility required to furnish or produce same.
(9) No matter subject to the supervision, regulation and control of the Council, as provided herein, shall be affected, augmented, diminished, or modified in any manner or form except as provided herein or by subsequent order or action of the Council or by order or judgment of a court of competent jurisdiction.
Code of the City of New Orleans, Home Rule Charter, Article III, § 3-130.
The Appellants alleged that ENO improperly included in its fuel adjustment mechanism charges from its unregulated affiliate, SFI.[73] As discussed earlier, SFI owns and leases oil storage facilities and transportation equipment, and also provides fuel oil that ENO uses at generating *245 facilities. The charges at issue are referred to as "SFI Period Costs," and include general and administrative costs, operation costs, depreciation and amortization expenses, and interest charges on SFI's loans, and taxes other than income taxes (such as property taxes).
The Appellants alleged that in October 1995, SFI billed ENO more than $618.08 for the delivery of 20 barrels of oil, for an average price of $25.65 delivery charge per barrel. The Appellants further alleged that SFI added $68,810.00 for Period Costs, or the equivalent of $3,440.50 per barrel. Hence, the Appellants contend that the delivery costs and SFI Period Costs together resulted in a purchase price of $3,466.15 per barrel of oil. For the total review period of April 1985 through August 1999, the Appellants claimed that ENO billed and collected $26,723,918.73 in Period Costs.
Although the Appellants averred that the City Council found that SFI Period Costs were base rate type costs that ENO should not have included in its FAC charges, they also argued that the City Council rejected the testimony of every non-Entergy witness in the case/including its own experts, who recommended refunds.
The Appellants also argued that the City Council misapplied the equity doctrine where there was ample positive law concerning the regulatory policy concerning ENO's fuel adjustment mechanism. They claimed that equity is determined by resorting to justice, reason, and prevailing usages, and it may, pursuant to La. Civ. Code art. 4, only he applied when no rule for a particular situation can be derived from legislation or custom.
The Appellants maintained that the orders of the LPSC prohibit the recovery of fixed, non-fuel costs via the FAC mechanism and that Louisiana Supreme Court decisions have affirmed that fixed, non-fuel costs must not be included in a utility's fuel adjustment mechanism. In support of this argument, the Appellants cited Entergy Gulf States, Inc. v. La Pub. Serv. Comm'n, XXXX-XXXX (La.1/20/1999), 726 So.2d 870; Gulf States Utilities Co. v. La. Pub. Serv. Comm'n, 1996-2046 (La.2/25/97), 689 So.2d 1337; and Daily Advertiser v. Trans-La, supra.
In Entergy Gulf States, Inc. v. La. Pub. Serv. Comm'n, Entergy Gulf States appealed an LPSC order which disallowed its FAC filings. The district court ordered the Entergy Gulf States to refund ratepayers for portion of fuel adjustment charges and determined that portion of disallowances were not reasonable. The LPSC and Entergy Gulf States appealed portions of the district ruling concerning LPSC Order No. U-19904, which required that Entergy Gulf States refund to its ratepayers $34.24 million of its FAC charges collected between 1991 through 1994. The Supreme Court affirmed in part and reversed in part and held, inter alia, that: (1) the LPSC applied the proper prudence review standards in scrutinizing Entergy Gulf States' decision-making, Id., p. 26, 726 So.2d 886; (2) the disallowance of FAC recovery for forced outages and refueling outage extensions was not arbitrary nor capricious, Id., p. 9, 726 So.2d at 877; (3) Entergy Gulf States failed to demonstrate that it acted prudently in incurring replacement power costs; Id., p. 16, 726 So.2d 881; (4) finding imprudence due to poor management and provision of inadequate written procedures was reasonable, Id., p. 28, 726 So.2d 887; (5) between the ratepayers and Entergy Gulf States, Entergy Gulf States had to bear the burden of vendor negligence and not pass losses through to ratepayers, Id., p. 20, 726 So.2d 883; (6) imprudence disallowances based on Entergy Gulf States' failure to upgrade *246 capacity of nuclear generating station was reasonable, Id., p. 21, 726 So.2d 884; and (7) the determination that a gas storage facility was in fact an asset of Entergy Gulf States and the facility's electrical service was an operational expense includable only in the base rate, was reasonable, Id., p. 35, 726 So.2d 891.
In Gulf States Utilities Co. v. La. Pub. Serv. Comm'n, 96-2046 (La.2/25/97), 689 So.2d 1337, an electric utility company, Gulf States Utility Co., (GSU) appealed the Public Service Commission's (PSC) order requiring that a portion of a $6.35 million annual payment representing gain received by GSU on sale of generating units to joint ventures be eliminated from its FAC and in rates charged to its ratepayers. GSU appealed. The district court reversed and vacated. The PSC appealed. The Supreme Court reversed and remanded the case.
On remand, the PSC issued an order requiring GSU to refund to customers certain amounts for fuel adjustment overcharges, imprudence disallowances, and interest on past refunds. On review, the district court affirmed.
On direct appeal, the Supreme Court, affirmed in part, reversed in part and rendered, holding that: (1) the PSC's calculation of GSU's FAC overcharge refund to ratepayers of a portion of an annual payment representing gain received by GSU on sale of generating units to joint venture, without allowing any setoff for GSU's investments in certain common facilities transferred to generating units project, was reasonable, despite contention that setoff denial permanently foreclosed recovery of GSU's investment in common facilities because Commission had since removed plant from base rates, 689 So.2d at 1342; (2) the PSC acted reasonably in allowing GSU's shareholders recovery of, but not return on, expenses incurred in transaction with joint venture, in calculating GSU fuel adjustment clause overcharge refund, Id., at 1344; (3) the PSC did not violate rule against retroactive rate making when it retroactively disallowed GSU's FAC charges for prior period, requiring overcharge refund to ratepayers, Id., at 1345; (4) for purposes of GSU's FAC recovery, the PSC did not act arbitrarily and capriciously in disallowing as imprudent purchased-power costs stemming from power outages beyond scheduled refueling outages at GSU's nuclear power plant, Id. at 1350; (5) the PSC properly calculated refund for imprudent purchased-power costs stemming from nuclear plant outages by separately determining amount purchased-power costs for replacement power were greater than GSU's cost of capacity generated by regulated portion of plant and amount of difference between purchased-power costs and cost of higher-priced capacity from unregulated portion of plant, Id. at 1347; and (6) the PSC could not require GSU to refund to ratepayers interest on fuel adjustment clause over-recovery due to accounting error as to its buy back of portions of nuclear power plant, which over-recovery GSU had refunded to ratepayers, without interest at time its fuel clause mechanism contained no interest factor, Id. at 1351.
Finally, in Daily Advertiser v. Trans-La, a Div. of Atmos Energy Corp., 612 So.2d 7, natural gas customers brought a purported class action against an intrastate pipeline, a local distribution company, and their unregulated affiliates, alleging, inter alia, antitrust violations in connection with alleged manipulations of automatic FACs. The district court overruled the defendants' declinatory and dilatory exceptions, and defendants appealed. The appeals court affirmed the district court's judgment. Granting certiorari, the Supreme Court, held that: (1) automatic *247 FACs allegedly manipulated by defendants were an integral component of the rate structure and, thus, the gas purchasers' claims were within the exclusive jurisdiction of the LPSC and were subject to requirement of exhaustion of administrative remedies insofar as they arose out of adjustment clause computations and sought reparation for overcharges, Id. 612 So.2d at 26; (2) primary jurisdiction doctrine warranted deferral to the LPSC of claims seeking damages other than overcharges, Id. at 32.
The Appellants maintained that ENO did not attempt to obtain approval from the City Council before including SFI Period Costs in its fuel adjustment mechanism. The Appellants noted that during the administrative proceedings the evidence supported that SFI Period Costs are fixed non-fuel expenses. They asserted that the City Council's consultant, Mr. Kennan Walsh, and ENO's witness, George Panzeea, both agreed that SFI Period Costs are not direct costs of fuel and are not generation dependent.
Additionally, they also claimed that Mr. Louiselle, ENO's expert witness, admitted that none of the resolutions utilized by ENO in preparing and charging costs through its FAC mention SFI Period Costs.: The Appellants also maintained that there was no City Council review or deliberation followed by an order or resolution recommending that SFI Period Costs be included in ENO's FAC. In short, the Appellants maintained that ENO deliberately chose to forego regulatory oversight and, instead, opted to grant itself a rate increase.
The Appellants urged that ENO and its affiliates were warned by the regulating authorities, particularly the Department of Utilities and the City of New Orleans, to exclude SFI Period Costs. In further support, of their position, the Appellants indicated that ENO was warned repeatedly that SFI Period Costs do not belong in the FAC. They note that in 1977, the FERC audited ENO's regulated Mississippi affiliate and found that the company had improperly included SFI Period Costs in its adjustment charges. Thereafter, all of Entergy's Operating Companies, including ENO, agreed that they would not include SFI Period Costs in their wholesale FAC charges.
However, just a few years later the FERC discovered that ENO's affiliate, ELI, had continued to include SFI Period Costs in its fuel adjustment mechanism, in violation of the earlier commitment exclude them. Specifically, the Appellants indicate that in Louisiana Power & Light Co., 57 F.E.R.C. ¶ ¶ 61,101 (Opinion No. 36) (1991), the FERC ordered ELI to refund the SFI Period Costs included in its FAC because such costs were ineligible for recovery, even in the absence of any obligation regarding the legitimacy or prudence of those costs, or that such costs were excessive. The Appellants asserted that ENO also received direct warnings from the FERC that SFI Period Costs were not properly included in its fuel adjustment mechanism. Based on these prior warnings, the Appellants assert that equity was not properly invoked by the City Council concerning the collection of SFI Period Costs via the FAC mechanism.
The Appellants also argued that Entergy's personnel were well aware that ENO might not be allowed to recover any SFI Period Costs, if it attempted to realign those cost with base rates. In order to prove this fact at trial, the Appellants introduced an internal ENO memorandum which spelled out the dangers of losing the entire amount of SFI Period Costs if the fuel adjustment mechanism was changed. The Appellants assert that the memo reveals that ENO wanted to avoid any action *248 which could bring its actions of including SFI Period Costs, that were estimated between $17 million to $18 million dollars per year, to the attention of the City Council. The Appellants asserted that this evidence alone is compelling enough to prove that ENO had the requisite knowledge that it had improperly collected SFI Period Costs in its FAC mechanism.
The Appellants argued that the City Council's decision to not order refunds allows ENO to recover SFI Period Costs that it would not have recovered. During the review period, 1985 though 2001, ENO agreed to freeze its base rates, thereby foregoing the ability to recover any additional base rate increases. One of the City Council's consultants, Mr. Walsh, agreed that ENO circumvented the City Council's rate freeze orders by flowing SFI Period Costs via its fuel adjustment mechanism. Hence, the Appellants concluded that the City Council's decision to not order refunds is expressly contrary to the decisions of both the LPSC and the Louisiana Supreme Court. The Appellants alleged that the City Council's inaction, under these circumstances, condones ENO's circumvention of the base rate freeze.
The Appellants also pointed out that there was absolutely no evidentiary or factual support for the City Council's decision to deny refunds. The Appellants claimed that their experts, Mr. Robert Janssen, along with Mr. Chavanne (the S & WB's[74] expert), and the City Council's experts, Mr. Walsh and Mr. Philip Movish, unanimously agreed that the SFI Period Costs were improperly included in the FAC adjustment mechanism, without the City Council's prior approval. It was also unanimously concluded that the inclusion of SFI Period Costs had harmed ratepayers.
In support of their argument, the Appellants relied extensively on the opinions of its experts, Mr. Janssen, and Mr. Chavanne.
Their first expert, Mil Janssen, after being duly sworn and qualified as an expert in "fuel adjustment clause analysis and policy," testified regarding the alleged wrongful profits and costs improperly included in the retail FAC charges of Entergy Louisiana and its affiliate of Entergy New Orleans. He further indicated that many of the issues he addressed in earlier proceedings are identical to those in the instant proceeding. These issues include: (a) wrongful profits, (b) improperly included Period Costs, and (c) improperly included decontamination and decommissioning costs found in both ENO's and ELI's FAC charges.
He testified that his purpose in testifying was to present the results of his review of the FAC filings of ENO, and to identify overcharges flowed through the FAC to ENO's ratepayers. He testified that these overcharges have resulted in wrongful profits, conflicts with regulatory resolutions, and improperly included costs.
Mr. Janssen testified that he was retained in 1998 to review ENO's FAC for inappropriate costs and calculations. He testified that his review started with the City Council in its capacity as a regulator of ENO's FAC charges. Additionally, he personally reviewed 15 years of ENO's FAC charges and supporting data, as well as dozens of the City Council's resolutions, as well as past orders of the FERC, the LPSC, and the Louisiana Supreme Court regarding the regulation of FACs.
Mr. Janssen testified that the City Council has produced several resolutions which addressed the cost credits included *249 in ENO's FAC charges, provided a review of those costs, and/or addressed the calculation of those costs to produce ENO's FAC charges. These resolutions include the following: a Resolution dated October 25, 1973; Resolution R-75-118 (dated September 11, 1975); Resolution R-81-73 (dated April 9, 1981); Resolution R-81-216 (dated August 16, 1981); Resolution R-85-248 (dated May 9, 1985); Resolution R-85-526 (dated September 5, 1985); Resolution R-86-112 (dated March 20, 1986); Resolution R-87-81 (dated May 21, 1987); Resolution R-91-157 (dated September 5, 1991); Resolution R-94-960 (dated December 22, 1994); and Resolution R-95-360 (dated April 6, 1995).
In the October 25, 1973 Resolution, the City Council approved a request by ENO to "revise the Fuel Adjustment [C]lause in each of its electric rate schedules which contain such a clause so as to permit the average fossil fuel costs per kilowatt-hour as delivered during the month to be used in determination of the fuel adjustment for the month in which the kilowatt hours were used."
In Resolution R-75-118, Mr. Janssen testified that the City Council required ENO to pay sixty (60) days of interest on any over-billings to its customers through its FAC charge starting with the month of November 1975.
In Resolution R-81-73, Mr. Janssen testified that the City Council fixed and established new electric and gas rate schedules for ENO. With regard to ENO's [FAC], the City Council removed the word fossil' from the title and required the Department of Utilities to conduct an annual audit of both ENO's FACs and gas cost adjustments and report the results to the Council.
In Resolution R-81-216, he testified that the City Council "determined that it would be in the best interest of ENO's customers if it used an average fuel and gas cost adjustment clause mechanism for a twelve (12) month period." Therefore, it authorized ENO to use the same method that was employed at that time by the electric and gas utilities subject to the LPSC's jurisdiction.
Mr. Janssen testified that in 1985, the City Council regained regulatory authority over ENO after it had been ceded to the LPSC for a short time. Resolution R-85-248 provided for the continuance of "[a]ll rates, controls, petitions, complaints, investigations, applications, and other pending matters, of whatever nature or kind" that were in existence immediately preceding the transfer of regulatory authority, "except as inconsistent with Home Rule Charter of the City, of New Orleans. . . ." Additionally, Mr. Janssen testified that the City Council also ordered that the pending matters and all new matters from that point on would be governed by the "rules, regulations, practices, and procedures of the Council of the City New Orleans" that were in effect on December 31, 1981. Hence, the City Council provided for the continuance of all the existing matters and the regulation of any new matters under the regulations and procedures in effect before regulation of ENO (then NOPSI) was transferred to the LPSC.
In Resolution R-85-526, Mr. Janssen testified that "the City Council froze ENO's FAC recovery at its then-effective level for the purpose of providing interim rate relief for electric service in order to enable them to pay for its share of the Grand Gulf 1 nuclear generating Station."
Mr. Janssen testified that in Resolution R-87-81, the City Council directed ENO to amortize excess deferred taxes through its FAC over to six-month periods in 1987 and 1988.
*250 In Resolution R-91-157, Mr. Janssen testified that "the City Council required ENO to calculate the difference between the System Energy Resources, Inc. (SERI) non-fuel costs billed to ENO pursuant to the allocation of Grand Gulf and the estimate of such costs contained in the Resolution. This calculation was to be included in the `over/under' provision in ENO's FAC."
In Resolution R-94-960, Mr. Janssen testified that "the City Council required ENO to include an interest component for all over and under-recoveries in the existing `over/under' true-up procedure for Grand Gulf non-fuel costs in ENO's FAC."
Lastly, he testified that in Resolution 95-360, "the City Council clarified the calculation of interest provided for in Resolution R-94-960."
Mr. Janssen testified that he believed that ENO relied on some of the aforementioned Resolutions when it assembled and filed its FAC, however he surmised that it is difficult to determine precisely which resolutions and/or documents on which ENO relied upon in filing its FAC.
Mr. Janssen testified that the aforementioned Resolutions provided specific guidelines and general principles concerning the costs included in ENO's FAC. He indicated that the resolutions "primarily pertaining to (a) the timing and type of average fuel costs mechanism that would be used, (b) a few very specific costs, credits and calculations to be included in ENO's FAC, (c) establishing audits of ENO's FAC, and (d) the continuance of ENO's FAC under the City Council's original regulatory framework prior to the regulation of ENO by the LPSC."
He also stated that extensive proceedings regarding the reviews of fuel adjustment charges have been conducted at both the state (by the LPSC) and federal (by the FERC) levels. He indicated that the state and federal proceedings show that there are additional principles and guidelines required for the appropriate level of review to be undertaken. He also indicated that many of these principles have been affirmed by the Louisiana Supreme Court and some have been firmly established for at least 25 years. Thus, he opined, the City Council can rely on these specific guidelines and general principles, "(a) as being in the public interest and (b) for determining whether ENO's rates are just and reasonable."
Mr. Janssen also testified that none of the City Council's resolutions contradicted the FERC's and the LPSC's principles and guidelines for costs included in FACs. He indicated that aside from providing interest calculations, excess tax deferral amortization, and a temporary recovery freeze, the City Council did not determine the propriety or prudence of costs included in ENO's FAC. He opined that there is "little overlap, and no contradiction, between the intention, as set forth therein, and substance of the City Council's Resolutions and the guidelines and principles of the FERC and [the] LPSC."
Mr. Janssen testified that he believed that the City Council is free to adopt the general principles and specific guidelines developed by the FERC and the LPSC for the Council's own review of ENO's FAC. He indicated that if the Council determines that the general principles and specific guidelines developed by the FERC and the LPSC are in the public interest and produce just and reasonable rates for its own regulatory jurisdiction, then it would be appropriate for the City Council to adopt the precedents of the FERC and the LPSC.
Mr. Janssen testified that the FERC has developed general principles of specific guidelines for both reviewing and ordering *251 refunds on utilities' wholesale FAC's across the country. He indicated that these principles and guidelines can be found in various orders issued by the FERC in audits performed by its Staff. The orders and audits that he specifically reviewed and relied upon are: (1) FERC Orders in Docket No. ER76-285 (Phase II); (2) FERC Orders in Docket No. E-8570, (3) FERC's April 1977 Report on Results of Audit related to Charges for wholesale Electric Service by Mississippi Power and Light Company under Fuel Adjustment Clauses filed with the Federal Power Commission; and (4) FERC Orders in Docket Nos. FA86-63-000 and FA86-63-4D01.
Regarding Docket No. ER76-285 (Phase II), he testified that the FERC issued two (2) relevant orders: (1) Opinion No. 37, 6 FERC ¶ 61,299, dated March 30, 1979 and (2) a November 19, 1979 order, denying rehearing. Specifically, these orders provide general principles related to retroactive rate-making and the prudence of costs passed through FACs. He also stated that in the same proceeding, the FERC found that the Public Service Company of New Hampshire (PSNH) imprudently passed through its FAC, costs related to spot market purchases of 204,000 tons of coal when alternative supplies of cheaper coal were available. The FERC ordered PSNH to refund these imprudently incurred costs, plus interest.
He testified that the general principles contained in the FERC Docket No. ER76-285 (Phase II) are as follows:
 Public utility regulators have the ability to review the FACs of their jurisdictional utilities to determine the prudence of costs recovered from their customers;
 Orders for refunds based on reviews of FACs are not barred by principles against retroactive rate-making;
 Valid fuel clause formulas allow the inclusion of fuel expenses that are just and reasonable. If costs are included that should have been collected elsewhere, then one of the elements necessary for proper computation of fuel adjustments has been misstated; and
 Any inequities resulting from fuel adjustment clauses should be discovered through surveillance and can be remedied through complaint proceedings. The responding utility should their present an affirmative defense.
Mr. Janssen further testified that in Docket No. E-8570, the FERC issued two orders relevant to this proceeding: (1) the Initial Decision on non-fuel costs adjustment issue, dated July 20, 1976; and (2) the April 26, 1970, order that Affirmed in Part and Modified in Part an initial decision on FACs. These orders explained the intent and purpose of FACs and the eligibility of certain types of costs to be included in FACs. In the same proceeding, the FERC found that the Southern California Edison Company improperly included several costs in its FAC and it ordered the Southern California ^Edison Company to refund these improperly included costs, plus interest.
In Docket No. E-8570, he indicated that the general process from the proceeding is as follows:
 The intent and purpose of FACs is to reflect changes in only the fuel component per kilowatt of energy cost and that this should be strictly construed.
 The cost of capital to acquire fuel and to maintain an adequate fuel inventory is not subject to treatment any different from the cost of capital for any other purpose. Financing costs are clearly not the kind of costs that may or should enter into computations under Commission-approved FACs.

*252  The FERC's policy is to scrutinize costs reflected in FACs to make sure only eligible fuel expenses are covered through the monthly fuel charge.
 The substance of costs is more important than the form when determining what costs are includable in FACs.
 Fuel exploration and development costs should not be included in FACs. A properly conceived and applied FAC cannot reflect such fixed, known in measurable costs without doing violence to both the intended purpose and the very rationale supporting the allowance of flow-through of particularly volatile fuel costs.
 Considerations of prudence are irrelevant to a proper determination of the legitimate fuel costs components includable in FACs.
He also noted that in the FERC's April 1977, Report on Results of Audit related to Charges for wholesale Electric Service by Mississippi Power and Light Company under Fuel Adjustment Clauses filed with the Federal Power Commission, the FERC's auditors published a report documenting their analysis of SFI Period Costs included in Entergy's wholesale FACs and reached an agreement with the Entergy Operating Companies that excluded SFI Period Costs from inclusion in wholesale FACs on a prospective basis. Additionally, he noted that the general principles contained in this April 1970 report are as follows:
 Utilities should not have the opportunity to recover through FACs any fuel costs which ordinarily are incurred directly by utilities after obtaining delivery of fuel to the unloading point.
 Although costs may be proper cost of service items to be considered in setting utility base rates, they may not be properly accounted for as cost of fuel and therefore would be improperly included in FACs.
Mr. Janssen stated that in FERC Docket Nos. FA86-63-000 and FA86-63-001, the FERC issued several orders and discussed the practice of Entergy Louisiana Inc. (ELI), as well as other Entergy Operating Companies, of passing SFI Period Costs through their wholesale FACs. He testified that the orders and documents in these proceedings revealed that in both the late 1970s and early 1980s the FERC determined that SFI Period Costs were improperly included in the FACs of Entergy Operating Companies since those costs were not properly included in the FERC's System of Accounts as a fuel cost. In the late 1980s, Mr. Janssen noted, the FERC auditors found that ELI had reintroduced SFI Period Costs into its wholesale FAC, contrary to its previous agreement with the FERC documented in the April 1977 report. The FERC determined that the SFI Period Costs were improperly included and these costs were subsequently refunded to ELI's wholesale customers. The general principles found in these orders are as follows:
 Costs not properly includable in FERC Accounts as fuel costs are not properly recoverable from customers through FAC billings.
 `[W]hile an automatic adjustment clause such as the FAC is part of the filed rate, the components of such clause remains subject to review and modification to ensure that only eligible cost items are flowed through to customers in the clause.'
`[D]ue to the prohibition against retroactive rate-making, utilities which choose to disregard our accounting and rate regulations face the risk of permanently forfeiting every dollar, with interest, that they improperly recovered through their fuel clauses. . . . '
*253 Mr. Janssen also indicated that the LPSC has also developed general principles and/or specific guidelines for reviewing FACs in Louisiana.[75] Specifically, regarding his review of the City Council's Resolutions, he testified that when he first reviewed the resolutions of the City Council, he noticed three primary things: (1) the City Council did in fact establish an FAC for ENO, which Mr. Janssen noted is important because It was not a tax, adjustment clause or a capacity adjustment clause, but specifically an FAC; (2) he also noticed that the resolutions of the City Council primarily addressed issues concerning the mechanics of the FAC such as how interest should be calculated on over billings and also address special circumstances, such as ensuring that ENO stayed solvent in the 1980s, and (3) that these resolutions did not provide an extensive determination of the specific fuel costs that were inappropriate for inclusion in the FAC. He noted that fuel costs were simply placed into a broad category fuel when the FAC was initiated.
Mr. Janssen pointed out that the same issue was addressed by the FERC, the LPSC, and other regulators, but he focused the extent of his recommendation on the orders of the FERC and the LPSC for three reasons: first, both the FERC and the LPSC regulate or have regulated ENO; second both regulate FACs and have had to review and correct FACs on a number of occasions; and third, in the past, both the FERC and the LPSC operated in the same position as that of the City Council in that they both authorized FACs and neither formally designated what costs should or should not be included in FACs (aside from the general category of fuel); and both the FERC and the City Council reviewed the FAC of a number of utilities.
When the FERC and the LPSC reviewed the utilities, Mr. Janssen testified, the LPSC and the FERC used the reviews as an opportunity to clarify their intent for the FAC. Specifically these clarifications concerned what should be included, and how the FAC should operate. Once the clarification was made by the entities concerning the FAC and associated concepts, the determinations made by the entities were upheld by the Louisiana Supreme Court. Mr. Janssen outlined five of the important FAC concepts clarified by the FERC and the LPSC as follows:
1. Only volatile fuel costs are properly "includable" in the FAC. This is because the FAC was created as a recovery mechanism alternative to base rates because base rates do not keep up with the rapid and significant changes in cost recovery requirements.
2. Costs other than particularly volatile fuel costs are not properly included in FACs. That is, non-fuel and direct fuel, fixed predictable costs should not be included in the FAC without explicit regulatory approval from the regulator authorizing the inclusion of such costs.
3. He opined that costs which have been improperly included in the FACs should be both, removed from ratepayers' energy bills, and refunded. He specified that the refund should be applied to any profits in the FAC since the FAC charges were meant to recover actual costs incurred by ENO. He also opined that the reason for the refund is that the misuse of the FAC creates a *254 number of problems, including the most significant problem, "that it sidesteps the City Council's oversight and authority of rates, and that results in a utility basically self-granting its own base rate increases." He maintained that refunds of improperly included costs and profits are not barred by principles of retroactive ratemaking that would bar such a retroactive change in base rates. He maintained that the FAC charges are not base rates, as there is no reasonableness review before the City Council for the assessment and recovery of FAC charges, as would occur for base rates. He further opined that retrospective review and correction of FAC is actually critical to the operation of the FAC.
4. Fourth, he also pointed out that because making base rates retroactively prohibited, the FERC, in one of its orders, very distinctly stated that the risk the utility runs when it chooses to misuse its FAC is permanently forfeiting every dollar plus interest that was improperly included.
5. The final FAC concept, is "prudence." Prudence concerns whether or not a cost was reasonably incurred at the time it was incurred. He indicated that prudence, although a very important concept in and of itself, is irrelevant concerning improper inclusion and "cannot be assumed of any costs improperly included in the FAC" because of two reasons: first, improper inclusion sidesteps the approved reasonableness review that base rates would undergo before the City Council; second, even when prudent customers are overcharged by Entergy New Orleans' improper inclusion of costs in the FAC, Entergy New Orleans can recover costs immediately through the FAG rather than waiting for approval from the City Council to recoup costs. Additionally, his review revealed that Entergy New Orleans may not have been able to recover these costs because it had agreed to three base rate freezes during the period of his review, which covered approximately 10 years of the 15 years of records he reviewed. He concluded that Entergy New Orleans would have had to wait for recovery until the base rate freeze was over. Hence prudence, he maintained, is not a defense against requirement to refund and pay interest on costs that were improperly included in the FAC.
ENO, he testified, overcharged its customers in three ways: first, it improperly included costs in its FAC such as the SFI Period Costs and AECC non-fuel fixed costs; it profited from this practice,[76] and failed to comply with the City Council's resolutions.[77]
Regarding SFI Period Costs, Mr. Janssen testified that SFI, which is a subsidiary of ENO, was "established in 1972 to purchase, finance, and store oil for the Entergy utilities, and that these utilities, including ENO, pay for the costs to operate SFI," hence, the Period Costs. He noted that although there was not an initial impact on the cost of oil to ENO, over time, its use of oil declined, while the inclusion of Period Costs caused increases in the price of oil per barrel sold to ENO.
*255 Mr. Janssen opined that these SFI Period Costs were improperly included because they are non-fuel base rate type overhead costs of ENO's affiliate, SFI. In addition, ENO failed to get explicit approval from the City Council to include these costs in its FAC. Although ENO had been expressly informed that SFI Period Costs were not fuel costs appropriate to include in the FAC, ENO continued to include, them in their billings,[78] even during the base rate freezes. He testified that the amount of these overcharges due to improper inclusion is approximately $26.7 million dollars during the period between June 1985 to June 2001. Of the $26.7 million dollars, $14.1 million dollars were improperly included in Entergy's FAC during a base rate freeze.
Mr. Janssen testified that the second improperly included costs were the AECC non-fuel fixed costs. The AECC is an electric co-operative in Arkansas. In 1985, ENO entered into a five-year agreement to purchase power from AECC, which included $13.5 million dollars per year as a fixed payment for non-fuel costs. Mr. Janssen stated that non-fuel fixed costs are not appropriately included in the FAC and further that ENO included this portion in its FAC, even though it did not get approval from the City Council. Since the charges were not clearly itemized or listed separately as a line item, the improperly included costs were difficult to distinguish. These improperly included items, totaled approximately $6.1 million dollars, and of this amount, $2.3 million dollars were included in the FAC charge dsrihg a base rate freeze.
Mr. Janssen explained that ENO overcharged customers for power through its FAC by not providing the full credit to its customers for the cost of power sold "off-system." But he testified that although Entergy maintained that a credit was included in the base rates, the information that he reviewed does not support Entergy's contention because the data Entergy provided does not support it. He further indicated that if the credit had been provided in base rates the way Entergy stated, the credit actually provided would be minimal and the majority of the overcharges, or profit, would have been in Entergy's FAC and its customers would have been overcharged. Mr. Janssen estimated that the overcharges due to ENO's wrongful profits are approximately $6 million.
The third way Entergy overcharged its customers was by not complying with the City Council's resolutions.[79] This practice also occurs because ENO's FAC is based on an estimate. Since the FAC is based on an estimate, and is designed to recover actual costs in any given month, the FAC will either overbill or underbill its costs. Mr. Janssen indicated that the City Council addressed these "estimates" and overbilling Issues in the 1970s. Additionally, in a 1975 resolution, the City Council "explicitly required ENO to pay interest whenever it overbilled its customers with the FAC."
Nevertheless, when ENO moved from under the jurisdiction of the City Council *256 to that of the LPSC in 1982, it was no. longer required to pay interest on its FAC overbillings. However in 1985, Entergy New Orleans was under the jurisdiction of the City Council once again, but it did not resume paying this interest on overbillings as it was required to do in the 1985 resolution which returned jurisdiction to the City Council. Mr. Janssen concluded that since Entergy New Orleans did not pay the interest from its overbillings to ratepayers, it essentially receives "an interest-free loan" from its customers. The amount overcharged by Entergy, through June 2001, is approximately $5.1 million.
Mr. Janssen concluded that Entergy New Orleans overcharged its customers by approximately $44 million dollars through its FAC mechanism for over 15 years beginning in 1985. He indicated that since the practice occurred over such a long period, the interest which has accrued as a result of the practice has nearly doubled the amount to approximately $105 million dollars. Overall, he recommended to the City Council that Entergy New Orleans be ordered to refund the $44 million dollars, along with applicable interest.[80]
The Appellants' second expert, Mr. Steven Ruback, after being duly sworn and qualified as an expert in "FAC analysis and policy," testified that his understanding of the instant proceedings is that ENO has included indirect or overhead costs, called Period Costs, in its FAC for several years. He testified that the consequence of such an inclusion has been the overrecovery of Period Costs, which have inappropriately flowed through ENO's FAC to ratepayers.
Mr. Ruback testified that there are two basic and important aspects of FAC regulation that regulators need to clearly understand. The most important aspect is that the FAC is an exception to the longstanding and well-established principles used to set base rates. FACs are also an exception to the regulatory compact because fuel adjustment charges, particularly automatic FACs are FACs that only require a perfunctory hearing, effectively strip a utility of an important incentive to minimize the costs flowing through the FAC and provide for the recovery, of included expenses without the necessity of a base rate proceeding.
Mr. Ruback testified that base rates should allow the utility the "opportunity" to recover prudently incurred operating and maintenance expenses, taxes and a fair return on investment that is used and useful in providing utility service. FACs are only intended to flow through any increases or decreases in fuel costs that are not included in base rates. The regulatory compact is deeply rooted in traditional utility regulation. Such a regulatory compact exists between ENO and its customers. The regulatory compact requires that base rates be set for the time period that the rates are expected to be in' effect and provides utility with a monopoly for electric service within its service area. He indicated that base rates are prospective and are intended to allow the utility the opportunity to earn a fair rate of return. The basic "bargain" implicit in the regulatory compact is that the utility is granted a monopoly in the service area in exchange for a public service obligation to provide safe and reliable service at just and reasonable rates.
He testified that the regulatory compact also requires that the base rates not be changed between base rate cases. The *257 reason base rates are not changed between rate cases is to provide the utility with a powerful incentive to minimize Costs, minimize increases in costs, and to search for deficiencies in other areas of its operations to offset cost increases between the time base rates are set and when the base rates become effective. This incentive is powerful because the utility keeps any cost savings between rate cases, but must absorb any cost increases. Without this inducement there would be little incentive for the utility to minimize costs.
He noted that regulatory commissions act as a surrogate for the competitive market. The base rate incentive to retain savings or to be forced to absorb losses for costs included in base rates is necessary and in the public interest because the electric monopoly status in the service area eliminates the need to minimize costs since there is no competition. By including Period Costs in the FAC, ENO rids itself of any incentive to minimize Period Costs, such as fixed charges, interest expense, operation and steam expense, general and administrative expenses and amortization of a successful exploration activities. The lack of competition further exacerbates the problem from a regulatory perspective. Without meaningful competition, an allowance of Period Costs in the FAC basically eliminates any incentive ENO has to minimize these costs. Therefore allowing ENO to include Period Costs in the FAC is a failure of regulation, which is intended to be a surrogate for competition, in order to provide an incentive to minimize costs.
Mr. Ruback testified that there is no incentive to minimize Period Costs when such costs are included in the FAC because ENO is not at risk to absorb cost increases between base rate cases, and has no incentive to reduce-Period Costs because ENO is not allowed to retain the savings between rate cases. He opined that including Period Costs in the FAC seriously dilutes ENO's incentive to minimize Period Costs. The incentive to minimize Period Costs is effectively eliminated. He testified that the consequences are higher bills than are necessary for safe and reliable service to customers. The inclusion of Period Costs in the FAC is a recipe for unjust and unreasonable rates and is an unusual exception to the costs typically included in FACs.
He testified that the reason the FACs are allowed is that such a clause eliminates the need for utilities to pancake base rate increases when fuel costs are increasing. In addition, regulators and ratepayers do not have to file for rate decreases because fuel costs are decreasing. He testified that FACs included in the utility's tariff, particularly automatic FACs or FACs with perfunctory hearings, are intended to promote administrative efficiency by eliminating the time and effort needed for base rate increase or base rate reduction filings.
Mr. Ruback testified that the only costs properly included in the FAC are costs which are: (1) large enough; (2) volatile enough; and (3) substantially beyond a utility's control. He indicated that the use criteria are long-standing and well established. If costs are not large enough, volatile enough or beyond a utility's control, such costs should be included in base rates to provide an incentive to minimize costs. He pointed out that period or overhead costs should clearly not be included in the fuel adjustment charge but should be included in base rates, whenever ENO files for base rate increase.
He indicated that period or administrative costs are not large enough to justify inclusion in the fuel adjustment Charge. ENO's Period Costs were $25.3 million over a 171 month period. Mr. Ruback testified that this amount equates to $1.8 million a year or about $148,000.00 a *258 month. Per his review of the instant matter, ENO's annual revenue for 1999 was $508 million dollars, and the annual Period Costs are about "a third of one percent of annual revenue." Mr. Ruback opined "that there is no danger of ENO falling into financial distress if Period Costs are not included in the FAC because they failed to meet the rate design base rate exception of being large enough to affect the utility's financial viability."
Mr. Ruback also opined that Period Costs are not volatile. He testified that although the underlying oil costs are volatile and are impossible to forecast with accuracy, period or overhead costs are not. He pointed out that while oil costs are subject to price and demand fluctuations as most commodities are in the New York Stock Mercantile Exchange, and is also subject to political influences, it is highly volatile. However, Mr. Ruback testified that this is not the case with Period Costs of System Fuels, Inc., (SFI). SFI has a contract with ENO to provide liquid fuels and it included Period Costs in its price. The categories of Period Costs SFI includes in the contract are:
a. general administrative costs;
b. operating costs;
c. depreciation and; and amortization;
d. interest cost; and
e. taxes other than income.
The total costs for these categories are not substantial in terms of ENO's annual revenue there. Additionally these costs are not volatile enough to justify inclusion in the fuel adjustment charge as an exception to basic rate-making.
Mr. Ruback testified that these costs are within a utility's control. He indicated that company management has considerable influence over administrative and general expenses, operating costs and installation of utility plants, which requires depreciation and amortization. Furthermore, taxes other than income, such as property taxes, can be contested, and other taxes are statutorily established. Consequently, these costs are not beyond a utility's control or are volatile. Mr. Ruback concluded that the period or overhead costs in question are not large enough, volatile enough, or beyond utilities control to qualify as an exception for the inclusion in the fuel adjustment charge.
Mr. Ruback testified that SFFs contract with ENO was initially for a term of ten years, and continues from year to year unless terminated with one year notice. Additionally, SFI is an affiliate of Entergy. He opined that the City Council should be:
particularly vigilant about including alleged fuel costs of the utilities affiliate in the fuel adjustment charge. The reason for this is that non-regulated affiliates are often used as a strategy to recover costs which would not otherwise be recoverable if directly incurred by a regulated utility.
Mr. Ruback indicated that when a nonregulated company provides services to a regulated utility, the price should be the lower of the market price or cost of providing the service. He opined that the cost of providing service should be measured as if the regulated utility was providing that service.
Additionally, he testified that certain parts of the SFI contract were cause of concern to him. Particularly the "all requirements" section of the contract effectively precludes ENO from testing the market during the term of the contract. To Mr. Ruback's knowledge, ENO has never tested the market for an all requirements contract for liquid fuels. He also pointed out that the price portion of the contract is also "extremely bothersome." ENO has obligated itself to pay for liquid *259 fuels sold by SFI at SFI's cost. According to the contract, the "[s]eller's costs shall mean the actual cost to seller of acquiring liquid fuels, all transportation and operation costs, inventory shrinkage, fixed charges, interest expense, operation and steam expense, and general and administrative expenses and amortization of unsuccessful exploration at committees." Mr. Ruback testified that it was clear to the that if ENO undertook to directly provide the services, that many of the categories of Period Costs would not be eligible for inclusion in the fuel adjustment charge. He opined that ENO understood that Period Costs may not be eligible for inclusion but still "charged ahead," as evidenced by an internal memo which reads:
Any change in the System's method of procuring fuel oil through SFI will have significant economic implications. A change could draw attention to how the Operating Companies collect fuel oil and Period Costs. Thus, the potential exists that the collection of these Period Costs will be reduced by as much as the full $17-$18 million. Any reduction would t)e reflected as System cash flow and the income decreases.
Mr. Ruback concluded that including these costs in the fuel adjustment charge because of a voluntary agreement to pay SFI on a strict cost basis and not explore the competitive market "is a blatant attempt to promptly recover period costs, which should have been recovered in base rates, not fuel adjustment charges, by ENO filed in a base rate case it was not earning its authorized rate of return. Very simply, the FAC is not a substitute for base rates."
Lastly, in addressing the testimony of Mr. Janssen, Mr. Ruback agreed with several regulatory principles referred to in Mr. Janssen's testimony. These stated principles include the following:
 Public utility regulators have the ability to review the FACs of the jurisdictional utilities to determine the prudence of costs recovered from their customers;
 Orders for refunds based on reviews of FACs are not barred by principles against retroactive rate making;
 Valid fuel clause formulas allow the inclusion of fuel expenses that are just and reasonable. If costs are included that should have been collected elsewhere, then one of the elements necessary for proper computation of fuel adjustment has been misstated;
 Any inequities resulting from FACs should be discovered through surveillance and can be remedied through complaint proceedings. The respondent utility should then present an affirmative defense;
 The intent and purpose of FACs are to reflect changes in only the fuel component per kilowatt energy cost and this should be strictly construed;
 The cost of capital to acquire fuel and to maintain an adequate fuel inventory is not subject to treatment any different from the cost of capital for any other purpose. Financing costs are clearly not the kind of costs that may or should enter into computations under the Council approved FAC;
 Fuel exploration and development costs should not be included in FACs. A properly conceived and applied FAC cannot reflect such fixed, known and measurable costs without doing violence to both the intended purpose and the very rationale supporting the allowance of flow through particularly volatile fuel clause;
 Costs not properly includable in FERC Accounts its fuel costs are not properly recoverable from customers through FAC billings;

*260  While an automatic adjustment clause such as the FAC is part of the filed rate, the components of such clause remain subject to review and modification to ensure that only eligible cost items are flowed through to customers under this clause;
 Due to the prohibition against retroactive rate making, utilities which choose to disregard accounting and rate regulations faced the.! risk of permanently for fitting every dollar, with interest, that they improperly recovered or their fuel clause;
 A utility's subsidiary should not profit on transactions included in its affiliated utility's FAC.
 Transactions with utility affiliate should be reviewed for prudent management judgment and acquiring fuel [or power] at the lowest competitive prices;
 As the name implies, FACs are not designed to allow utility to earn a profit; rather they are recoupment device designed to permit a dollar for dollar recovery of fluctuation in fuel costs; and
 The requirements of fairness which compels adjustment in rates to compensate utilities for escalating fuel costs also compels retrospective reconciliation to exclude charges identifiably resulting from unreasonable computations or inclusions.
Mr. Chavanne, who appeared as an expert for the S & WB, testified that the prudence standard should be applicable in the instant proceeding. He stated, "[t]hat in a rate-making proceeding, a utility company has the burden of demonstrating that it used a reasonable decision making process based on facts known and knowable at the time to arrive [at] a reasonable course of action." He opined that although the instant case concerned intention or inadvertence, he suggested that these two are not the standard for questionable ratemaking decisions, and reiterated that the proper standard is the prudence standard.
Mr. Chavanne's testimony concerns four issues. The first issue, he maintained, supports the conclusions of the Appellants' experts and the Advisors of the City Council that SFI Period Costs were improperly included in ENO's FAC filings from May 1985 to date. Mr. Chavanne testified, "as a non-fuel costs, SFI Period Costs are not properly recoverable through ENO's fuel adjustment clause." He further opined that in Entergy's FAC, the language itself indicates that it just refers to fuel costs, and not non-fuel costs.
Second, Mr. Chavanne testified that he was concerned about the SFI percent of Period Costs. To illustrate his point he quoted from a 1987 SFI facilities task force report.
"[A]ny change in the system's method of procuring fuel oil through SFI will have significant economic implications. A change could draw attention on how the Operating Companies collect fuel oil and period costs. Thus, the potential exists that the collection of these Period Costs will be reduced by as much as a full $17-$18 million [dollars]. Any reduction would be reflected as system cash flow and net income decreases."
Mr. Chavanne found that this report was disturbing because if the City Council was, in fact, aware that the SFI Period Costs were flowing through the FAC, then why would Entergy be concerned about drawing attention to the costs and about possibly losing collection of these costs. He also indicated that according to the same schedule that he quoted from, in 1985, 1986, and 1987, that 95 percent of every penny billed to Entergy New Orleans by SFI was a Period Cost The same trend *261 remained in effect throughout the 1990s, complete with an excess of 90 percent of every penny charged attributable to SFI Period Costs.
Mr. Chavanne also addressed the fact that Entergy New Orleans was also asked to provide copies of all LPSC Orders on which it relied in determining its FAC filings during the Delaney proceedings. Howeyer, in response, Mr. Chavanne noted, Entergy New Orleans responded, "[s]ee the attached order and communications relied upon by ELI in making its filings."[81] Hence, Entergy continued to rely on an outdated format.
Additionally, Mr. Chavanne testified that in a 1979 correspondence from the LPSC's Chief Engineer, Eddie Gallegos, to LP & L rate department, Mr. Gallegos wrote:
You will recall that at our last fuel adjustment hearing I suggested a format for your monthly presentation. Enclosed is a suggested a format. This will enable all participants to present the same information in their narratives, and you can, of course, elaborate on any matter you wish. The format closely parallels the one being used by Louisiana Power and Light Company.
Mr. Chavanne also testified that attached to the Gallegos correspondence, was a schedule which specified, under the section titled "Fuel Costs," an "item 13" which designated the following:
Cost of fuel; A, invoice price; B, other FPC account 151 cost; C, total FPC account 151 cost.
However, Mr. Chavanne opined that even though Entergy New Orleans maintained that it relied on Mr. Gallegos' correspondence in developing its FAC filings, Mr. Chavanne testified that there was no doubt in his mind that the FERC clearly indicated that SFI Period Costs were not "FPC account 151" costs. For this reason, he opined that Entergy was inappropriate in contihuing its use of the LPSC methodology in developing its FAC filings to include SFI Period Costs.
The second issue discussed by Mr. Chavanne is what he refers to as a "compound interest" issue in which he believes is the appropriate time value of money that any refund should be added to. He opined that generally accepted financial principles indicate that ratepayers should be entitled to receive the time value, of money used by other parties.
The third issue included in Mr. Chavanne's testimony concerned "line losses" as applied to Entergy New Orleans' highvoltage (HV) customers in Orleans Parish. He testified that in reviewing one of Entergy New Orleans' own studies[82] from 1990 to date it shows that the line loss factor is .75 percent. However, he noted that ENO has used a constant 2% line loss factor for the past 40 plus years. Because of this, he opined that the HV customers are also entitled to a refund from 1990 on.
The fourth and final issue concerned whether or not Entergy properly accounted for non-jurisdictional line losses.[83] However, Mr. Chavanne did not elaborate on this issue in his testimony.
ENO agreed with the findings of the City Council in the administrative proceeding and countered that the Appellants' claims are not supported by the *262 facts and evidence presented at the hearing. Additionally, ENQ contends that the Appellant's arguments are inconsistent with fundamental rate-making principles and applicable precedents. ENO contends that even though the City Council had the authority to determine that SFI Period Costs should be recovered through base rates rather than through its fuel adjustment mechanism, the City Council never exercised its' authority to order ENO to realign its SFI Period Costs. ENO noted, however, that had the City Council ordered ENO to realign its Period Costs, the City Council would have ordered so on a prospective, revenue neutral basis. ENO also indicated that in a recent resolution, the City Council allowed it to keep the Period Costs in its FAC.
ENO averred that in the instant matter, it requested that the City Council review the facts and evidence, and as a matter of equity, it requested that the City Council not order any refunds of SFI Period Costs passed through its fuel adjustment mechanism. Based on its review of the evidence, ENO maintained that the City Council correctly found that SFI Period Costs were not imprudently incurred and that the City Council's decision was amply supported by the evidence in the record.
ENO also noted that its treatment of SFI Period Costs was identical to ELI's treatment of Period Costs as discussed in the Delaney case; that is, until ELI's SFI Period Costs were realigned prospectively into base rates on a revenue neutral basis pursuant to LPSC General Order No. 21497 and Order No. U-23626, both discussed at length in Delaney, infra.
ENO noted that in Delaney, the LPSC investigated identical issues regarding SFI Period Costs and concluded the following:
(1) it sanctioned the recovery of SFI Period Costs through the FAC in numerous base rate proceedings, (2) that the costs were prudently incurred and properly included in ELI's FAC filings, and (3) that the ratepayers were not harmed by the inclusion of Period Costs in ELI's FAC filings.
ENO also maintained that the Appellants' assertion that ENO improperly included SFI Period Costs in the FAC is also without merit. ENO noted that Mr. Janssen recommended that all of the SFI Period Costs included in ENO's FAC be refunded, with interest, because the City Council had not explicitly approved the inclusion of Period Costs in the FAC. Mr. Janssen also opined that ENO included the Period Costs in its FAC with the intention of avoiding `the City Council's review. ENO urged that both Mr. Janssen and Mr. Ruback[84] opined that since SFI Period Costs are fixed, and predictable, they should be recovered through base rates.
ENO asserted that Mr. Janssen suggested that the City Council looked to the LPSC's realignment of SFI Period Costs in Delaney as guidance in determining whether they were properly included in ENO's FAC. ENO averred that the City Council reviewed the LPSC's realignment of SFI Period Costs in the Delaney case, and closely examined the LPSC's conclusion that the Period Costs had been properly passed to ratepayers through the FAC. Furthermore, ENO asserted that the LPSC concluded that the SFI Period Costs were prudently incurred. ENO also pointed out that Mr. Janssen subsequently admitted that the LPSC has never ordered refunds as a consequence of LPSC General Order No. U-21497 and LPSC General Order No. U-23626, as well as the LPSC's *263 Findings of Fact and Conclusions of Law that accompany Delaney Order.
ENO argued that the Appellants' recommendation to refund SFI Period Costs relies on the fact that the City Council has not explicitly authorized the inclusion of SFI Period Costs in any of its orders or resolutions. ENO noted that the Appellants have taken the posture that ENO is authorized to act only when it is explicitly given leave to do so via a City Council order or resolution during a properly convened session. ENO contends that the Appellants' position is illogical because "according to plaintiffs, ENO's reliance on more than 20 years of Council audits without a refund is insufficient to support ENO's calculation of the FAC during those 20 years."
ENO countered the Appellants' position by noting that the evidence at the hearing established that the City Council authorized the use of FACs as early as 1922. ENO noted that since then, several resolutions have amended the FACs. None of the subsequent orders, or resolutions gave detailed instructions or guidance on the calculation of the FAC or what may be properly included or excluded from the FAC, and significantly, ENO also noted that no order or resolution specifically allowed or prohibited the inclusion of SFI Period Costs in ENO's FAC. However, ENO noted that it has been aware that SFI Period Costs were being recovered through its FAC since; at least, 1974.
Additionally, ENO asserted that the City Council determined that it had acted reasonably and prudently in recovering SFI Period Costs, and rejected the Appellants' argument that ENO included SFI Period Costs with the intention of avoiding the City Council's review. ENO asserts that the City Council found no credible evidence to support the Appellants' allegation that ENO allegedly intended to harm ratepayers or manipulate or abuse the FAC.
ENO also suggested that the issue of SFI Period Costs was raised during the City Council's 1974-1975 ENO base rate case.[85] In that proceeding, the City *264 Council refused a request to change the formula for determining the monthly fuel adjustment. Instead, the City Council approved base rates for ENO that did not included SFI Period Costs and authorized their continued recovery through the FAC.
George J. Penzeca, a former city auditor who was employed by the public accounting and consulting firms of Price Waterhouse and Ernst & Young, testified as a witness/consultant for ENO. He noted that he had the opportunity to serve as the city's auditor in connection with several prior audits of Entergy New Orleans' fuel adjustment charges. He indicated that there were a total of seven audits of ENO's FAC charges by the City of New Orleans covering the period between 1980 and 1997, excluding the period of the LPSC's regulation, which was between January 1982 until early May, 1985.
Mr. Penzeca testified that he personally worked as a consultant to the City of New Orleans in the first six, out of seven,[86] audits. The audits were performed in accordance with the City Council's policy of monitoring and periodically auditing adjustment charges pursuant the City Council Resolution R-81-73. These audits were intended to provide information that could be useful to the City in its effort to exercise appropriate regulatory control over energy costs automatically billed to consumers pursuant to the operation of the fuel adjustment charge. The objective of the audits was to determine if the costs included in the fuel adjustment charge were appropriate and reasonable, and to discern if Entergy New Orleans had taken appropriate measures to minimize the cost billed to its consumers.
He testified that the scope of these audits included a review of the FAC methodology employed, compliance with regulatory directives, and the mathematical accuracy of the fuel adjustment charge calculations. He also identified the nature, source, and amount of costs recovered by the FAC. He reviewed supporting documentation for costs incurred and fuel adjustment charge billing procedures. He indicated that through his review of the audits, he gained an understanding of the regulatory history of FAC charges in the City of New Orleans.
Mr. Penzeca testified that the earliest fuel adjustment charge dates back to 1922 and was based on the changes in the cost of coal at that time. Over the years, the fuel adjustment charge methodology has changed in response to both market factors and regulatory directives. He also testified that the New Orleans City Council has actively monitored and regulated the fuel adjustment charge over the years. The current authorized FAC was established while Entergy New Orleans was under the jurisdiction of the LPSC. He indicated that the basic fact methodology has remained unchanged since the City Council regained regulatory jurisdiction in 1985, with the exception of Grand Gulf related and other special purpose City Council resolutions passed subsequent to 1985.
Based on his work for the city in connection with the audits, he opined that the FAC methodology employed by Entergy New Orleans is in compliance with its authorized rate schedules and applicable City *265 Council resolutions. He also opined that the fuel adjustment charge was calculated in accordance with the monthly FAC filings submitted to the City of New Orleans.
Additionally, Mr. Penzeca opined that the issues raised by. Mr. Janssen were addressed to a greater or lesser extent in the audits commissioned by the City of New Orleans. He testified that none of these audits found that ENO had improperly recovered any costs to the fuel adjustment
Mr. Penzeca also specifically addressed the issue that has been raised in connection with the inclusion of SFI Period Costs in the fuel adjustment raised by Mr. Janssen, Mr. Chavanne, and Mr. Walsh. All maintain that the SFI Period posts were improperly recovered via the fuel adjustment charge that the amount of costs recovered should be refunded customers. Mr. Penzeca asserted that the City of New Orleans was aware of the fact that SFI Period Costs were recovered via the fuel adjustment charge since at least 1974. He asserted that in 1975, the fuel adjustment charge was the focus of an Entergy New Orleans rate case, and was the subject of the special investigation by the City Council's consultants in connection with the same rate case.
Mr. Penzeca testified that the FAC charge was disclosed in its monthly FAC filings to the City of New Orleans, it was also addressed repeatedly in the various other reports commissioned by the City of New Orleans, and it was also addressed in ENO's responses to the 1991 audit directed to the City Council. He testified that FAC charges were also disclosed in various other city regulatory contexts, including the PURPA, the Public Utility Regulatory Policy Act; in the testimony of F. William Hoffman of Price Waterhouse, in ENO's response to Resolution R-95-361, and for ENO's 1995 request to increase the. FAC charge for accumulated SFI taxes.
Mr. Penzeca asserted that the City of New Orleans has known that SFI Period Costs have been recovered through the FAC charge for more than 27 years. He also indicated that this method of cost recovery has been in place prior to, during, and after the period of the LPSC's regulation, and it remains in place currently. He opined that the refunds suggested by Mr. Janssen, Mr. Chavanne, and Mr. Walsh, simply conflict with the regulatory history of this matter.
Mr. Penzeca also addressed the alleged wrongful profits recovery through the FAC as raised in Mr. Janssen's testimony. This issue relates specifically to the FAC treatment of off-system power sales. Mr. Panzeea indicated that the method used by ENO results in both positive and negative differences between the costs of power and a credit to the FAC upon sale of the power. These positive and negative differences ultimately enter into the determination of base rates.[87] As an auditor, he testified that he was aware of the issue. It was disclosed to the City of New Orleans in the 1986 audit report, and the exception was taken to the accounting method used by ENO. He noted that this accounting has been in place consistently since the jurisdictional period of the LPSC's regulation. He opined that ENO did not manipulate its FAC to recreate any so-called wrongful profits. He also opined that the very use of that term is misleading and "somewhat inflammatory."
Mr. Penzeca also testified concerning the issue of interest on over collections, which occurred during the period while ENO was under the jurisdiction of the *266 LPSC. He indicated that there was no requirement for interest to be paid on the FAC overbillings. He further testified that ENO openly and consistently applied the same FAC methodology when regulation was returned to the City of New Orleans in 1985. The mere fact that ENO New Orleans was no longer paying interest on overcollections was well known by the City of New Orleans by virtue of the monthly fuel adjustment charge filings as well as disclosures in some of the audit reports in which Mr. Penzeca was involved.
Mr. Penzeca testified that Mr. Janssen's analysis ignores important changes to ENO's approved FAC methodology pursuant to City Council Resolution No. R-76-135, whereby estimates would no longer be used in the calculation of the FAC. He also stated that the over and under collection of fuel costs are an inherent and unavoidable part of the functioning of ENO's currently authorized electric FAC. He specified that ENO no longer pays interest on overcollections pursuant to City Council Resolution No. R-85-248.
Concerning the issue of the Grand Gulfs, "D & D" costs, Mr. Penzeca testified that ENO has historically recovered D & D costs through the FAC pursuant to Title XI of the Energy Policy Act of 1926, and also the requirements of Resolution R-91-157, which addressed the subject of Grand Gulfs non-fuel costs. Mr. Penzeca indicated that the City of New Orleans has been aware that D & D costs were recovered via the FAC by virtue of prior audit disclosures. He opined that there was no basis for the retroactive disallowance and refund suggested by Mr. Janssen.
Mr. Penzeca also testified regarding the "allocation of line loss issue" raised by Mr. Chavanne. Mr. Penzeca asserted that although Mr. Chavanne argued for a different allocation of line losses among customer classes, the allocation methodology used by ENO has been in place since 1955. He also added that the City of New Orleans has been aware of the allocation used by ENO by virtue of prior audit report disclosures, correspondence to the City dated approximately February 4, 1997, as well as ENO's response to the 1991 Ernst & Young audit report. Mr. Penzeca opined that there was no basis for the refund recommended by Mr. Chavanne.
Concerning the AECC energy adders issue raised by the ratepayers, Mr. Panzeca indicated that this issue was first disclosed to the City in the 1986 audit report. He indicated that these adders were a part of the total purchase price paid for power from AECC, and they were recovered through the FAC like any other purchase power costs. He indicated that the AECC adders were intended to cover variable O & M costs purchased from AECC. He disagreed with Mr. Janssen's argument that such costs were improperly recovered because they are fixed and predictable. He stated that no such allegation that costs were imprudently incurred was ever made, and he saw no basis for retroactive disallowance and refunds suggested by Mr. Janssen.
Simply put, ENO argued that the Appellants' position that it should be ordered to refund SFI Period Costs passed through the FAC, "flies in the face of prior decision[s]" made by the City Council to not realign costs and is barred by the filed rate doctrine and the rule against retroactive rate-making. ENO maintained that the FAC itself is a filed rate that is not subject to retroactive ratemaking. In support of this argument, ENO cites Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571 (1981); 101 S.Ct. 2925, 69 L.Ed.2d 856.
In Hall, natural gas producers brought a state court action against its buyer contending that its buyers payments under *267 leases it had purchased in the same production field triggered the "favored nations clause" of the purchase agreement, which had been filed with and approved by the FERC. The district court held that the "filed rate doctrine" precluded an award of damages for the period during which the producers were subject to the LPSC's jurisdiction. The Third Circuit Court of Appeal affirmed. However, the La. Supreme Court reversed, 368 So.2d 984. On remand, however, damages were assessed and the Court of Appeal, 379 So.2d 1142, affirmed. Granting certiorari, the U.S. Supreme Court held that although the buyer innocently breached the contract by failing to inform the producers of lease payments, it deprived the producer of an opportunity to apply to the LPSC for a rate increase. The state court's award of damages, which were equal to the difference between the approved contract rate and the lease payments, was barred by the filed rate doctrine, notwithstanding the state court's determination that had rate increases been filed, they would have been approved.
The U.S. Supreme Court's disposition affirmed in part, vacated in part and remanded the case. Ultimately, it was concluded that the filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority. See, e.g., T.I.M.E. Inc. v. United States, 359 U.S. 464, 473, 79 S.Ct. 904, 909, 3 L.Ed.2d 952 (1959)." Id. at 577, 101 S.Ct. 2925.[88]
ENO argued that the filed rate doctrine applies to rates that have already been filed with state regulatory bodies. The filed rate doctrine prohibits state regulatory bodies from attempting to regulate or modify rates that have been filed with their own agency. As also stated in Hall:
Not only do the courts lack authority to impose a different rate than the one approved by the Commission, but the Commission itself has no power to alter a rate retroactively.8 When the Commission finds a rate unreasonable, it"shall determine the just and reasonable rate . . . to be thereafter observed and in force." § 5(a), 52 Stat. 823, 15 U.S.C. § 717d(a) (emphasis added). See, e.g., FPC v. Tennessee Gas Co., 371 U.S. 145, 152-153, 83 S.Ct. 211, 215, 9 L.Ed.2d 199 (1962); FPC v. Sierra Pacific Power Co., 350 U.S. 348, 353, 76 S.Ct. 368, 371, 100 L.Ed. 388 (1956). This rule bars "the Commission's retroactive substitution *268 of an unreasonably high or low rate' with a just and reasonable rate." City of Piqua v. FERC, supra, at 12, 610 F.2d, at 954.
Id., 453 U.S. 571, 578, 101 S.Ct. 2925, 69 L.Ed.2d 856 (U.S.La., 1981). ENO argues that if the City Council took such action, the act would amount to retroactive ratemaking, which the City Council is prohibited from doing.
In addition, ENO maintained that SFI Period Costs have steadily declined over the years. Because of this trend, ENO insists that ratepayers have benefited from the SFI Period Costs being passed through the FAC because the costs were lower. ENO notes that had the SFI Period Costs been passed through base, rates at a fixed amount, then the ratepayers would not have benefited from the lower costs.
The City Council asserted that the only question in this appeal is simply whether the district court committed reversible error in affirming the City Council's findings. First, the City Council disagreed with the Appellants' contention that the City Council has no deference. The City Council countered that in Louisiana jurisprudence, it is well established that the City Council is entitled to substantial deference in matters related to the regulation of public utilities within its jurisdiction. See State ex rel. Guste v. Council of City of New Orleans, 309 So.2d 290, 294 (La.1975). Second, the City Council further maintained that its resolutions are "presumed valid . . . and are not to be overturned absent a showing of arbitrariness, capriciousness, or abuse of authority."[89] Lastly, the City Council maintained that its resolutions "will not be overturned absent a finding that it was clearly erroneous or is unsupported by the record."[90] Therefore, the City Council urged that this Court affirm the district court's judgment which found that the City Council did not act arbitrarily nor capriciously, absent any error of law, or a finding that is manifestly erroneous or clearly wrong.
In response to the Appellants' contention that the City Council confused its role in the administrative proceedings, and that the "[City] Council's fundamental misunderstanding of its role led it to commit numerous errors of law that materially affected the outcome of the case and deprived the Appellants of their constitutional rights to due process, the City Council asserted that the Appellants' contention is incorrect. Pursuant to the Home Rule Charter, legislative powers of the city are vested with the City Council." See, Home Rule Charter § 3-101(1). The City Council contends that rate-making is the legislative function. However, the Appellants maintain that their claims were supposed to have been decided on the law and the facts, not on the basis of a legislative weighing of interests, policymaking, or political compromise.
Additionally, the City Council countered by noting that the instant case concerns the Appellants' allegations regarding ENO's FAC filings, as opposed to ENO's base rate. The City Council maintains that ENO's FAC is a "formula" rate, which cannot be subject to changes. In support of this contention, the City Council cited Daily Advertiser, supra, in which the Supreme Court held:
Automatic FACs are widely-accepted rate making tools, utilized to allow a utility to recoup fluctuating fuel costs on an ongoing basis. Schiffel, Electric Utility *269 Regulation: An Overmen of Fuel Adjustment Clauses, 95 Pub.Util.Fort. 23, 24 (1975). Simply put, an automatic, fuel adjustment clause is "a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the Company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates." City of Norfolk v. Virginia Electric & Power Co., 197 Va. 505, 90 S.E.2d 140, 148 (1955).
612 So.2d at 22. Additionally, the City Council also pointed out that in Daily Advertiser, the Supreme Court also held that:
Implementation of such clauses is an exercise by a regulatory commission of its rate making, as opposed to rule making, power. In re Petition of Allied Power & Light Co., 132 Vt. 354, 321 A.2d 7 (1974). Such clauses are generally adopted in a rate proceeding as an integral part of a utility's overall rate structure. Scates v. Arizona Corp. Comm'n, 118 Ariz. 531, 578 P.2d 612, 616 (1978); Public Service Co. of New Hampshire, 600 F.2d at 947 (describing such clauses as part of a "utility's filed rate"). While in a few jurisdictions regulatory commissions are statutorily authorized to implement such clauses, in Louisiana, as in most jurisdictions, the commission implements such clauses pursuant to its plenary rate making authority. See City of Chicago v. Illinois Commerce Comm'n, 13 Ill.2d 607, 150 N.E.2d 776, 782 (1958) (commission's rate making function includes the authority to make pragmatic adjustments); Trigg, Escalator Clauses in Public Utility Rate Schedules, 106 U.Pa.L.Rev. 964, 996 (1958) ("Trigg"); Note, Due Process and the Automatic Fuel Adjustment Clause, 52 Ind.L.J. 637 n. 3 (1977).
Conversely, the commission's allowance of monthly cost adjustments pursuant to such clauses does not constitute rate making in the traditional sense of that term because such adjustments go into effect without an antecedent reasonableness review and thus are not "commission-made" rates.
612 So.2d at 23,
The City Council also addressed the Appellants' claim that their rights were violated through the City Council's appearance of adopting a partisan role. The City Council noted that by law, it is to be made party to appeals of its orders so that it may properly defend its actions.
The City Council also rejected the Appellants' claim that due process was violated. Particularly, the City Council pointed out that the Appellants did not specify whether or not they were invoking procedural or substantive due process claims, or both. However, the City Council noted that the Appellants' due process claims fail for several reasons: first, the Appellants did not raise the issue before the City Council, nor did they raise it until their reply brief was submitted to the district court, and should be deemed waived by this Court; and lastly, the City Council asserted that the Appellants were provided all the process that they were due, and that the City Council indicated that there was nothing present in the record to substantiate a due process violation.
As to the Appellants' claims that the City Council did not base its decision either on the law or on the facts in the record before it, and that it should not have considered policy reasons or the greater good in arriving at its decisions, the City Council argued that the record in the instant case demonstrates that the City Council reached its decisions based on the law and the facts and the record.
*270 Furthermore, the City Council noted that its decision-making was also correct because, in its capacity as the utilities regulator, it is bound to engage in fact-based ratemaking and regulation that takes into account the practical and policy effects of its decisions on the utility, the ratepayer, and the community. Hence, the City Council reiterated that the Appellants' argument that they were deprived of constitutional due process does not have merit.
Additionally, the City Council rejected the arguments raised by the Appellants on appeal. It pointed out that the Appellants advance six "weak arguments" in support of their allegations that the City Council incorrectly resorted to equity and declined to order refunds of SFI Period Costs. These six "weak arguments" were: (1) despite whether equities squarely fall, the law-according to the Appellants requires refunds; (2) the City Council did not previously approve of ENO's recovery of SFI Period Costs through ENO's FAC; (3) the Appellants claim that ENO had been advised by the New Orleans Department of Utilities and the FERC not to pass SFI Period Costs through its FAC; (4) the Appellants claim that ENO knew it should not have used the FAC mechanism to recover SFI Period Costs; (5) ENO could not have recovered SFI Period Costs through its base rates because of the base rate freezes that were in effect; and (6) the City Council's own experts agreed that refunds should be awarded.
The City Council averred that contrary to the assertions made by the Appellants, it did not illegally decline, as a matter of equity, to order refunds of SFI Period Costs. And in declining to do so, the City Council stated that it was following the same holding specifically found with respect to ELI in the Delaney case. The City Council reiterated the argument posited by ENO by pointing out that in Delaney, the LPSC concluded that "SFI Period Costs were prudently incurred, and until these costs were realigned pursuant to LPSC General Order No. U-21497, they were properly included in ELI's FAC filings." Thus, no refunds of SFI Period Costs recovered through the FAC were ordered in Delaney. The LPSC concluded that these costs were not imprudently incurred, but it established a mechanism by which ENO could recover all of the costs through base rates going forward.
Additionally, the City Council noted that while ENO did not seek antecedent review of SFI Period Costs, as opposed to the mandatory review required for base rate filings, ENO did not have to seek approval for SFI Period Costs. SFI Period Costs are instead subject to an after-the-fact prudence review, and as noted by the City Council, no one disputes the prudence of these SFI Period Costs. The City Council asserted that ENO's failure to seek prior approval of prudently incurred SFI Period Costs, should be affirmed by this Court.
As to the Appellants' allegation concerning what ENO "knew" regarding ENO's failure to seek prior approval to include SFI Period Costs,[91] the City Council asserted that there is ample evidence in the record to support the district court's affirmation of its decision, particularly in light of the fact that ENO has recovered SFI Period Costs through the FAC since the 1970s.
Additionally, as stated similarly in ENO's response to this particular issue, that SFI Period Costs could not have been recovered through ENO's base rate due to rate freezes, the City Council noted that that type of recovery, the corresponding payments to ratepayers as a result of base *271 rate freezes could have resulted in higher payments by ratepayers in light the record which showed a steady decline of approximately 80% in SFI Period Costs over the past 15 years. Hence, SFI period Costs, as asserted by the City Council, in all likelihood benefitted ratepayers."
The City Council also addressed, the Appellants' claims that the Advisors of the City Council suggested refunds be awarded, but that the City ignored the recommendation. The City Council noted that the Appellants appear to have confused the proper role of the Advisors of the City Council in the regulatory process. The City Council reiterates that the Advisors of the City Council are not the City Council, and that the role within the regulatory process is to advise, while City Council's role is to decide. The City Council maintained that its sole responsibility is to weigh and consider the evidence and opinions presented by all parties, including the Advisors of the City Council. The City Council averred that it was free to accept or reject the evidence as it deems appropriate, and to arrive at its own independent decision based on the law, the facts, the record, and what it finds to be in the best interests of ratepayers, utility, and ultimately the citizens of the City of New Orleans.
As to the Appellants' argument that the City Council committed error in invoking equity in refusing to award refunds of SFI Period Costs, the City Council contends that "equity" is sine qua non[92] of the legitimate exercise of regulatory discretion.[93] For the above stated reasons, the City Council argued that it was not arbitrary or capricious in denying refunds of SFI Period Costs, and that this Court should likewise affirm the district court's judgment.
Specifically, two experts, Kennan Walsh and Philip Movish, testified on behalf of the City Council.
Mr. Walsh's testimony addressed several cost components of ENO's FAC filings that should not have been included in ENO's fuel adjustment filings.
He testified that the specific cost components that the Advisors of the City Council identified which have been included in ENO's FAC filings, but should not have, included the following:
a. There was an improper inclusion, of SFI Period Costs in ENO's FAC filings after April, 1985. The effect of including non-fuel, fixed SFI Period Costs in its FAC resulted in the over-collection of nearly $25,750,000.00. For the year 2000, there was an additional over-collection of nearly $666,000.00 of SFI Period Costs through ENO's FAC.
b. ENO mistakenly discontinued the interest calculation on its fuel adjustment over billings after May, 1985. The omission of interest in ENO's FAC filings for the period of May, 1985 through December, 1999 was approximately $2,272,000.00. For the year 2000, there was an additional omission of approximately $344,000.00 of interest on overbillings through ENO's FAC.
c. There was a fuel adjustment flow through of the capacity charge component of firm energy costs by virtue of Entergy's System Agreement allocation of joint account purchases and or through Service Schedule MSS-3, Exchange of Electric Energy *272 Among the Companies. For the summer of 1999, ENO improperly collected approximately $700,000.00 of non-fuel related capacity charges associated with the firm energy contracts through its FAC. In the summer of 2000, approximately $715,000.00 of non-fuel related capacity charges associated with firm energy contracts flowed through ENO's FAC.
d. ENO "inappropriately" dispatched Entergy Power, Inc. (EPI) generating units during periods in which less costly supply resources were available to the Entergy System, thus flowing more expensive fuel costs through its FAC. The approximate amount of excess costs to ENO's ratepayers for the time period 1990 through 1999 was $1.3 million dollars. In 2000, the approximate amount of excess costs charged to ratepayers was $830,000.00.
Mr. Walsh testified that the total dollar impact of improper or excessive costs that flowed through ENO's FAC mechanism to its ratepayers from 1985 through 1999 was approximately $32 million dollars. He also testified that an additional amount of approximately $2.5 million dollars flowed through ENO's FAC in the year 2000 alone.
He also testified that SFI Period Costs are non-fuel overhead expenses or fixed costs associated with SFFs procurement of oil for the Entergy Operating Companies. These fixed costs are either directly or indirectly allocated to each Operating Company based upon each Operating Company's proportion of oil burning generation capability to the Entergy System's total. The fuel adjustment is recovered on a monthly basis.
Mr. Walsh further testified that he did not find any specific City Council resolutions that address the proper recovery mechanism of SFI Period Costs. However, he indicated that City Council Resolutions, Nos. R-76-135, and R-76-179, respectively, specifically address the recovery of fuel related costs, "whereas SFI Period Costs are not non-fuel related fixed expenses that should not be recovered through the FAC, but rather through electric base rates."
Mr. Walsh also testified that several independent reviews were conducted of ENO's FAC mechanisms. As a result of one such review, by CPA accounting firm Ernst & Young in 1991, the firm stated:
Although excluding these charges would not decrease monthly electric fuel adjustment charges by an appreciable amount, the relatively fixed and predictable nature of this non-fuel expense makes recovery through electric base rates more appropriate. Such a change in the manner in which SFI [P]eriod [C]osts are recovered should be considered in the context of NOPSI's next application for rate relief.[94]
Based on the Ernst & Young review, Mr. Walsh indicated that Entergy was advised to apply for a base rate increase as it made the "recovery through base rates more appropriate." However, he indicated that ENO never attempted to change its mechanism of recovery for non-fuel SFI Period Costs through the FAC.
He further indicated that in 1990, another independent examination was conducted by the FERC. This examination determined that ENO used the wrong expense accounts to classify search in all stores costs assigned by SFI lending, He testified that this independent review gave further *273 support to Ernst & Young's recommendations. He stated that the FERG made its recommendations and findings[95] based on an audit of ENO's records from the period of January 1, 1990 through December 31, 1993. He testified that specifically, the FERC found:
a. SFI incurred rent' and other expenses for oil storage tanks it leased and expenses such as inspecting, loading, unloading, repairs, maintenance, clean-up, rent, property, taxes, depreciation, and leasehold improvements for tanks it owned.
b. Besides tank storage costs, SFI incurred administrative expenses and interest related to the acquisition and storage of oil inventory.
c. SFI billed its costs related to the oil program each month to those Operating Companies, including ENO, that had an ownership share in SFI.
d. ENO classified its allocated share of Period Costs billed by SFI in the Uniform Systems Account designated as "Account 501, Fuel."
e. ENO should have classified the various costs billed by SFI as if it incurred the costs directly in various operating expense accounts, instead of using Account 501.
f. Recommended that ENO adopt the necessary procedures to ensure it classifies charges from SFI effective January 1, 1997, according to the appropriate expense accounts.
g. Noted that in a coverletter dated February 26, 1997, ENO agreed in a letter to the FERC dated February 19, 1997, that it would adopt the FERC's recommendations.
Mr. Walsh testified that although the FERC "implied" that ENO would adopt its recommendations to change its accounting practices of reporting SFI Period Costs in Account 501, ENO responded to the FERC via letter on February 19, 1997, setting forth its desire to continue reporting SFI Period Costs in Account 501. ENO reiterated the same stance in two subsequent letters to the FERC dated May 8 and May 28, 1997, respectively.
The letter of May 28, 1997, particularly discussed expansion of ENO's SFI oil program strategy and included a statement indicating that Entergy was pursuing a plan to discontinue utilizing SFI to provide fuel oil and related storage services to the companies. However, Mr. Walsh indicated that the Entergy Operating Companies' dependence on SFI continues and that Entergy's plan never came to fruition. Thus, the FERC specifically identified Entergy's improper reporting of SFI Period Costs in Account 501 and subsequently recommended the correct accounting treatment. However, for reasons unknown, Mr. Walsh noted that ENO continued reporting its SFI Period Costs without any change from its historically applied method of flowing fixed costs through its FAC.
Yet, Mr. Walsh stated that ENO admitted that it was aware that SFI Period Qosts were fixed costs in a letter dated February 28, 1996. He opined that had ENO followed the FERC's recommendation, to report SFI Period Costs to the appropriate account, rather than to Account 501, these Period Costs would not have been passed on to ENO's customers via the FAC. He also testified that ENO still classifies SFI Period Costs on its monthly FAC filings under the itemization of "Other FERC titled Account 501 costs." He further explained that the heading directly corresponds to direct and allocated *274 amounts reflected on SFI Invoices included in the company's monthly FAC filings.
Mr. Walsh concluded that ENO has not adhered to the City Council's resolutions through its improper inclusion of SFI Period Costs in its FAC filings. He testified that these costs are non-fuel related fixed expenses that should not be recovered through the FAC. He also testified that since ENO continues to report its SFI Period Costs in the FERC Account 501, contrary to the FERC's recommendation, the SFI Period Costs are improperly flowed through its FAC filings. The ultimate result, he concluded, is ENO's recovery of SFI Period Costs via the FAC in lieu of base rates.
Mr. Philip Movish testified as a witness on behalf of the Advisors of the City Council. His testimony addressed two separate issues: (1) the existence of transmission constraints and the potential impacts that such transmission constraints can have on the cost of power to New Orleans ratepayers, and need to study mitigation of such impacts; and (2) the implementation of additional risk mitigation processes, as agreed to between the LPSC and ELI in Delaney.
Concerning his testimony concerning Entergy's transmission constraints, he described the ENO service area as existing within the Amite South area of Entergy's transmission system. The Amite South area is defined in the southeastern most portion of Louisiana extending from the mouth of the Mississippi River North through New Orleans, Jefferson and the River parishes to the Gonzalez area in Ascension Parish, and just east of Baton Rouge. He noted that historically and presently, the Amite South area has been transmission constrained.
Specifically he testified that existing energy transmission lines do not have adequate capacity to import the full load requirements of its customers located within Amite South in the event of certain contingencies, such as an unplanned outage of one of Entergy's Amite South transmission lines. In order to maintain its ability to reliably service its customers located within the Amite South area, Entergy is forced to operate local area generation. He noted that Entergy's total transmission import capacity into the Amite South area is 2,180 MW under peak load conditions and is limited by the single contingency laws of Entergy's Willow Glen-Waterford 500 kV transmission line.
Mr. Movish testified that if the transmission lines failed during peak low conditions, Entergy's underlying 230 kV transmission line system would become severely overloaded. In order to mitigate this problem, he suggested that Entergy limit the flows on both[96] of its transmission lines to a total of approximately 935 MW. The energy flows would then be limited by reducing the Amite South's area transmission imports and/or the output of Entergy's Waterford 3 generating unit.
He testified that in order to limit imports of power into the Amite South area to a maximum of 2,180 MW, Entergy operates its generating facilities located within the Amite South area. Some of Entergy's Amite South area generation is operated under economic dispatch in order to serve load needs. Other Entergy Amite South *275 area generators are operated for reliability and voltage support purpoaes.
Mr. Movish testified that although many transmission systems throughout the United States suffer from similar constraints, Entergy's transmission System was originally designed to serve the individual load requirements' of each of its Operating Companies with limited import and export of power. He testified that since the formation of Entergy, and the integration of each of the Operating Companies' transmission systems, Entergy has continued to expand and upgrade its overall system. He noted, however, that the physical limitations inherent in the former Operating Companies' discrete transmission systems affect and limit the overall capability of the integrated system to transfer imports and exports of power. Consequently, he opined that such facilities were not designed to support such flows. He testified that although Entergy has continued to upgrade, expand, and develop higher voltage transmission facilities, its older underlying lower Voltage transmission system affects the overall system's ability to move power. He opined that the more Entergy increased its reliance upon the wholesale marketplace to meet its peak native load obligations, the more robust the transmission into to the New Orleans area, the better ENO will be able to capture the effects of competitive wholesale market opportunities.
Mr. Movish testified that he does find it problematic that Entergy operated local area generation within its Amite South area in order to support its voltage requirements. He stated that many electric utility companies operated generation on this basis as a result of transmission system limitations particularly to protect against violating transient stability limits or to mitigate transmission, concerns. However, he testified that he was concerned that any resulting increases in the cost of power to ENO customers that may have resulted from this local area generation approach. He testified that these problems could potentially have been avoided if Entergy had implemented long term plans to upgrade the transmission facilities in the Amite South area, therefore, enabling itself to access power at a lower cost for ENO's customers.
Mr. Movish did not have an opinion concerning the magnitude of additional costs imposed upon ratepayers as a result of the existence of Entergy's transmission constraints. However, he did testify that quantification of additional costs would require a cost-benefit study to be performed by Entergy in order to analyze the extent of such transmission constraints, potential methods of mitigating such constraints, and the relative costs and net benefits that could occur as a result of improving the transmission import capability into the New Orleans area.
He also testified that Entergy had not been compliant in performing cost-benefit studies to investigate the Amite South area imports and implementation of risk mitigation procedures as outlined in the Delaney proceeding.
Based upon the above arguments, the testimony of its two experts, and the affirmation of its Resolution by the district Court, the City Council asserts that this Court should find that the City Council did riot violate its position as an administrative adjudicator, pursuant to Daily Advertiser, 612 So.2d 7 (La.1993), in failing to award refunds for overages charged by ENO through its FAC.
The record reveals that the Appellants and the Advisors of the City Council alleged that ratepayers were overcharged by approximately $26 million dollars, plus compound interest from 1985 through *276 2000. This was not because the SFI Period Costs were imprudently incurred, but rather because SFI Period Costs should not have been included in ENO's base rates and not its FAC. However, the record also indicates that the parties in this matter did not assert that the City Council resolution explicitly allows for the recovery of SFI Period Costs through the FAC.
The record also indicates that Mr. Walsh testified that the City Council[97] explicitly stated which fuel expense accounts[98] should be recovered through the FAC. He also testified that the FERC determined, after an audit which concluded in 1997, that SFI Period Cost expenses should not be included within account 501, but rather in other specific accounts and thus not charged through the wholesale FAC.
The record also indicates that in LPSC Docket No. 21497, the LPSC conducted an investigation concerning the FACs of jurisdictional electric utilities. In this order, the LPSC issued its General Order U-21497 in which it revised the format in which the FAC filings are to be made, providing for the realignment of certain costs, including SFI Period Costs, from FAC recovery to base rates, and establishing certain reporting and other requirements relating to LPSC jurisdictional FACs. As noted earlier in this opinion, General Order No. U-21497, which provides for the realignment of base rates, applies prospectively only, as evidenced by the LPSC's provision that such costs are realigned on a revenue-neutral basis only if recovery through base rates is commenced at the time such recovery are removed from the FAC calculation.
Keeping these issues in mind, the record indicates that even though the LPSC ordered a prospective realignment of costs, this action does not indicate that any of those realigned costs had been improperly recovered through the FAC in prior periods, and furthermore, LPSC General Order No. U-21497 did not establish that any particular costs component was improperly included in FAC filings prior to the revenue-neutral realignment prescribed by the LPSC.
The record also indicates that while independent audits of the FAC mechanism were conducted, there was no evidence that such FAC audits were ever made the subject of extensive review by the City Council, and that any inaction with respect to the City Council cannot be deemed to have been in concert with ENO.
Additionally, the record indicates that the ratepayers were not harmed by ENO's inclusion of SFI Period Costs for several reasons, to wit: (1) first, no party challenged the prudence of the SFI Period Costs, and therefore, the City Council is required to allow ENO to recover such costs in either the FAC, or base rates; (2) ENO does not earn a return on the recovery of SFI Period Costs through its FAC, but ENO would if the costs were recovered through its base rates.
The record also reveals that no evidence was introduced by the Appellants to support their claim that the inclusion of the SFI Period Costs in ENO's FAC filings were: (1) the result of any intention to harm or deceive ENO's ratepayers; (2) the result of any manipulation or abuse of the FAC to the detriment of ENO's ratepayers; or (3) the result of any agreement between ENO and its affiliates to harm the ratepayers; or (4) fraudulent. These *277 findings are consistent with the System Agreement as discussed in the LPSC's findings in Delaney.
Since it appears that the matters asserted by the Appellants are essentially identical to those claims raised by the plaintiffs in the Delaney case, the record does not support the Appellants' claims of arbitrariness, capriciousness, or ah abuse of discretion in the City Council's determination that it did not abuse its role as an administrative adjudicator in refusing to order refunds to the Appellants for alleged overcharges billed by ENO to ratepayers through its FAC charges. Therefore, we find that this assignment of error does not have merit, and conclude that the district court was also correct in affirming the Resolution of the City Council as to its findings in the administrative proceeding.

II.
In their second assignment or error, the Appellants assert that other non-fuel costs called AECC-adders[99] were improperly billed to ratepayers in ENO's FAC mechanism. They argued that the City Council erroneously refused to order refunds of these costs, contrary to regulatory policy and law requiring refunds of these base rate type costs. The Appellants point out that Entergy Arkansas, or EAI, acting as agent for ENO and other Entergy Operating Companies, entered into an agreement with Arkansas Electric Cooperative Corporation (AECC) to purchase power. The agreement provided that AECC would be paid a margin of $4.50 per megawatt hour on 3,000,000 MW each year, regardless of the amount of energy actually purchased. The purpose of the adder was to cover all costs, other than fuel costs, incurred by AECC to supply the energy. However, the Appellants assert that the adder amounted to a fixed annual sum of $13.5 million.[100] The AECC adder, as urged by the Appellants, did not vary based on the amount of power actually purchased, and was actually a constant, fixed, and predictable cost.
The Appellants alleged that EAI purchased AECC power under the contract, and that for many years ENO recovered the costs for the AECC adder under the FAC mechanism. The Appellants' expert, Mr. Janssen, confirmed that the amount billed by ENO in AECC adders was approximately $6,065,151 dollars through the FAC mechanism.[101] The Appellants noted that ENO's own expert, Mr. Louiselle, did not dispute Mr. Janssen's findings or statements.
The Appellants also maintain that the City Council's refusal to award refunds of the AECC adders was inconsistent with its other finding in Resolution No. R-04-66. In that resolution, the City Council ordered that other costs improperly included in its FAC be refunded because those costs were known and measurable non-fuel costs and were not eligible for inclusion in FAC mechanism. Particularly, the City Council ordered refunds of capacity costs related to summer power purchase agreements, because the capacity costs were non-fuel, fixed and predictable costs.
*278 However, the Appellants noted that the City Council erroneously concluded that the AECC adders should not be refunded because they were not capacity or facility costs. The Appellants argued that there was no distinction between capacity costs of summer power purchase contracts, for which refunds were ordered, and the AECC adders. The Appellants maintained that each of those costs were ineligible because each was a fixed, predictable non-fuel base rate cost.
The Appellants asserted that the City Council's Resolution should be vacated and that ENO be ordered refunds in the amount of $6,065,151.00, because the City Council "misapplied the test for determining the eligibility of costs recoverable through the fuel adjustment mechanism." [102] They pointed out that "the test for eligibility is whether [the cost] is fluctuating, is volatile, and is a fuel cost," and based on this criteria, they assert that the AECC adders fail these criteria.
Additionally, the Appellants argued that this Court should show no deference to the City Council's findings because the City Council misapplied the standards of review of fuel adjustments, as articulated in Daily Advertiser and Entergy Gulf States, supra.
ENO argued that the AECC adder is a FERC-approved contract pursuant to a Power Coordination, Interchange and Transmission Service Agreement ("PCTA").[103] The PCITA allows for AECC costs to be included in the FAC. The AECC adder, as noted by ENO, was set at a fixed amount and was designed to recover estimated incremental variable operation and management costs associated with power generation, and non-fixed costs. ENO suggested that the City Council was aware of this practice and had implicitly approved inclusion of the AECC adder in the FAC since 1986. ENO also noted that the City Council's conclusion was neither arbitrary nor capricious in finding that the AECC adder had been properly flowed though ENO's FAC filings and that ENO acted without any fraud or intent to harm in including the FAC.
ENO pointed out that in 1985, EAI,[104] acting as an agent for what was then Middle South Utility System, entered into a FERC-jurisdictional contract to buy, sell, and/or exchange surplus energy with AECC. Additionally, ENO noted that the EAI/AECC PCITA governs the relationship between the AECC and EAI. Under the current EAI/AECC PCITA, the price for energy was set at actual fuel costs, plus $4.50 per megawatt hour to cover all variable costs other than fuel. The contract specified that the Entergy System is obligated to annually pay a sum equal to the $4.50 per megawatt hour adder, times 3,000,000 MW per hour, or $13.5 million per year for variable Operating & Management costs.
ENO asserted that the EAI/AECC PCTA is merely an arms-length transaction between two unaffiliated entities and that the AECC adder was part of the total purchase price paid for power from AECC and was based on the volume of power purchased, adjusted to provide the AECC with a negotiated margin on the sale. ENO maintained that costs directly related to the acquisition of power from AECC, flowed through the FAC as a purchased power cost. ENO also noted that the AECC adder collects variable Operations & Management costs associated with generation *279 of power. Thus, ENO asserts that these AECC adder costs were properly flowed through the FAC.
ENO also argued that AECC's variable Operation & Management adder was a part of the FERC-approved rate for the sale of energy, not capacity, to Entergy on behalf of the Operating Companies. The AECC Operation & Management adder was part of the FERC-approved PCITA, a contract that stated that the Operation & Management adder covered all, variable costs other than fuel. Due to this contract, ENO argued that the AECC adder was intended to collect variable Operation & Management costs and is part of the FERC-approved PCITA rate for the sale of energy, and was properly collected through ENO's FAC filings. ENO asserted that there was no basis for retroactive disallowance in the refund of these costs. ENO pointed out that the City Council agreed with ENO's position as to this issue and held, "based on the evidence provided on this issue, the Council finds that ENO properly passed through ENO's FAC costs related to the AECC energy adder, and the plaintiffs err in their interpretation of what costs this charge is designed to recover."
ENQ's expert, Mr. Bruce Louiselle, also testified concerning the AECC adder, and concluded that based upon his independent review of the data, the AECC adder was not an appropriate item to include in the FAC mechanism.
ENO also countered the Appellants' position by noting that Mr. Louiselle testified that no City Council resolution has prohibited the Inclusion of fixed and predictable costs in ENO's FAC. ENO averred that the City Council has implicitly improved the inclusion of the AECC adder in the FAC since 1986. Pursuant to a 1986 audit of ENO, the $4.50 adder was brought to the attention of the Department of Utilities, and the audit specifically stated that AECC energy is priced at the actual cost of fuel per megawatt hour plus $4.50 per megawatt hour. Under this agreement the purchase price was adjusted to provide AECC with margins of $13.5 million ($4.50 per megawatt hour on a 3,000,000 MWh) each year, regardless of the amount of energy actually purchased.
However, ENO maintained that despite the City Council's knowledge of the AECC adder since 1986, Mr. Janssen, the Appellants' expert, urged that ENO never disclosed that its AECC energy adder was included in the FAC. ENO averred that although it was not required to bring the AECC energy adder to the City Council's attention because the adder is a FERC-approved contract it was not subject to the jurisdiction of the City Council. ENO asserts that the AECC adder issue was raised with the City Council through the audit process and the City Council implicitly approved of ENO's practice.
As to the remaining claims raised by the Appellants, ENO argued that the City Council correctly held that in including the AECC adder in its FAC, ENO did not act with harmful, deceptive or fraudulent intent. ENO reiterated its position that the City Council was been aware of ENO's practice with respect to the AECC adder since 1986. ENO concluded that there Was no basis for retroactive disallowance and refund of the AECC energy adder.
The City Council asserted that the evidence presented to it established that the AECC adder represented the incremental and variable Operation and Maintenance costs associated with generations of ENO's purchases from AECC through EAI. The Appellants argued that these types of expenses are fixed, variable, and predictable non-fuel costs that should be recovered through ENO's base rates and not its *280 FAC. The Appellants also argued that to permit these types of costs to be recovered through the FAC, as opposed to base rates, was inconsistent with parts of the City Council's earlier resolution, wherein the City Council ordered that other costs be refunded because they "were known and measurable non-fuel costs." However, the City Council maintained that the Appellants' assessment concerning this issue was incorrect.
The City Council noted that the record amply established that the AECC energy adder "is meant to recover variable incremental costs directly related to power generation by, and acquisition of that power from, AECC like any other purchase power cost." Hence, the City Council concluded that the AECC energy adder is probably flowed though ENO's FAC. The City Council found:
ENO properly passed through ENO's FAC costs related to the AECC Energy Adder, and the plaintiffs err in their interpretation of what costs this charge is designed to recover. The AECC Adder was designed to recover estimated incremental variable O & M costs associated with the generation purchase from AECC, and therefore it is appropriate for it to be recovered as a cost a fuel in the FAC. Whereas the AECC Energy Adder has a fixed rate at $4.50 per MWH, the evidence suggests that the AECC Energy Adder with not designated to recover demand related costs, capacity costs or facilities charges, but rather variable costs. The record shows that EAI/AECC/PCITA is an arms length transaction between two unaffiliated entities. The AECC Energy Adder is a part of the total purchase price for power from AECC, and is based on the volume of Powell purchased, adjusted to provide AECC with the negotiated margin on the sale.
Additionally, the City Council also asserted that the Appellants have not questioned the prudence of these incurred costs, but rather focused their attention to the manner in which ENO recovered them. Based on these arguments, the City Council argued that it did not act arbitrarily nor capriciously in refusing to award over $6 million dollars, plus interest, in refunds to ratepayers for legitimately incurred AECC energy adder costs that were applied to purchases and properly part of the cost of fuel included within ENO's FAC. Additionally, the City Council pointed out that since the district court agreed with its findings, this Court should also affirm its findings.
Our review of the record indicates that the Appellants requested a refund in the amount of $6.1 million, plus interest, for non-fuel costs that were allegedly flowed through the ENO's FAC to ratepayers. However, the record indicates that neither the Intervenors nor the Advisors of the City Council addressed this particular issue in their testimony.
The record illustrates that the AECC Adder was designed to recover variable 0 & M costs of fuel related to electric power generation purchased from AECC and is recoverable under the FAC as a fuel purchase. Although the plaintiffs have argued that the AECC adder was not designed to recover such charges, the record reveals that the AECC adder is a part of the total purchase price for power from AECC,[105] which is based on the total volume of power purchased, adjusted to provide AECC with a margin on the sale.
*281 Hence, the record does not support a claim that the inclusion of the AECC adder in ENO's FAC filings was: (1) the result of any intention to harm or deceive ENO's ratepayers; (2) the result of any manipulation of abuse of the FAC to the detriment of ENO's ratepayers; or (3) the result of any agreement between ENO and its affiliates to harm the ratepayers, or (4) fraudulent.
As previously stated, it is also clear from the record that the matters asserted by the Appellants are essentially identical to the claims raised the plaintiffs in the Delaney case. Therefore, based on our review of the record in the matter sub judioe, the findings in the instant matter are consistent with the Service Agreement discussed at length in the Delaney case. There was no arbitrariness, capriciousness, or abuse of discretion in the City Council's discretion. This assignment of error does not have merit and we affirm the judgment of the district court.

III.
In their third assignment of error, the Appellants argued that since ENO has historically been unable to generate enough of its own power to meet its customers electricity needs, it purchased the balance of the supply of electricity from a wholesale power market. However, the Appellants pointed out that the decision of where to purchase power was not performed by ENO, but rather through Entergy's unregulated affiliate, ESI, which purchased power for not only ENO, but for the sister utilities in Arkansas, Mississippi, Louisiana and Texas as well.[106] Additionally, ESI also sold any excess power that those utilities had available for sale.
The Appellants claimed that ESI received offers of power available from the wholesale market on behalf of ENO and its sister utilities. When ESI determined what power to purchase from non-affiliate companies, it compared the price of power Offered by such non-affiliate companies with the estimated cost to ENO of acquiring a like amount of power from one of its affiliated Entergy Operating Companies.
However, the Appellants maintained that ESI did not simply accept the offers for power that were less expensive than the cost of procuring a like amount of power from one of ENO's affiliates. Instead, the Appellants argued that ESI fictitiously discounted the actual cost of obtaining power of the selling company so that it appeared less expensive than the offer from the non-affiliated supplier. ENO referred to this fictitious discount as the "margin."
The Appellants claimed that ENO utilized this practice because it allowed ENO to wait for the best deals for power. However, the Appellants rejected this practice because, they argued, that the use of the fictitious discount by ESI was done to reject non-affiliate offers[107] and buy power from the Entergy System that was produced by ENO's affiliates. Appellants noted that the power was produced and charged to ENO at or near the cost determined by the initial estimate, and not at the artificially reduced price that was used to make cost comparisons. Therefore, when ENO billed ratepayers for this affiliate-produced power, it overcharges them the difference between the cost of that power and the lower-priced offer from the non-affiliate that was rejected.
*282 The Appellants pointed out that the witnesses who testified concerning this particular issue agreed that the margin caused ENO to reject lower costing, non-affiliate offers. Additionally, the Appellants maintained that the margin was not, and has never been authorized by any of ENO's tariffs, at the retail or wholesale level, nor was it ever approved for use by the City Council. The Appellants argued that ENO did not disclose the margin until after the City Council proceedings began.[108]
Nevertheless, despite the City Council's adoption of Resolution No. R-04-66, which found that the margin was reasonable and in light of the uncontroverted evidence introduced at the hearing to the contrary, the Appellants asserted that the City Council's finding was arbitrary and capricious and had no factual basis in the record. The Appellants also asserted that ENO did not offer any contemporaneous evidence from the 1993-1999 period that was under review. ENO, per the Appellants, did not present any evidence which proved the reasonableness of its decision to use a margin that the amount of the margin itself was reasonable.
In support of this argument, the Appellants reiterated the position held by the Louisiana Supreme Court in Entergy Gulf States Inc., v. La. Public Service Comm'n, 98-0881, (La.1/20/99), 726 So.2d 870, 889,[109] that a utility bears the burden of proving the reasonableness of its decision-making with contemporaneous evidence. The Appellants argue that ENO failed to carry its burden of proof. The Appellants assert that the only evidence presented by ENO was "an after-the-fact review" concerning a very limited time period. However, the Appellants note that rather than proving the prudence of the margin, the report directly contradicted ENO's prior claims that the margin was minor, and showed that the size of the margin exceeded the amounts represented by ESI's employees who testified in the City Council proceedings.
The Appellants also allege that ESI testified that the size of the margin varied and that the decision whether to apply any margin at all is within the discretion of Entergy's traders, who procured electricity for ENO. This, as cited by the Appellants, reflects that the margin, by ENO's admission itself, was applied in an arbitrary and inconsistent manner and not subject to any defined rules or procedures.
As elicited by the Appellants, the City Council refused to award refunds because it concluded that the Appellants had not proven that the use of the margin, "had any impact on any specific third-party offer or sale." Hence, rather than requiring ENO to prove that the margin resulted in savings for ratepayers, the City Council "improperly" shifted the burden to the Appellants to prove that ENO acted unreasonably, by showing specific offers of lower cost power from non-affiliates. The Appellants vehemently argue that this shifting of the burden of proof was legal error. This showing of individual instances, as argued by the Appellants, would have been impossible to do because ESI has destroyed its records which showed these offers of sale.
*283 The Appellants' expert, Dr. Roach reviewed the power purchases and productions costs, along with the prices of available power from non-affiliates on n hourby hour basis for the relevant time period. The Appellants assert that Dr. Roach's analysis revealed that ENO purchased 8,121,858 MWh of power from its affiliated companies. The Appellants aver that this amount was more expensive than the prevailing market prices from non-affiliates. The Appellants allege that ENO's systematic rejection of lower cost non-affiliate power resulted in $24,400,000 in overcharges, plus interest.
The Appellants also challenge the City Council's conclusion that the "concept" of the margin was reasonable. They note that while the City Council dismissed their claims, with prejudice, based on its determination that the application of a margin was reasonable, it contemporaneously ordered a comprehensive analysis to determine whether the margin was an effective policy in meeting service obligations at the lowest reasonable costs. Additionally, the City Council also ordered a study to determine whether ESI's decision-making process related to power purchases was reasonable. The Appellants argue that the City Council's findings concerning this assignment of error constitute legal error and were arbitrary and capricious.
The Appellants' expert, Dr. Craig Roach, testified concerning the prudence of affiliate purchases by Entergy New Orleans.[110] Much of his testimony was based upon one "simple policy standard" and one "simple fact." The simple policy standard, he explained, is that ENO was obligated to provide reliable service to the people of New Orleans at the lowest reasonable cost. He concluded that ENO failed to provide reliable service at a reasonable cost, and that ENO failed to use reasonable decision-making procedures. In this respect, he opined that Entergy New Orleans was imprudent and that the people of New Orleans are owned the refund.
As for the "simple fact" on which Dr. Roach based his expert opinion, he testified that when ENO purchased power from its affiliates, it paid a higher price, or rather a premium, to its own affiliates compared to what it paid to other competing suppliers. He testified that the fact that such a premium exists was based on extensive research into ENO's hour by hour operating results for the Entergy companies over and near seven-year period from 1993 through September 1999.
Based upon his review of the data, he first found that the premium was pervasive. He indicated that it was paid in 67% of all hours accounted for during that seven year period. Second, he found that the premium was substantial. He testified that the premium averages $5.62 per megawatt hour, or in other words, 23% of the price paid to affiliates is a premium. Third, and finally, he found that the premium accumulated a significant number, approximately $45.7 million over the seven-year review period. He opined that the people of New Orleans have been overcharged by this amount. Dr. Rdach also testified that his review of the data led him to conclude that the premium resulted from Entergy New Orleans' choice to rely on six (6) biased corporate procurement practices.
Biased Procurement Practice # 1  The Margin
The first imprudent procurement practice was the use of the "margin," or what *284 he referred to as a "fictional discount." He illustrated this practice via the use of a hypothetical as follows:
DR. ROACH. In this example, a competing supplier comes to Entergy and says, "Look, I'll sell you electricity for year at $20 per megawatt hour." Entergy steps back and says, "Well, what would it cost us generate that power ourselves?" And they come up with an answer of $25. It's higher; it's more expensive to generate.
The story should end at that point. Obviously, it's better for the customer it Entergy buys rather than generates. But the story doesn't seem to and at that point.
In this case, Entergy would invoke what is terms (sic) a $5 "fictional discount" and I don't mean to be flip here, but basically what's going on is that Entergy pretends that it's real cost isn't $25 but only $20.
It then rejects purchase offer from the competing supplier, but the problem is at the end of the month when it comes to build the people of New Orleans for that power, it uses an actual costs, the $25.
Based upon his hypothetical example, he opined that the New Orleans ratepayers were substantially overcharged. He opined that the New Orleans ratepayers "pay (25%) too much." Although he recommended that $45.7 million be refunded, he suggested that $24.4 million of the total could be directly traced to the procurement practice of the "margin," or rather the "fictitious discount."
Dr. Roach testified that Entergy had attempted to justify the use of the margin in three ways. First, he testified that ENO had attempted to justify its use of the margin by its assessment that if it did not have a margin, then it would not save money. Dr. Roach found this justification to be unfounded; Dr. Roach indicated that he believed the margin was actually used to reject lower-cost offers, from energy providers. He opined that use of the margin would never save consumers money because ENO paid more for services.
Second, he testified that ENO justified its use of the margin by arguing that there was "uncertainty" in the estimated costs to generate energy. Dr. Roach opined that uncertainty goes both ways, while the margin presumed that uncertainty only goes one way to calculate energy costs. He further opined that the margin practice presumed that the estimated costs to generate energy could only be "too high."
The third justification, Dr. Roach testified, was what Entergy calls its "Monte Carlo[111] analysis." In essence, he explained the data produced in the Monte Carlo analysis was not contemporaneous data since Entergy produced the evidence in 2001. For this reason; Dr. Roach opined that the information "can't be used to justify behavior in 1993 to 1999." In addition, he opined that the Monte Carlo analysis was "purely hypothetical." He also indicated that Entergy's own witness testified that the Monte Carlo analysis was meant to be illustrative.
Biased Procurement Practice # 2  Reselling Low-Cost Non-Affiliate Electricity to Others
The second imprudent practice discussed by Dr. Roach concerned ENO's *285 practice of reselling of low cost non-affiliate electricity to other companies. He indicated that this practice was also pervasive and that the trend was found in 89% of all the hours examined during the near seven-year period. Dr. Roach also explained that when he asked ENO to justify the practice, it responded that the practice had to do with "system constraints." However, Dr. Roach testified that he doubted whether the unspecified system constraints justified the resale of energy.
Based Procurement Practice # 3  Reselling its Own Low Cost Electricity to Others
The third imprudent practice concerned ENO's practice of reselling of low cost system electricity to other companies. Simply put, Dr. Roach testified that Entergy sells its own generated power to others off-system at a lower price than it sells to the New Orleans ratepayers. He testified that this practice was pervasive and indicated that the trend was found in 82% of all the hours examined during the near seven-year period. Dr. Roach found no evidence to justify the practice,
Biased Procurement Practice # 4  Joint Account Purchasing
The fourth imprudent practice concerns ENO's practice of "complete reliance on joint account purchases as opposed to direct purchases." He explained the practice in the following excerpt:
DR. ROACH. Again, to explain it in an example, at the same moment a company like Entergy Arkansas is selling power, at say, $80, to Entergy New Orleans, the Entergy Corporation is channeling to Arkansas cheap power, $20 power.
My concern occurs because Entergy Arkansas is already in surplus; they already have more power than they need. . . .
Although the System Agreement allows ENO to make direct purchases, Dr. Roach testified that his review of the records did not show any indication that ENO attempted to exercise its contractual rights to make direct purchases. Entergy's justification, Dr. Roach testified, was that if direct purchases were made, it would be "disruptive to system operations," and "disruptive to economic dispatch," Dr. Roach disagreed with Entergy's justification since only 10% of the purchases are less than one hour purchases, the remaining 90%, longer-term purchases.
Biased Procurement Practice # 5-artificially low price
The fifth imprudent practice concerned ENO's practice of buying power based on ah artificially low price. The price differed from the high price that was actually paid by the ratepayers. Dr. Roach testified that Entergy justified the practice by stating that "this is the inevitable result of how utilities are operated."
Biased Procurement Practice # 6-EPI
The sixth imprudent practice concerned ENO's practice of subsidizing an unregulated subsidiary called EPI. Dr. Roach indicated that Entergy's decision to buy from EPI was based on an artificially low price. However when it was billed, it was based on a higher price. He pointed out that when Entergy decided to buy from EPI, it essentially defined incremental costs in one way but when it billed, it defined incremental costs in a way which led to a higher price. Dr. Roach traced $4.89 million to this imprudent practice.[112]
*286 Dr. Roach opined that each of the biased procurement practices should be classified as imprudent by the City Council and that Entergy be ordered to refund the entire $45.7 million, plus applicable interest, to the New Orleans ratepayers. In the alternative, he also suggested that if the City Council concluded that only the margin was imprudent, that $24.4 million be refunded.
ENO argued that its use of a margin in its power purchase decisions was reasonable and supported by the evidence in the record. ENO explained the use of the margin as follows:
How the Margin Works:[113]
ESI, on behalf of the Operating Companies, participates in the wholesale power market in order to take advantage of economic opportunities to purchase energy when it is available at a cost below the System's incremental cost of generating electricity with its own resources. ESI also purchases power from the wholesale market to satisfy emergency needs for meeting System load when its own resources are not available. Such opportunities to purchase power may be available on an hourly, daily, monthly, seasonal, or annual basis. ESI constantly monitors the price of electricity in these markets and exercises its economic alternatives when appropriate. During 2000, ESI purchase more than 17,000,000 MW in these markets.
Depending on the different time frames (hourly, daily, monthly, seasonal, or annually), ESI dispatchers use different procedures to purchase power from the wholesale, electric market. When evaluating annual or seasonal energy purchases, ESI either entertains offers from potential suppliers, or contacts potential suppliers, to determine the pricing and terms those suppliers are offering in the marketplace. The cost in terms of the office received from those solicitations are compared to the costs and operational concerns associated with the use of the System's own resources. If the purchased power offer is less costly than generation of the System's own resources, including consideration of the margin, and consistent with the System's requirement to provide reliable service, ESI typically will enter into a letter agreement to acquire the power.
In the hourly, daily, and monthly markets, ESI primarily relies on telephone communications to survey the market and collect pricing information. Wholesale power purchasers call potential suppliers to supply the market and receives calls from market participants with power to sell. This information is processed quickly; in the hourly and daily markets, the decision to buy must be made within a few minutes.
In making the decision to purchase energy off-system, the Entergy System requires that the price of such a purchase be lower than the estimated of avoided cost. The differential or "margin" (the size of which depends on the time horizon for the purchase) is necessary to ensure that the purchase produces a benefit to the System and its customers. The System requires a margin (i.e., a minimum level of savings) for the purposes of deciding the maximum acceptable price for a fixed price economy energy purchases for the next hour, day, month, season or year.
ENO noted that this practice was been employed for years in order to achieve the System Agreement's objective of "obtain[ing] *287 the lowest reasonable cost of energy to all the Companies."
Mr. Louiselle, ENO's expert, testified that he conducted an extensive independent investigation of the allegations[114] Contained in the Appellants' claims in the instant matter. He explained that Entergy collected the documents and furnished them to him for review. He described the present appeal as a "progeny" case `because it is directly related to the Delaney case. The issues, facts, and documents are basically identical. He also indicated that Entergy had no input over his investigation and that he was not denied access to any documents that he requested during the investigation. Mr. Louiselle stressed that his opinions were based on the facts he discovered during his independent investigation.[115]
In his testimony, Mr. Louiselle addressed the imprudent procurement practices and manipulation of the FAC alleged by the Appellants. Regarding the margin, Mr. Louiselle noted that Dr. Roach's margin calculation assumed an average price. However, Mr. Louiselle specifically indicated that based upon the testimony of Dr. Roach, in which Dr. Roach described the margin as a "fictional discount," Mr. Louiselle testified:
[ENO] forewent not purchasing or did not purchase some $24 million  or incurred $24 million of excessive charges because it did not make purchases at the rate of $3.00 per megawatt-hour, the average margin [Dr. Roach] assumed in his calculation; in other words, that but for the margin, [Dr. Roach] assumes that these purchases would have been made and would have reduced costs by some $24 million for ENO.
Alternatively, he says that but for this margin, the MSS-3 price would have been reduced by an average of $3.00 per megawatt-hour, and that's, in effect, how he gets his $24 million.
Mr. Louiselle opined that Dr. Roach made assumptions that ENO would have purchased an additional 160 million megarwatt-hours of off-system energy in addition to the amount that it had actually purchased. He also indicated that Dr. Roach assumed that ENO's off-system energy purchases would be equal to 22 percent of the total purchases of the Southern Company and AEP  two extremely large holding companies.
However, Mr. Louiselle testified that in regard to ENO specifically, Dr. Roach assumed that ENO's off-system purchases were equal to 22% of the total purchases of the Southern Company and AEP, two extremely large holding companies. Mr. Louiselle pointed out that these purchases only equal two percent of the size of the larger holding companies' purchases. In essence, he rejected Dr. Roach's testimony because the facts simply did not support the remedy proposed by Dr. Roach. This opinion is further substantiated by Mr. Louiselle's indication that the LPSC also rejected Dr. Roach's recommendation on the very same issue.
Mr. Louiselle also testified concerning Dr. Roach's "bait-and-switch" terminology. The "bait" entails the incremental dispatch price which all utilities use in making dispatch decisions, while the "switch" is the *288 average cost used to bill customers. Mr. Louiselle pointed out that all utilities use average costs to bill customers, and they use incremental dispatch costs in making dispatch decisions. Hence, the practice is common. Mr. Louiselle indicated, that The System Agreement requires the dispatch be based on incremental costs because that is how costs are minimized. The MSS-3 in the System Agreement, the FERC-approved rate schedule also required that prices be based on average costs. Based on these facts, Mr. Louiselle opined that the switch is required by a FERC-approved tariff, and the bait is also required by a FERC-approved tariff. He stated that both of them are rational and reasonable ways of dealing with those issues. He also indicated that the LPSC also rejected Dr. Roach's assessment of this matter.
The third item addressed by Mr. Louiselle concerns what Dr. Roach described as a "shell game." Essentially, Mr. Louiselle classified this item as a restatement of the "bait-and-switch." This practice consisted of the parent company switching from a system wide stacking of supplies on an incremental basis to a company-specific stacking based on average costs. Mr. Louiselle classified this practice as common in the industry. He indicated that incremental costs are used to make system decisions, while average costs are used to make company-specific allocations of a company's resources to other companies. This argument was also rejected by the LPSC.
Next, Mr. Louiselle addressed the sale of low-cost system resources and Dr. Roach's claim that stacking led to such sales of resources. Mr. Louiselle indicated that Dr. Roach's assessment was not factually correct, as stacking does not lead to a sale. Mr. Louiselle indicated that what actually leads to a sale is an opportunity to earn a profit, or rather "the incremental cost of making the sale is less than the incremental revenue received from the sale." He indicated that there was not actually stacking occurring, but rather a re-dispatch of the System to determine what was the resource used to make that sale. Mr. Louiselle indicated that off system sales, because they are based on incremental costs versus incremental revenue, produce profits and was Of benefit to the customers because those profits are shared among the Operating Companies. However, Mr. Louiselle noted that this theory was also rejected by the LPSC.
ENO also relied on the testimony of Mr. Kenneth Turner, the Secretary of the Operating Committee. Primarily, his testimony described the workings of the Entergy System Agreement along with the various service schedules. He indicated that the System Agreement is a FERC rate schedule that requires the Entergy companies to operate as a single integrated electric system.
He testified that the System Agreement was signed by the Operating Companies on April 23, 1982, and was initially approved by the FERC on June 13, 1985 in Opinion number 234. Subsequently, the FERC approved several modifications to the System Agreement that enabled the Entergy System to add Gulf States Utilities to the System Agreement, effective December 31, 1993.
He opined that the System Agreement has specific benefits, such as joint planning and combined operation of the Entergy System. He also opined that combining loads of the System is more optimal than having each separate company do its own dispatch. Hence, it is more optimal to dispatch as a single system because there is increased reliability as a result of combining the dispatch loads. Mr. Turner also *289 indicated that the objectives of the System Agreement are reliability and economics.
He also testified that the administration of the System Agreement is conducted by the Operating Committee.[116] The Operating Committee consists of members from each of the five Operating Companies as well an additional member from the Entergy Corporation and is required to meet at least once quarterly.[117] The Operating Committee is controlled by majority vote. The respective responsibility ratio for each of the Operating Companies is detailed in the System Agreement. Mr. Turner testified that twenty percent of the voting ratio on the Operating Committee is apportioned to the parent company, Entergy Services, while 5.57 percent is apportioned to ENG.[118]
The day-to-day administration of the System Agreement is carried out by the Entergy Management Organization, known as the EMO. The EMO is a department within the Entergy Services.
He indicated that there are seven (7) service schedules associated with the System Agreement. The first is the MSS-1, which is reserve equalization; MSS-2, which is transmission equalization; the MSS-3, which is the exchange of energy among the Operating Companies;[119] the MSS-4, which is a unit of power purchases, the MSS-5 is the service schedule by which the profits from off-system sales are allocated to each of the Operating Companies; MSS-6 is the allocation of the expenses for each of the operation centers pursuant to the System Agreement; and the MSS-7, which is a service schedule, sometimes referred to as a merger fuel protection feature. He testified that currently the Operating Companies that participate in MSS-7 are Entergy Gulf States and Entergy Louisiana. All other companies, opted out of this service schedule. All seven service schedules are the FERC filed rates which govern an "after the fact" allocation of the benefits and burdens associated with the operation of the system.
He further testified that the MSS-3 service schedule determines how the energy is allocated among the Operating Companies each hour and that it is an after-the-fact hour by hour allocation of the energy. Hpwever, even though MSS-3 allocates all the energy generated or purchased by the system, but not all energy in the system is priced pursuant to MSS-3. He explained that MSS-3 really allocates the imbalance of energy among each of the companies by comparing the loads and the resources of each one of the companies, and each company has first rights to their own resources. Operating Companies are required to take energy allocated to them pursuant to the provisions of MSS-3.
Mr. Turner also distinguished between direct purchases and own-account purchases. A "direct purchase" occurs when a single Operating Company arranges to make a purchase directly for his own account. An "on-account purchase" is basically an allocation of purchase that has already been made, but is allocated for that company's own account. He explained that the difference between the two is that the direct purchase would be when the company makes its own arrangements *290 directly in the market for its own account. On the other hand, he noted that an own-account purchase is one where the system has already made the purchase and it's just been reallocated to that company's account, only to one company's account. He distinguished that sometimes the purchases could be made by multiple companies, but noted that a system purchases for the system. The purchase is later allocated to a single company for after-the-fact accounting purposes.
He further testified that off-system purchases were made for the joint account of all the Operating Companies, and were allocated based on a responsibility ratio pursuant to the System Agreement. Hence, an order for an on Operating Company to make a purchase for its own account, or rather a single company purchase, the agreement is clear that it would require the approval of the operating committee in order to do so. Mr. Turner opined that he did not believe it was likely that the Operating Committee would allow a single Operating Company to purchase energy on its own behalf because it would adversely affect the remaining Operating Companies.
Mr. Turner also testified that EPI, Energy Power Incorporated, was created in 1989 to facilitate the purchase of Entergy Arkansas' 31 ½% ownership of the Independent Steam Electric Station (ISES), unit 2, for approximately 265 megawatts, and one hundred percent of EAFs Richie ISES unit 2, or 544 megawatts. This agreement concerning EAFs purchase of energy from EPI and the associated operating agreements, were also approved by the FERC. Mr. Turner also indicated that there was an extensive review of these purchase agreements by the City Council, the LPSC, and the MPSC before they were approved by the FERC.
He also noted that EPI and EAI entered into a "PCITA"[120] which provided that EAI or the dispatching of the EAI resources be done in conjunction with the total systems dispatch. Mr. Turner testified that the PCITA is clear that the combined loads of the Entergy System and EPI are to be dispatched, and that the dispatch would be conducted as if those units belonged to Entergy, and would be dispatched for the benefit of the EPl loads.
As for the margin, Mr. Turner testified that the margin has never been discussed at an Operating Committee meeting.
Mr. Turner would not confirm whether Entergy made regulatory agencies aware of the margin. He acknowledged that the decisions, when decisions were sometimes made by the Operating System, were sometimes made at a disadvantage to smaller Operating Companies. He stated that there was "something fundamentally wrong with the System Agreement . . . [which] would require a filing at the FERC to remedy that." However, he reiterated that decisions are made with the intent of being the right thing for the System as a whole.
He also testified that although Mr. Dan Packer,[121] the former Chief Operating Officer of Entergy, could have requested the Operating Committee to allow Entergy to make less expensive off-line purchases, thereby saving ratepayers money, Mr. Turner indicated that Mr. Packer made no such request of the City Council. However, Mr. Turner indicated that Mr. Packer did make a request for his own account, or rather, a reallocation due to extenuating *291 circumstances.[122] Mr. Turner opined that direct purchases are favorable for an individual company because it allows the company to possibly obtain lower costs; however, it would put the individual Operating Company at odds with its parent company because it would place the Operating Company in direct competition for the same supply with the Operating Systena,
Mr. Turner also noted that pursuant to Section 4.02 of the Operating Agreement, an Operating Company may, with permission of the Operating Committee, agree to contract with an outside source to make direct purchases for its own account. He indicated that this practice is never allowed by the Operating Committee. However, he confirmed that Section 4.02 still remains in the System Agreement, and he also confirmed that although the practice is never allowed, Entergy has never sought to have Section 4.02 removed from the System Agreement.
Mr. Alan Bruce Ralston testified as an expert for ENO. Mr. Ralston, who also testified during the Delaney proceedings, described the use of the "PRMOD" production cost simulation model. The model was intended to produce an estimated cost for the actual generation of energy. It priced out fuel and other related items to produce the lowest cost possible to serve any energy needs there are at a particular time.
Beginning in 1978 he was a "hands-on" user of the PROMOD model, and he testified that he developed "input" data, which was entered using "card images." The data, which was contained in those eighty columns on this card, was "read" by the computer. The results generated by the computer would then be analyzed and then reduced to recommendations which would fee reviewed by a supervisor. If a supervisor had any input, then Mr. Ralston would redo the runs, based on the supervisor's suggestions, until they were adequate to meet the needs of the PROMOD study at tile specified time. Mr. Ralston confirmed that the PROMOD model was widely used in the industry and, presently, it continues to be widely used.
In addition to the PROMOD model, Mr. Ralston identified a number of other models used in the industry that are substantially similar to the PROMOD model. These models include: "the West Cougar model," "the Scheduler model," "the Main Plan model," and finally a more recent model called "ProSim."
He testified that it was his job to figure out how Entergy could bring the planning group and operation group together. The focus of this effort, with the PROMOD model, was to make sure that the PROMOD model utilized by the long-term planning group correctly reflected the real operations of the groups.
Mr. Ralston also confirmed that the PROMOD model was used to prepare seasonal plans as well as short-term and longterm plans. He explained that several "process teams" handled different time frames. For example, one team would be assigned to handle the next day up to about a week into the future, while another team handled monthly, seasonal and actual planning. If longer time periods were needed, then longer time periods were simulated. For time period simulation, the data that was used to do the production and costs calculations were changed. However, he testified that he did not design *292 or input the data, rather, he helped to design the studies, communicated the needs to the engineers and analysts assigned to the teams (who in turn would input the data), and assisted the analysts and engineers if they encountered any difficulties simulating the items asked of them. However, the supervisory duties he described were handled by a team and were not solely his responsibility.
He further testified that after the initial test runs were made using the data, the staff would bring the results to the management team to review. The management team had involvement in the process every step along the way and would critically review the results and suggest areas where the output did not look like it conformed to his expectations.
Mr. Ralston pointed out that the issue raised in the instant appeal, as well as in the Delaney case, suggested that Entergy did not properly access the wholesale market for the benefit of its consumers. Additionally, he testified that Mr. Louiselle, Mr. Turner,[123] himself, and others attempted to persuade the parties in the instant litigation that Entergy did properly access the wholesale market by using the PROMOD model to generate a retrospective of what might have happened in 1997. However, Mr. Ralston indicated that although the Appellants expert had access to the PROMOD retrospective, once the models were reviewed, he decided that some of the modeling conventions adopted by Entergy were not the ones he would have recommended be adopted.
Mr. Ralston addressed the testimony of Dr. Roach by classifying Dr. Roach's testimony as containing "pejorative language." Additionally, he testified that Dr. Roach "mischaracterizes the facts and provides questionable testimony."
Mr. Ralston countered Dr. Roach's testimony by stating that "[t]he procurement practices employed by the Entergy System result in the lowest reasonable cost to the system." He indicated that the practices were based on the principles of economic system operations, including incremental cost dispatch, which produces the lowest reasonable cost.
He indicated that after the dispatch was done, the FERC-approved System Agreement allocates the costs incurred by the system among each of the Operating Companies. Mr. Ralston stated that this was the proper approach to dispatch a system on incremental cost as well as an individual company. He indicated that there is a difference between the two.
Mr. Ralston testified that the Appellants' criticisms of the System's procurement practices were based on faulty assumptions and were not consistent with actual System operation. The first assumption, was that the Appellants assume that it was possible to operate the system to maximize the benefits for the whole system and for each individual Operating Company at the same time. He reiterated that the operation was appropriately done on the basis of minimizing the cost of the system, while the allocation was done after the fact. He maintained that it was always done in this manner and that all predecessor agreements and the current System Agreement "all believe[d] that this is the correct way to come and the FERC has approved these agreements."
Mr. Ralston also attacked Dr. Roach's second "wrong" assumption concerning the alleged premium on affiliate purchases. *293 He pointed out that the System makes off-system purchases only when expressly given leave to do so because they are less expensive than generator power. Mr. Ralston opined that Dr. Roach's analysis that a premium exists relied on a comparison that is flawed.
In support of his opinion, Mr. Ralston explained that the real reason was baled on a difference in costs. While the Entergy System is basically a gas-fired system regarding the margin, the surrounding systems are basically coal-fired on the margin. He pointed out that the price of natural gas has exceeded the price of coal, thus making off-system purchase power less expensive than own system gas-fired power.
The next incorrect assumption made by Dr. Roach, per Mr. Ralston, was the assumption that there is an unlimited quantity of off-system power. He testified that this was "simply not true." He emphasized that the Appellants wrongly assume that additional off-system energy is available at the average price of Entergy's actual purchases or at the volume-weighted average price. This too, he testified, is an incorrect assumption made by the Appellants. Mr. Ralston noted that in any market for electricity, the price of electricity increases as demand increases.
Mr. Ralston testified that the incorrect assumption made by the Appellants is that the "constraints that the system has to meet do not affect the system's ability to access off-system energy." He testified that "[transmission constraints alone restrict economic imports into the Entergy System."[124]
ENO further argues that while calculated avoided cost represents the System's best estimate of future costs, the calculations of avoided costs were based on many variables that have significant uncertainty, and that longer commitment horizons for purchase power decisions involve more uncertainty that are involved in the estimation of avoided costs. The longer the commitment horizon, the greater the risks are that the assumptions (such as the system load, the price of fuels, the availability of generating units, the availability of transmission service, and the availability and price of alternative purchase power resources) are on which the avoided cost estimates are based will prove to be inaccurate. ENO maintains that in the face of this uncertainty, "there [was] a natural risk associated with committing, and advanced to purchases of power."
ENO also challenges the Appellants' contention that by rejecting offers for wholesale energy that were priced less than the cost of generation of the systems on resources, even if by one cent, energy artificially reduced the costs of its own generation thereby creating a "fictional discount," that increased the cost of power ultimately billed to its ratepayers. ENO argues that the Appellants' allegation is based upon two flawed assumptions: first, the Appellants ignore any possibility that there will be subsequent offers of power at even lower prices than Entergy would be able to purchase; and second, the Appellants assume that Entergy can avoid and was obligated to purchase "all" low-cost energy for the good of the system, "completely ignoring the transmission and operating constraints that limit the amount of power that the system can purchase from off system suppliers."
ENO notes that it provided evidence which included market comparisons, modelse, *294 and actual data from the Entergy System that demonstrated to the City Council why the use of the margin is "sound in theory and reasonable and effective in practice." On the other hand, the Appellants provide a "simplistic analysis, in which they compared System avoided costs to off-System cost which did not reveal that Entergy declined offers of less expensive power to the detriment of ENO ratepayers."
Essentially, ENO asserts that the City Council rejected the Appellants' arguments when weighed against the substantial evidence in the record, and concluded that Entergy was reasonable both in its decision to employ a margin in its purchase decisions and in the means by which it applied the margin. ENO points out that the City Council "[found] no evidence in this matter which indicates that the level of margin which has been applied historically by ESI and its power purchase decision-making was undertaking to favor affiliate generation, to deceive or harm ratepayers, to manipulate the FAC, or fraudulent." [125] ENO also notes that the City Council adopted the recommendation of the Advisors of the City Council that ENO and prospectively ordered an annual analysis of third-party offers of power to show that the use of the margin remains justified as an effective policy in meeting service obligations at the lowest reasonable cost.
ENO also rejects the Appellants' argument that the City Council was arbitrary in refusing to order Entergy to cease using the margin and in refusing to order a refund of alleged losses flowing from the use of the margin. Basically, ENO also rejects the Appellants' complaint that Entergy did not have pre-authorization from the City Council to employ a margin in its purchase decisions, and that the use of the margin is not specified in the System Agreement. Additionally, ENO rejects the Appellants' claim that dispatchers exercise discretion regarding when and how to apply the margin in their purchase decisions.
However, ENO maintains that "as part of its strategy to fill its directive to obtain the lowest reasonable costs of Entergy consistent with transmission and operating constraints, Entergy uses its knowledge of the wholesale market and the judgment and expertise of its traders to make decisions which all went to purchase off system power and at what price." Additionally, it avers that "Entergy's traders are asked to get the best deal they can negotiate and purchasing off system electric power . . . traders seek a price set at discount to the Entergy System's projected avoided cost," but that the "traders are given the flexibility to apply this margin, if that would call for, in reaching their purchase/generate decisions" that are sometimes called for in such a volatile wholesale power market.
Mr. Movish, who appeared as an expert on behalf of the Advisors of the City Council, testified concerning the use of the margin. He opined that the specific margin utilized by Entergy when deciding to contract for off-system supplies can result in higher power costs to ENO/ELI's native load ratepayers than would otherwise occur. *295 He testified that in Delaney, the LPSC Staff recommended that Enteygy; reevaluate its use of the margta and provide a detailed analysis demonstrating the correctness of the value of the margin used in making its off-system purchase decisions. Mr. Movish opined that Entergy should be required to undertake a comprehensive, cost-benefit analysis to determine the economic benefit or harm to ENO/ELI's native load New Orleans ratepayers as a result of the specific margin value applied in its off-system power purchase decisions and justification for continuing or modifying the margin prospectively.
Nevertheless, the City Council maintains that the Appellants attacked ESI's use of the margin is purchasing strategy by referring to it as a "fictitious discount." Additionally, the Appellants challenge the City Council's decision to assign them initially with the burden to prove the imprudence of using the margin, as well as ordering an annual review of the margin due to its variable nature. However, the City Council avers that the Appellants' rationale is incorrect.
The City Council notes that the record demonstrates that ESI's fluctuating margin as the mechanism which, provides a measure to which the Entergy System ensures the lowest reasonable cost of energy by Operating Companies. The City Council found that it was reasonable for Entergy to use the margin in deciding whether to purchase or generate the next increment of power.
The City Council maintains that the use of the margin and ensures that when ESI goes after power it will be cheaper. The City Council notes that the margin specifically requires that before ESI purchases off system, that the energy be priced lower than the System's projected avoided cost of reproducing the required power. The City Council also notes that without the margin, there would be no opportunity for the System to realize cost savings by purchasing power rather than generating power from its own resources. The City Council found that the use of the margin allows ESI the flexibility to negotiate the, lowest cost of energy available in the wholesale power market and get the best deal possible.
The City Council also notes that the Appellants' claim that it erred in requiring them to prove that "the margin has had any impact on any specific third-party offer for sale," rather than placing the burden on ENO to prove that ESI's use of the margin is reasonable. However, the City Council maintains that assigning the initial burden to the Appellants does not, constitute legal error, since "a utility's investments are presumed to be prudent and allowable." Gulf States Utilities, 578 So.2d at 85. Additionally, only after the party who challenges those expenses, "raises serious doubt about the prudence of the particular investment, a search and inquiry becomes necessary, and at that point, the burden shifts to the utility to prove that the expenditure was in fact necessary and appropriate, all resulted in no additional costs." Id.
The City Council argues that the Appellants simply could not meet the initial burden in raising "serious doubt" about the prudence of ESI's use of the margin which is similar to the argument raised by ENO. The City Council claimed that based on the above holding in Gulf States Utilities, the utility's burden of proof is only triggered by "serious doubt," which the City Council asserted, was not raised by the Appellants in the instant matter. The City Council also maintained that its findings were not arbitrary, nor capricious in reaching its conclusion not to award $24.5 million dollars, plus compound interest in refunds to ratepayers, for what the City *296 Council deemed an "appropriate use" of the margin contained in the record before it.
The parties and experts in this matter have repeatedly indicated and have all agreed that this case is very similar to the Delaney matter. As discussed earlier, identical violations were asserted against Entergy with respect to its rate computations. The Delaney case was resolved via a consent agreement and the critical issue dispositive of Delaney is the monetary amount that Entergy agreed to reimburse to its ratepayers as part of the consent agreement. Although we note that the City Council and the district court were not bound by the Delaney consent agreement, we observe that the issue which is most instructive to us in Delaney is the actual reimbursement amount reimbursed to the plaintiffs by Entergy.
Thus, we must consider the law of the case[126] in this instance. Since Entergy was a party in the instant case and was also a party in Delaney, we must review the City Council's refund order in the instant matter, and compare this amount to what Entergy agreed to refund to its ratepayers in the Delaney matter for the same conduct of the utility.
"A consent agreement is, in effect a bilateral contract between the parties which gets its binding force from the consent that the parties gave, rather than from adjudication by the courts." Richardson v. Richardson, 2002-2415, p. 4 (La. App. 1 Cir. 7/9/03), 859 So.2d 81, 85, citing Palgrave v. Gros, XXXX-XXXX, p. 5 (La.App. 5th Cir.9/30/02), 829 So.2d 579, 582. In the matter sub judice, the Delaney case was considered as a progeny case, whereby all subsequent litigation arising out of the utility's alleged imprudent ratemaking practices, can be referred to for both points of law and suggested remedial recommendations.
As stated earlier in Alliance For Affordable Energy v. City Council of New Orleans, 96-0700 (La.7/2/96), 677 So.2d 424, 434, "in reviewing decisions of public bodies . . . the courts will not interfere with the functions of these bodies in the exercise of the discretion vested in them unless such bodies abuse this power by acting capriciously or arbitrarily." In the matter sub judice, we find that the amount the City Council ordered refunded to ratepayers was arbitrary and capricious.
As we discussed above, the Delaney matter was resolved via a consent agreement and both the Delaney plaintiffs and ENO agreed to the terms of the agreement. ENO was ordered to refund the Delaney plaintiffs, who numbered more than 190,000 ratepayers, an amount of $72 million dollars. Basic mathematical computation reveals that the Delaney settlement resulted in an average refund of $379 dollars per ratepayer. However, the amount ordered refunded by the City Council in the matter sub judice results in a refund of just above $40 dollars per ratepayer for each of the 180,000 ratepayers. Even a cursory comparison between these two amounts indicates a glaring disparity between refunds ordered and agreed to in the Delaney matter and those ordered in the instant matter.
Bolstering support for our determination of arbitrariness and capriciousness by the City Council is that the record shows that: (1) several experts agreed that reimbursement was due to the ratepayers; and (2) the City Council's own independent *297 advisors, Advisors of the City Council, also made a recommendation that $34.3 million dollars be refunded to the New Orleans ratepayers as a result of ENO's "improper fuel adjustment practices and charges." However, the City Council chose to ignore the Advisors of the City Council's recommendation. Yet, the City Council failed to support its recommendation with any rational justification for. declining to accept the recommendation of Advisors of the City Qouncil. Instead, the City Council chose to award nearly 1/5th of what the Advisors of the City Council recommended.
Taking the disparity of the refunds ordered by the City Council and the LPSC into consideration, we must conclude that the City Council's award was arbitrary and capricious because the City Council provides no rationale for the disparity when its recommendation is compared to that of the LPSC in Delaney. We note that the City Council' failure to provide a basis for its recommendation is contrary to our jurisprudence. In Eagle Water, Inc. v. Louisiana Public Service Comm'n, XXXX-XXXX, p. 8 (La.1/17/07), 947 So.2d 28, the Supreme Court noted,
The purpose underlying the requirement that an agency must provide a statement of findings as to disputed issues and reasons for its determination is "to enable a reviewing court to determine with, some measure of confidence whether or not the ratemaking authority, which still remains in the Commission, has been exercised in a manner which is not arbitrary, capricious or unreasonable."
Id., 947 So.2d at 34 & n. 4, citing, Gulf States Utilities Co. v. Louisiana Public Service Comm'n, 578 So.2d 71, 83 (La. 1991), quoting Central Louisiana Electric Co.,%k Louisiana Public Service Comm'n, 437 So.2d 278, 279 (La.1988).
While ENO argues that the City Council's "computation is warranted, their argument flies in the face of its consent agreement in Delaney. As previously stated, the number of ENO's ratepayers in Delaney was 190,000, while in the instant matter, the ENO ratepayers number 180,000.
Therefore, we find that this assignment of error does have merit and conclude that the City Council acted arbitrary and capriciously in ordering refunds which are grossly disparate to the refunds ordered in Delaney for identical claims. In all fairness to the parties, we conclude that the City Council's order of refunds falls short in providing an adequate remedy to the ratepayers for the violation found by the City Council. We conclude that the appropriate refund for the ratepayers is the $34.3 million dollar amount originally suggested by Advisors of the City Council. This refund should result in an average amount of $191 per person for the 180,000 ratepayers.

IV.
In their fourth assignment of error, the Appellants argue that the City Council exceeded its jurisdiction in ruling on matters of intent, fraud, and motive. The Appellants maintain that the City Council's findings do hot belong in its ruling. The Appellants observe that under Daily Advertiser, 612 So.2d 7, the City Council, as ENO's regulator, has exclusive original jurisdiction over their claims for overcharges arising out of ENO fuel adjustment mechanism.
The Appellants note that the remainder of their state law claims were formally stayed during the City Council proceedings so that the City Council could exercise its primary jurisdiction over the raterelated claims. However, the Appellants claim that the state law claims, which include, inter alia, antitrust and breach of *298 contractual duties owed to ENO's ratepayers are under the original jurisdiction of the district court. They maintain that their legal claims for damages under state law theories of recovery are not before the City Council. The Appellants note that the state law claims are pending in the companion lawsuit and should have been suspended or deferred until the City Council, ruled upon the matters under its jurisdiction. The Appellants assert that issues concerning ENO's motive, intent, or state of mind and certainty cannot bind them or the courts of the state class-action lawsuit regarding antitrust violations, breach of contract, and other legal causes of action against ENO's parent and unregulated affiliates, which were not parties to the City Council proceeding.
Additionally, the Appellants argue that ENO's state of mind is irrelevant to the City Council proceeding. They aver that none of the issues alleged in their complaint concern ENO's state of mind, motivation, intent, or good or bad faith. In support of this argument, the Appellants cite Gulf States Utilities Co. v. La. Pub. Serv. Comm'n, 96-2046 (La.2/25/97), 689 So.2d 1337, in which the Supreme Court held "[i]t would be nonsensical to require `some conscious knowledge of wrongdoing for a finding of imprudence and let up the purpose of imprudence disallowances. . . .'" Id. at 1346.
The Appellants maintain that no investigation was ever conducted by any of their experts, nor did any witness, expert, or otherwise, offer an opinion on matters of fraud or state of mind. Furthermore, they note that the City Council's expert admitted that: 1) he did not know what fraud was under Louisiana law; and 2) that he could not testify whether any of ENO's practices he investigated amounted to fraud. The Appellants note that the only certified fraud examiner who testified was Mr. Penzeca, an ENO witness. However, he even testified that he was not hired by ENO to offer an opinion as to whether it had committed any intentional wrongdoing or deceptive practice having to do with ratepayers or the, City Council.
Hence, the Appellants maintain that it was legal error for the City Council to have ruled on matters of intent, motive, good or bad faith, or fraud, by addressing these matters that are not under its jurisdiction, in an administrative proceeding. The Appellants insist that these gratuitous findings are no more than dicta and are not binding on the courts and should be vacated by this Court.
ENO asserts that the City Council properly considered the evidence relevant to the findings of intent, state of mind, motive, and fraud. ENO also argues that the City Council did not go beyond its jurisdiction when it issued findings for the following three (3) reasons: first, the Appellants introduced evidence as to the state of mind and intent, thereby opening the door to Resolutions by the City Council as to the particular issues of state of mind, intent, motive, and alleged fraud; second, ENO asserts that the City Council followed the LPSC's lead in the Delaney case in finding that the regulator in a rate case has primary jurisdiction over issues related to state law claims based on alleged overcharges; and third, the Daily Advertiser case held that the City Council has primary jurisdiction over the Appellants' related state law claims.
ENO notes that during the administrative proceedings, the Appellants introduced evidence and made arguments regarding ENO's state of mind and intent regarding the FAC. Additionally, ENO asserts that the Appellants reiterated "that they would prove that ENO `knew' they improperly included SFI costs in the FAC" arid "stated that ENO's alleged improper *299 practices were `deliberates Intentional, and were known, or should have been known, to cause harm to ENO's ratepayers."
Nevertheless, ENO argues that the City Council found it necessary to examine the issues as to motive, state of mind, intent, and fraud because the Appellants introduced the evidence during the administrative proceedings. Furthermore, ENO argues that the City Council was bound to give consideration to the Appellants' allegations because the City Council has the responsibility to make findings of fact on all disputed issues in the case.
Additionally, ENO attacks this assignment of error on the basis that the "City Council, like the LPSC in the Delaney case, addressed the same issues and found no evidence of intent to harm ratepayers, bad faith, or fraud by Entergy. ENO maintains that the City Council even admitted the Findings of Fact and Conclusions of Law from the Delaney case into evidence and automatically specified that those findings would serve as legal precedent and would be given weight appropriate for such precedent. ENO points out that the City Council's Resolution "mirrors" the LPSC's position in the Delaney case.
Finally, ENO argues that under Daily Advertiser, the City Council has primary jurisdiction to rule on all issues related to claims of overcharges through the FAC. ENO asserts that the Appellants have misstated Daily Advertiser "in an attempt to escape the [City] Council's findings of fact that are unfavorable to their case pending in the District Court." However, ENO also points out that contrary to the Appellants' arguments, "a regulator in a rate case is not precluded by the Daily Advertiser decision from making findings of fact relevant to a plaintiffs" related state law claims."
Finally, the City Council addresses the Appellants' claim that the City Council's determination that ENO did not have the intent, motive, or state of mind, to commit fraud against its ratepayers. The City Council suggests that when the Appellants initially filed their case, "they willingly included these allegations as well as all the other allegations concerning fraud and other illegalities that were raised in the accompanying case", as well as including the same allegations in their pleadings, testimonies, and then the hearing on the merits. The City Council claims that the Appellants, through their pleadings, asked the City Council to make factual findings on those issues.
Essentially, the City Council maintains that the district court correctly affirmed its findings based upon the evidence in the record and requests that this Court affirm its Resolution. We agree. Hence, we conclude that this assignment of error has no merit, and is consistent with the findings in the Delaney case.

DECREE
For the reasons above stated, we affirm the City Council's Resolution and the district court's judgment with respect to the Appellants' first, except to the extent stated above, second, and fourth assignments of error, finding that there was no arbitrariness or capriciousness in the City Council's order and/or the district court's judgment. We conclude that as to these matters, ENO complied with the System Agreement.
As to the Appellants' third assignment of error concerning the City Council's resolution to order a refund to ratepayers for overcharges, we reverse on this issue only as to the amount ordered refunded, finding that the City Council's resolution was arbitrary, and capricious. The City Council *300 gives no reason for rejecting the recommendation of its experts in ordering a refund by ENO of improper charges. Such rejection of its own experts' testimony, and the imposition of an arbitrary refund sum constitutes arbitrary and capricious conduct by the City Council. Thus, we amend the order of a refund to that recommended by the Advisors to the City Council, $34,300,000. This Court's reference to the $34,300,000 sum is not meant to exclude applicability of interest to that sum as a matter or law, consistently, with the initial partial refund ordered by the City Council as noted in footnote 8 of this decision. In all other respects, the judgment of the district court is affirmed.
AFFIRMED IN PART; AMENDED IN PART AND AFFIRMED AS AMENDED.
GORBATY, J., concurs in the result.
NOTES
[1] The Operating Companies, which provide retail electric service consist of the following public utility companies: (1) Entergy Louisiana Incorporated ("ELI," which was formerly known as Louisiana Power & Light Company, or LP & L), which operates in Louisiana; (2) Entergy Arkansas, Inc., ("EAI", which is formerly known as Arkansas Power & Light Company, and operates in Arkansas); (3) Entergy Gulf States Inc., ("EGS," which was formerly known as Gulf States Utility Company or "GSU"); (4) Entergy Mississippi, Inc., ("EMI," formerly known as Mississippi Power & Light, or "MP & L"); and (5) ENO, formerly known as New Orleans Public Service, Inc.
[2] The parties were ordered in open court to brief for the Court the status of Entergy's bankruptcy. To date, the bankruptcy proceedings are still pending in federal court; however, all legal matters in which Entergy is a party are stayed. However, the Bankruptcy Court specifically lifted the stay in the present case so that the matter could be adjudicated.
[3] Although the state court suit was filed before the City Council proceedings, the state court matter was stayed during the City Council's administrative proceedings.
[4] The Sewerage & Water Board.
[5] The Advisors of the City Council are "outside consultants retained by the City Council to assist it in the investigation of the issues in the City Council Proceeding."
[6] The City Council argues that the only real question that this Court should consider in this matter is whether the district court committed reversible error in affirming the Council's findings.
[7] See infra p. 1 and note 1.
[8] The award consisted of $7,203,427.00 in principal and $4,106,645.00 in interest. The Appellants allege that this value only represented about one-fifth of what the City Council's experts testified was due to ratepayers.
[9] Written reasons were provided.
[10] Systems Fuels, Inc., or SFI is an unregulated affiliate of ENO.
[11] In Central Louisiana Electric Company v. Louisiana Public Service Commission, 508 So.2d 1361 (La.1987), Central Louisiana Electric Company, (CLECO), sought an increase in intrastate retail rates. The LPSC denied CLECO's request for the rate increase. On appeal, the district court awarded the utility company an increase sufficient to add additional annual revenues. The LPSC appealed. The Louisiana Supreme Court, held, inter alia, that the LPSC's order denying utility company an increase in intrastate retail rates when utility refused "freeze" proposal under which utility would have received benefit of fuel savings as a result of LPSC freezing automatic fuel adjustment clause was arbitrary.
[12] In Bowie v. Louisiana Public Service Com'n, 627 So.2d 164, 166 (La. 11/29/93), the Supreme Court elaborated on the duties of the Louisiana Public Service Commissions powers as follows:

Article IV § 21(B) of the 1974 Louisiana Constitution provides:
(B) Powers and Duties. The [public service] commission shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law. It shall adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties, and shall have other powers and perform other duties as provided by law. This provision delegates to the Public Service Commission the exclusive and plenary power to regulate all common carriers and public utilities. The Commission's power in this regard is as complete in every respect as the regulatory power that would have been vested in the legislature in the absence of Article IV § 21(B). Therefore, the legislature's acts or omissions can not subtract from the Commission's exclusive, plenary power to regulate all common carriers and public utilities, Cajun Electric Power Cooperative, Inc., v. LPSC, 544 So.2d 362(La.), cert. denied 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 536 (1989); Cajun Electric Power Cooperative, Inc., v. LPSC, 532 So.2d 1372, 1380, 1381 (La.1988) (on original hearing) (Dennis, J. dissenting) (Calogero, J. dissenting); South Central Bell Telephone Co. v. LPSC, 412 So.2d 1069, 1070 (La.1982); Central Louisiana Electric Co. v. LPSC, 373 So.2d 123, 128 (La. 1979); Louisiana Consumers' League Inc. v. LPSC, 351 So.2d 128, 131 (La. 1977).
The Public Service Commission is created for the purpose of exercising regulatory police power over all common carriers and public utilities and compelling the performance of their public duties for the benefit of the state and its citizens. Morehouse Natural Gas Co. v. LPSC, 242 La. 985, 140 So.2d 646 (1962); Southern Bell Telephone & Telegraph Co. v. LPSC, 187 La. 137, 174 So. 180 (1937). Accordingly, the constitutional provisions creating and granting, powers to the commission must be construed with practicality and liberality in order to accomplish their objects and to enable the Commission to perform the duties required of it by the people. Moreover, Article IV § 21(B) expressly authorizes and requires the Commission to adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties. See Louisiana Consumers' League, Inc. v. LPSC, 351 So.2d 128, 132 (La.1977) (Concurring opinion). Consequently, the Commission is vested explicitly and implicitly with the constitutional power necessary to the performance of its function of regulating common carriers and public utilities through the adoption and enforcement of reasonable rules and orders requisite to these purposes. See Cajun Electric Power Cooperative, Inc., v. LPSC, 544 So.2d 362 (La.1989); Consumers' League Inc. v. LPSC, 351 So.2d 128 (La. 1977); Denegre v. LPSC, 257 La. 503, 242 So.2d 832 (La.1971).
[13] Delaney et al. v. Entergy, Louisiana Public Service Commission, LPSC Executive Order No. 23356, (December 13, 2000).
[14] Additionally, similar to the case sub judice, the Delaney matter also had a civil suit pending in the Civil District Court for the Parish of Orleans at the time the LPSC issued its order in the Delaney case.
[15] Formula Rate Plan.
[16] PCITA allows for AECC costs to be properly included in the FAC.
[17] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 13, et seq.
[18] ENO produced 1077 MW of oil/gas natural; 0 MW of coal; 0 MW of hydroelectric power; and 184 WM of nuclear power.
[19] SERI owns an undivided of 90% interest in the Grand Gulf Nuclear Station.
[20] Daily Advertiser v. Trans-La, 612 So.2d 7, 11, n. 1, 24 (1993).
[21] Gulf States Utilities v. Louisiana Public Serv. Comm'n., 578 So.2d 71, 85 (La.1991).
[22] Daily Advertiser v. Trans-La, 612 So.2d at 23.
[23] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 39, et seq.
[24] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 43, et seq.
[25] The "MSS" moniker refers to Middle South Services. In the late 1980s, Middle South Services changed its name to Entergy, and MSS is merely a "holdover" from the old company name. The number "3" indicates that it was the third Service Schedule to be added as an ancillary to the System Agreement.
[26] System lambda is the short run incremental costs of generation.
[27] The incremental cost of fuel is the current market cost of fuel that has not yet been procured for a generating unit.
[28] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No, 55, et seq.
[29] Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 972, 106 S.Ct. 2349, 90 L.Ed.2d 943 (U.S.1986).
[30] Mississippi Power and Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 373-374, 108 S.Ct. 2428, 101 L.Ed.2d 322 (U.S.1988).
[31] See, Central Vermont Public Service Corporation, 84 FERC ¶ 61,194 (dated August 21, 1998).
[32] In Mississippi Power and Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322, MP & L was required to purchase a specific percentage of the output of the grand Gulf nuclear plant.
[33] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 58, et seq
[34] At the time of the 1973 System Agreement, FERC was called the Federal Power Commission, or the "FPC."
[35] Although the 1982 agreement was entered into in April 1982, the System Agreement was approved by the FERC on June 13, 1985 in Opinion No. 234. The System Agreement has been amended subsequent to its approval.
[36] Under the supervision of the Operating Committee, ESI is directed to manage the centralized operations center to dispatch the capacity and energy capability of the Operating Companies, in an efficient, economical and reliable manner.
[37] See, e.g., Mississippi Power and Light Co, v. Mississippi ex rel. Moore, 487 U.S. 354, 388, 108 S.Ct. 2428, 2447, 101 L.Ed.2d 322 (1988); Mississippi Industries v. FERC, 808 F.2d 1525 (C.A.D.C.1987); Federal Power Act § 201(b)(1).
[38] Mississippi Power and Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 371, 108 S.Ct. 2428, 101 L.Ed.2d 322; Nantahala Power & Light Co. v. Thomburg, 476 U.S. 953, 966, 106 S.Ct. 2349, 90 L.Ed.2d 943 (U.S. 1986).
[39] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000) Proposed Findings of Fact and Conclusions of Law, No. 71, et seq.
[40] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 101, et seq., citing Middle South Energy, Inc., (Opinion No. 234), 31 FERC ¶ 61,305 at 61,661.
[41] Economic dispatch is defined as "the distribution of total generating requirements among alternative sources for optimum system economy with due consideration of both incremental generating costs and incremental transmission losses." See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 122.
[42] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 106, et seq
[43] The historic reliance of the System on pint account purchases, as opposed to direct purchase by individual Operating Companies, is appropriate because the best way to minimize total System costs is to evaluate and make all energy purchase on a System basis. See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 214.
[44] This finding of fact also provides that an exception exists pursuant to the operation of MSS-3, "as discussed in Finding 116. . . ." Delaney's Finding of Fact and Conclusions of Law, No. 116 provides that "[i]n each hour, ELI's allocated share of joint account purchases is considered an ELI source for the purposes of calculating ELI's total sources in that hour to determine the allocations to and from the Exchange pursuant to Service Schedule MSS-3."
[45] See Delaney, LPSC Executive Order No. 23356, (December 13, 2800), Proposed Findings of Fact and Conclusions of Law, No. 120, et seq.
[46] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000) Proposed Findings of Fact and Conclusions of Law, Nos. 122, et seq.
[47] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 125.
[48] See infra p. 23 and note 27.
[49] The incremental transmission loss factor represents the incremental or avoidable transmission losses that would occur as a result of increasing generation at a particular generating unit or energy source.
[50] The term heat rate refers to the energy efficiency characteristics of a generating unit.
[51] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 147.
[52] In the hourly, daily, and monthly wholesale power market solicitations, the System relied mainly on telephone communications to survey the market and collect pricing information. All such conversations were tape-recorded so that the System has a record in the event that a disagreement arises as to the terms and conditions of the transaction that was entered into over the telephone. It is the System's practice to reuse the tapes after three months, when the recording is no longer necessary. In connection with the Delaney litigation, tapes were retained since February 1999 and were available for review by the parties.
[53] See infra p. 23 and note 26.
[54] Delaney, Finding of Fact and Conclusion of Law, No. 180, et seq.
[55] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 191.
[56] See Delaney, LPSC Executive, Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 193, et seq.
[57] On an "after-the-fact" basis, the allocation of energy and related costs is determined monthly via the Intra-System bill. For each hour, the Operating Companies who receive energy through affiliate transactions pay the Operating Companies that supply the energy for affiliate transactions. Entergy exchange through affiliate transactions is price pursuant to the terms of the FERC-approved Service Schedule MSS-3 of the System Agreement. See, Delaney Finding of Fact, and Conclusion of Law No. 197.
[58] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 200, et seq.
[59] "The allegation that low-cost non-affiliate joint purchases are being unfairly channeled . . . ignores the fact that Section 4.03 of the System Agreement specifically requires that all Operating Companies participate in such joint account purchases based on their load responsibility ratios . . ." "to require that all off system purchases of power be allocated to ELI and to other capacity/energy short Entergy Operating Companies would be in violation of § 4.03 of the System Agreement and require FERC approval. Entergy believes that such approval would not likely be granted." Delaney, Proposed Findings of Fact and Conclusions of Law, No. 218.
[60] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, Nos. 221, et seq.
[61] See Delaney, Proposed Findings of Fact and Conclusions of Law, Nos. 225.
[62] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000) Proposed Findings of Fact and Conclusions of Law, No. 247, et seq.
[63] Delaney, LPSC Executive Order No. 23356, (December 13, 2000) Proposed Findings of Fact and Conclusion of Law, No. 248, et seq.
[64] Delaney, LPSC Executive Order No. 23356, (December 13, 2000) Proposed Findings of Fact and Conclusions of Law, No. 248, et seq.
[65] Delaney, LPSC Executive Order No. 23356, (December 13, 2000) Proposed Findings of Fact and Conclusions of Law, No. 251.
[66] Delaney, LPSC Executive Order No. 23356, (December 13, 2000)Proposed Findings of Fact and Conclusion of Law, No. 253-254.
[67] Delaney, LPSC Executive Order No. 23356, (December 13, 2000)Proposed Findings of Fact and Conclusion of Law, No. 278 et seq.
[68] See infra p. 15 and note 15.
[69] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000), Proposed Findings of Fact and Conclusions of Law, No. 293, et seq.
[70] The LPSC staff noted that sometimes an invoice would not be received in time to be included in the filing in which the fuel purchase was included. In those cases, it may have been necessary for an entity to call the supplier to determine the amount of the charge for that month, and to supply the actual invoice in the subsequent month. See also, Delaney, Proposed Findings of Fact and Conclusions of Law, No. 295.
[71] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000) Proposed Findings of Fact and Conclusions of Law, No. 300, et seq.
[72] See Delaney, LPSC Executive Order No. 23356, (December 13, 2000) Proposed Findings of Fact and Conclusions of Law, No. 370, et seq.
[73] See infra, p. 10, note 7.
[74] As noted earlier in our discussion, the S & WB, intervened in this action.
[75] He noted that the regulations and guidelines concerning Louisiana are contained in "various general and company-specific orders issued by the LPSC and a Louisiana Supreme Court decision."
[76] Mr. Janssen classified this practice as a wrongful profits issue.
[77] Mr. Janssen noted that this was an overbilling issue.
[78] In 1974 the Department of Utilities of the City of New Orleans expressly informed Entergy New Orleans that SFI Period Costs did not belong in the FAC. In 1977 the FERC informed Entergy utilities as a whole) that Period Costs were non-fuel costs, and should not be filed in its FACs. Additionally, in the 1980s and 1990s ENO was informed that Period Costs were properly recoverable in base rates via audits that were performed of the FAC. Additionally, when the FERC audited ENO, the FERC clearly stated that these costs should not be accounted for as fuel costs.
[79] Mr. Janssen classified this practice as an overtoiling issue.
[80] Mr. Janssen calculated that the interest due on the overcharges, based on a simple interest calculation, is $35 million. A compound interest amount due on the overcharges is $61 million.
[81] Mr. Chavanne identified that this information was found in Schedule SWB-1 in'the Delaney proceedings.
[82] The information reviewed was one of the Price Waterhouse audit reports.
[83] The fourth issue raised by Mr. Chayanne relates to the transmission constraint implications of the Amite South area.
[84] Both experts of the appellants.
[85] In 1974, due to a natural gas shortage and rising fuel costs, the ENO submitted an application to the City Council for an increase in electric and gas rates. During the proceeding that came out of the application, the issue of the effect of SFI on the fuel adjustment charge was specifically raised. After an investigation was conducted by the firm of Wilsey & Ham concerning the relationship between ENO and SFI, a report was issued which concluded that the price paid for fuel purchased from SFI was lower than prices that would have been paid to other suppliers by each individually utility company. The study also found that rates paid by New Orleans customers, including the application of the fuel oil adjustment clause, are lower than they might otherwise have been.

On November 5, 1975, the City Council adopted Resolution No. R-75-178, which allowed ENO to continue its recovery of SFI Period Costs through the FAC. The City Council notes that under the circumstances of the 1974-75 rate case, it was left with two alternative courses of action: (1) either approve base rates that included SFI Period Costs and order that such costs no longer recovered through the FAC or, (2) approve base rates that did not include SFI Period Costs, in which case, the costs would continue to be recovered through the FAC.
ENO notes that the City Council's decision to take the second course of action had the effect of affirming the method of recovering SFI Period Costs through the FAC, even though it did not expressly address it in the resolution. In support of this contention, the City Council cites University of Pennsylvania v. Pennsylvania Public Utility Com'n, 86 Pa. Cmwlth. 410, 485 A.2d 1217, 1223, which held that, "It has never been the law . . . `that an administrative agency must set forth findings specifically noting the rejection, and reasons for such rejection, of each and every minor allegation by a party.'" It also held that "[when] the Commission was faced simply with a choice of actions, each fully explained in the record the Commissions choice in each case amounted to an implicit acceptance of the thesis of the party which prevailed and a rejection of the contentions of the loser," (citing Application of Midwestern Fidelity Corp., 26 Pa.Cmwlth. 211, 230 n. 6, 363 A.2d 892, 902 n. 6 (1976)).
[86] The seventh audit, Mr. Penzeca noted, was the "Main, LaFrenz" special-purpose review that was conducted for the Department of Utilities in 1974.
[87] Mr. Louiselle also testified to this.
[88] In Hall, 453 U.S. at 577-78, 101 S.Ct. 2925 (1981), the U.S. Supreme Court explained:

Except when the Commission permits a waiver, no regulated seller of natural gas may collect a rate other than the one filed with the Commission. § 4(d), 52 Stat. 823, 15 U.S.C. § 717c(d). these straightforward principles underlie the "filed rate doctrine," which forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority. See, e.g., T.I.M.E. Inc. v. United States, 359 U.S. 464, 473, 79 S.Ct. 904, 909, 3 L.Ed.2d 952 (1959). The filed rate doctrine has its origins in this Court's cases interpreting the Interstate Commerce Act, see, e.g., Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520-521, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939); Pennsylvania R. Co. v. International Coal Co., 230 U.S. 184, 196-197, 33 S.Ct. 893, 895-896, 57 L.Ed. 1446 (1913), and has been extended across the spectrum of regulated utilities. "The considerations underlying the doctrine . . . are preservation of the agency's primary jurisdiction*578 over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant," City of Cleveland v. FPC, 174 U.S.App.D.C. 1, 10, 525 F.2d 845, 854 (1976). See City of Piqua v. FERC, 198 U.S.App.D.C. 8, 13, 610 F.2d 950, 955 (1979).
[89] Citing Gulf States Utilities Co. v. Louisiana Public Service Comm'n, 578 So.2d 71, 78 (La. 1991).
[90] Id.
[91] This is an issue which the City Council denies to have issued findings.
[92] "That without which the thing cannot be." Black's Law Dictionary, Sixth Edition.
[93] Citing Entergy Services, Inc. Opinion No. 415, 80 FERC ¶ 61,197 at 691 (1997). (citations omitted)
[94] The review was dated September 30, 1991.
[95] FERC, Docket No. FA-17-000.
[96] The other transmission line, Mr. Movish testified, is Conway-Bagatelle 230 kV transmission line. In the event of a crisis, Mr. Movish testified that the Conway-Bagatelle transmission line would be loaded to approximately 130 percent of its maximum rating. Additionally, he testified that another transmission problem to the Amite South service area is the outage of Entergy's McKnight-Franklin 500 kV transmission line. He noted that loss of this line can and will cause severe overloads upon other transmission lines.
[97] City Council Ordinance No. 10663.
[98] FERC accounts 501, 518, 547, 555.
[99] The AECC is an electric cooperative corporation organized and operating under Act at 342 of the Acts of Arkansas of the 1937. The AECC is wholly owned by various electric distribution cooperatives, and is unaffiliated with any Entergy entity. The cooperatives distribute electricity in areas in which EAI, operates an electric transmission system and related facilities.
[100] The monthly installment on the AECC added was approximately $1,125 million dollars.
[101] This amount was billed as ENO's pro rata share of the costs of the AECC contract.
[102] The appellants indicated that "the correct test for eligibility does not concern the label attached to a cost."
[103] See infra p. 16 and note 16.
[104] See infra p. 1 and note 1.
[105] Per the record, "the EAI/AECC PCITA is an arms-length transaction between two unafiliated entities."
[106] See infra, p. 1 note 1.
[107] The appellants parenthetically note that the affiliate offers appear more expensive than the fictitiously discounted affiliate power.
[108] The appellants also allege that ENO never acknowledged the use of the margin in any pleading filed with the City Council.
[109] In Entergy Gulf States, Inc., v. La. Pub. Serv. Comm'n, the Supreme Court wrote that EGSI did not carry its burden of showing the reasonableness of its decision-making process under the prudence analysis because it witnesses only testified to an "`after-the-fact' explanation" and the "utility could not supply contemporaneous documentation of its decision-making processes."
[110] Dr. Roach indicated that in referring to affiliate purchases, he meant its purchases of electricity from other Entergy owned companies; most notably, other Operating Companies.
[111] In the Delaney Proposed Findings of Fact and Conclusions of Law, specifically at No. 152, the LPSC specifies that "[t]he Monte Carlo analysis demonstrates the conceptual basis for the use of the margin. Although the model cannot and should not be used to quantify a specific amount of margin it demonstrates that the technique of using the margin when a purchaser is faced with multiple offers results in lower energy costs then if the margin is employed."
[112] In addition to the above six imprudent procurement practices. Dr. Roach, suggested that the operation of the Michoud power plant which is run at its minimum load capacity. He indicated that the facility is run even though the power is very expensive.
[113] The City Council's summary of the how the margin works appears in the record, specifically in the testimonies of George J. Panzeca, and Mr. Bruce Ralston, infra.
[114] Mr. Louiselle bases his discussion of the margin on the testimony provided by Dr. Roach. Dr. Roach's testimony is addressed below.
[115] Regarding the alleged manipulation of the FAC, Mr. Louiselle noted the practices that the Appellants claim are imprudent are: the inclusion of SFI Period Costs; interest on overrecoveries; alleged wrongful profits; the inclusion of "D and D" fees and Grand Gulf burn charges; and ad valorem taxes, in ENO's FAC.
[116] Mr. Turner testified that he was Secretary of the Operating Committee since August 1996. He also testified that he is an employee of ESI.
[117] Presently, the Operating Committee meets once per month.
[118] The responsibility ratio does not directly correspond with the share of the vote.
[119] Mr. Turner indicated that this was the chief complaint in Dr. Roach's testimony.
[120] Power Coordination, Interchange, and Transmission Service Agreement, infra.
[121] Mr. Dan Packard has since retired from Entergy.
[122] At the time the reallocation was made, die Operating System had already purchased the energy, and the extenuating circumstances were that ENO had lost over 60 percent of its generation due to power outages. However, Mr. Turner distinguished that this was different than END taking the initiative to make direct purchases for its own account.
[123] Mr. Turner, another Entergy employee, was a member of the long-term planning group.
[124] He noted that Entergy System imports about 3,500 megawatts. He testified that even if the system were importing 3,500 megawatts in every hour, this would only amount to "little over than 30 million MW hours per year."
[125] In City Council Resolution No. R-04-66, the Council found that:

Entergy introduced several studies to demonstrate that he purchased" as much off system third-party power as could be expected, in light of the system reliability and economic considerations, that are rejected fuel offers based upon price when the purchase price offered was lower than the avoided cost, and in those limited instances it more often than not subsequently purchased power at even lower costs than had been rejected.
[126] In the instant case, the parties both stipulated that the issues presented are very similar to those raised in Delaney. Furthermore, both the City Council and the district court adopted the LPSC's findings from Delaney in their reasons for judgment.